UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PARKSIDE CAPITAL LLC, On Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>CONSTAR INTERNATIONAL INC., CHARLES F. CASEY, WILLIAM G. LITTLE, MICHAEL J. HOFFMAN, JAMES C. COOK, ALAN W. RUTHERFORD, JOHN W. CONWAY, ANGUS F. SMITH and FRANK J. MECHURA,<br><br>Defendants. | Civ. Action No.<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933<br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

**INTRODUCTION AND OVERVIEW**

1. This is an action on behalf of purchasers of Constar International Inc. ("Constar" or "the Company") stock, pursuant to Constar's Initial Public Offering ("IPO"). Constar is a wholly owned subsidiary of Crown Cork & Seal Co. ("Crown"). Crown is a leading supplier of packaging products to consumer marketing companies around the world. Constar's headquarters are located in Philadelphia, Pennsylvania.

2. In November 2002, Constar completed an IPO of 10.5 million shares of stock pursuant to a Prospectus/Registration Statement. The IPO, which was solely comprised of shares sold by Crown, was priced at $12 per share for total proceeds of $117 million after underwriting discounts and commissions. In fact, the Prospectus/Registration Statement was materially false and misleading and failed to disclose, among other things, that:

a. The Company was then experiencing an unseasonably low demand in its carbonated soft drink bottle business;

b. The Company was then experiencing an adverse impact in the Company's revenue stream due to the "pass-through" of lower resin costs;

c. The Company was then experiencing an adverse trend in the Company's conventional PET container shipments;

d. The Company's management had changed its focus just prior to the IPO and purposely reduced its higher volume preforms,[1] causing a Q4 revenue shortfall; and

e. The Company's goodwill was impaired and defendants failed to timely take an impairment charge.

3. As this adverse information was disclosed, the Company's shares eventually plummeted to $5.00 per share.

4. Public investors who purchased shares traceable to the IPO based on Constar's representations, paying $12 per share for Constar stock, have suffered tens of millions of dollars in damages.

**JURISDICTION AND VENUE**

5. The claims herein arise under §§11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§77k and 77o. Jurisdiction is conferred by §22 of the Securities Act and venue is proper in this District pursuant to §22 of the Securities Act and 28 U.S.C. §1391(b).

6. The violations of law complained of herein occurred in substantial part in this District, including the preparation and dissemination of materially false and misleading statements and the omission of material information complained of herein. Constar maintains its corporate headquarters and principal place of business at One Crown Way, Philadelphia, Pennsylvania. In connection with the conduct complained of herein, defendants, directly or indirectly, used the means

---

[1]"Preforms" are test tube shaped intermediate products in the manufacturing process for bottles and are purchased by customers or other PET container manufactures that operate equipment to convert preforms into bottles.

and instrumentalities of interstate commerce, including the mails and interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

7. Plaintiff Parkside Capital LLC purchased shares of Constar common stock pursuant to the Company's Registration Statement and Prospectus filed in connection with its November 2002 IPO. Plaintiff's signed certification, executed pursuant to the federal securities laws, is attached hereto.

8. Defendant Constar is a wholly owned subsidiary of Crown, a leading supplier of packaging products to consumer marketing companies around the world.

9. Defendant Charles F. Casey is, and at all relevant times was, a director of the Company and signed the Registration Statement.

10. Defendant William G. Little is, and at all relevant times was, a director of the Company and signed the Registration Statement.

11. Defendant Michael J. Hoffman is, and at all relevant times was, a director of the Company and signed the Registration Statement.

12. Defendant James C. Cook is, and at all relevant times was, a director of the Company and signed the Registration Statement.

13. Defendant Alan W. Rutherford is, and at all relevant times was, a director of the Company and signed the Registration Statement.

14. Defendant John W. Conway is, and at all relevant times was, a director of the Company and signed the Registration Statement.

15. Defendant Angus F. Smith is, and at all relevant times was, a director of the Company and signed the Registration Statement.

16. Defendant Frank J. Mechura is, and at all relevant times was, a director of the Company and signed the Registration Statement.

17.     For purposes of this Complaint, the defendants named in ¶¶9-16 will be referred to as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this action as a class action, pursuant to Fed. R. Civ. P. 23(a) and (b)(3), on behalf of a class consisting of all persons who purchased Constar common stock in or traceable to the Company's November 2002 IPO (the "Class").  Excluded from the Class are the defendants named herein, the officers and directors of Constar, members of the immediate families of such officers and directors, and subsidiaries and affiliates of defendants and their officers and directors. Class members are so numerous that joinder of them is impracticable. Common questions of law and fact predominate and include whether defendants: (i) violated the Securities Act; (ii) whether the Prospectus/Registration Statement misrepresented material facts; and (iii) the extent of and appropriate measure of damages.

19.     Plaintiff's claims are typical of all Class members' claims.  Plaintiff has selected counsel experienced in class and securities litigation and will fairly and adequately protect the interests of the Class.  Plaintiff has no interests antagonistic to those of the Class.

20.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class individually to seek redress for the wrongful conduct alleged.

21.     Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

## BACKGROUND

22.     Constar had been a division of Crown since 1992.  By February 4, 2002, Crown had a $400 million term loan to repay, and that was just a prelude to the $350 million it would have to pay bondholders in September 2002 and the $2.5 billion in bank debt due in 2003.  Crown lacked

the EBITDA to meet those payments and needed to scare up $1.2 billion to $1.5 billion through asset sales.

23.     On November 12, 2002, Crown issued a press release entitled "Crown Cork & Seal Announces New Terms for Proposed Initial Public Offering of Constar International Inc." The press release stated in part:

> Crown Cork & Seal Company, Inc. today announced that its wholly-owned subsidiary, Constar International, Inc., has filed an amended registration statement with the Securities and Exchange Commission containing new terms for Constar's proposed initial public offering. The price range for the offering of Constar's common stock is expected to be between $12.00 and $14.00 per share. Crown intends to sell 10.5 million shares of Constar common stock, representing approximately 88% of the outstanding common stock of Constar, and Crown has granted the underwriters of the offering an over-allotment option to purchase all or a portion of the remaining 1.5 million shares of Constar common stock owned by Crown. Constar will not sell any shares and therefore will not receive any proceeds of the offering. Constar intends to sell $175 million of senior subordinated notes due 2012.
>
> Constar also expects to enter into a $250 million credit facility consisting of a $150 million term loan and a $100 million revolving loan facility. A $350 million note from Constar to Crown will be repaid from the proceeds of the senior subordinated notes offering, the term loan and a portion of Constar's initial borrowings under the revolving loan facility. Crown expects to use the net proceeds from its sale of Constar shares and the proceeds from the repayment by Constar of its $350 million note to Crown to repay a portion of Crown's outstanding indebtedness.

24.     Thus, the IPO was important to Crown not only to create an efficient trading market in Constar common stock,[2] but to also pay down the debt load on Crown's balance sheet and stave off a potential bankruptcy of Crown.

**SUBSTANTIVE ALLEGATIONS**

25.     On November 14, 2002, the Registration Statement for the 10.5 million share IPO of Constar common stock was filed with the SEC and priced as follows:

---

[2] Crown maintained an equity ownership in the Company. By creating an efficient market for Constar's shares, Crown enhanced the value of this asset.

5

|                         | **PER SHARE** | **TOTAL**     |
|-------------------------|---------------|---------------|
| Public offering price   | $12.00        | $126,000,000  |
| Underwriting discounts  | $0.84         | $8,820,000    |
| Proceeds to Crown       | $11.16        | $117,180,000  |

26.     The IPO was accomplished via the Registration Statement and Prospectus filed with the SEC and declared effective on November 14, 2002. The Individual Defendants signed the Registration Statement and collectively were responsible for the accuracy of the offering documents.

27.     With respect to the PET packaging market, the Prospectus, dated November 18, 2002, stated:

> We are a leading global producer of PET, or polyethylene, terephthalate, plastic containers for food and beverages. We believe that PET represents one of the most rapidly growing packaging markets worldwide. We are one of the largest North American suppliers of PET containers for conventional PET applications in soft drinks and water. We also have an expanding position in the growing custom PET market. Custom PET containers are used for food, juices, teas, sport drinks, new age beverages, beer and flavored alcoholic beverages, all of which require advanced technologies, processing know-how and innovative designs.
>
> The PET packaging market is expanding as a result of growth in the beverage and food markets and conversions into PET packaging from traditional packaging materials such as glass, metal, and paperboard. In conventional PET applications, growth is largely due to new introductions of multi-pack single serve soft drinks in supermarkets and club stores and the increased popularity of single serve bottled water. Growth in custom applications is driven by demand for single serve beverages and convenience food products, and is facilitated by consumer preferences for PET's combination of transparency, resealability, light weight, and shatter resistance. Until recently, the limited availability of commercially proven technologies constrained the growth of custom PET applications. We believe that we have the patented technology and full-service deign capabilities necessary to capture expected large scale conversion opportunities for PET packaging.

28.     With respect to the Company's strategy, the Prospectus stated:

> Our objective is to grow and compete profitably in the PET container packaging market. We seek to lead conversions from other packaging materials in new PET product categories, while we continue to grow with our customers and our markets in conventional or established custom PET applications. We will continue to focus on the development and commercialization of bottle design, bottle forming and technologies that allow us to further leverage our existing manufacturing and distribution infrastructure, and our strong customer relationships. This particularly applies to the significant opportunities we believe exist in the custom PET market. In support of these strategies, we plan to be a leader in all the markets we serve by:

- continuing to serve the demanding needs of the world's leading consumer product companies with the PET products, services, product development and reliability they need to support their markets;

- investing in capacity expansion in all categories of PET bottle markets where profitable growth can be supported by appropriate contractual terms with our customers;

- remaining a high-quality, low-cost operator implementing best-practices manufacturing disciplines in every manufacturing activity we undertake;

- favoring the overhead efficiency, flexibility and utilization benefits of large scale manufacturing plants while maintaining the geographic presence that allows us to offer freight efficiency and service convenience to our customers; and

- attracting and retaining the skills and talent necessary to achieve our goals while fostering an environment of service and teamwork throughout our workforce.

29. The Prospectus also reported Constar's financial results for 2001 and the nine months ended September 30, 2002. For the nine months ended September 30, 2002, Constar reported that it had income before change in accounting for goodwill of $17.1 million and a loss of $50.1 million after the change in accounting.

30. Each of the statements relating to Constar's business plan, service and ability to carry out its business plan in the Prospectus was materially false and misleading when made. The true facts were:

    a. The Company was then experiencing an unseasonably low demand in its carbonated soft drink bottle business;

    b. The Company was then experiencing an adverse impact in the Company's revenue stream due to the "pass-through" of lower resin costs;

    c. The Company was then experiencing an adverse trend in the Company's conventional PET container shipments;

    d. The Company's management had changed its focus just prior to the IPO and purposely reduced its higher volume preforms, causing a Q4 revenue shortfall; and

    e.  The Company's goodwill was impaired and defendants failed to timely take an impairment charge.

## CONSTAR'S FALSE FINANCIAL RESULTS

  31.  In the Prospectus, Constar falsely reported its results for the nine months ended September 30, 2002 and 2002 and the first quarter of 2003 through its failure to make adequate and timely accruals for impairment of goodwill.

  32.  Constar's reported results and its representations concerning them were materially false and misleading when made due to the Company's failure to record goodwill impairment, and were not a fair presentation of Constar's results and were presented in violation of Generally Accepted Accounting Principles ("GAAP") and SEC rules.

  33.  GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  (17 C.F.R. §210.10-01(a)).

  34.  GAAP, as set forth in FASB Statement of Standards ("SFAS") No. 142, requires that companies review goodwill to determine if the assets are impaired:

> 18.  Goodwill shall not be amortized.  Goodwill shall be tested for impairment at a level of reporting referred to as a reporting unit. (Paragraphs 30-36 provide guidance on determining reporting units.)  Impairment is the condition that exists when the carrying amount of goodwill exceeds its implied fair value.[3]  The

---

[3]  The fair value of goodwill can be measured only as a residual and cannot be measured directly.  Therefore, this Statement includes a methodology to determine an amount that achieves a reasonable estimate of the value of goodwill for purposes of measuring an impairment loss.  That estimate is referred to herein as the *implied fair value of goodwill.*

two-step impairment test discussed in paragraphs 19-22 shall be used to identify potential goodwill impairment and measure the amount of a goodwill impairment loss to be recognized (if any).

**Recognition and Measurement of an Impairment Loss**

19. The first step of the goodwill impairment test, used to identify potential impairment, compares the fair value of a reporting unit with its carrying amount, including goodwill. The guidance in paragraphs 23-25 shall be used to determine the fair value of a reporting unit. If the fair value of a reporting unit exceeds its carrying amount, goodwill of the reporting unit is considered not impaired, thus the second step of the impairment test is unnecessary. If the carrying amount of a reporting unit exceeds its fair value, the second step of the goodwill impairment test shall be performed to measure the amount of impairment loss, if any.

20. The second step of the goodwill impairment test, used to measure the amount of impairment loss, compares the implied fair value of reporting unit goodwill with the carrying amount of that goodwill. The guidance in paragraph 21 shall be used to estimate the implied fair value of goodwill. If the carrying amount of reporting unit goodwill exceeds the implied fair value of that goodwill, an impairment loss shall be recognized in an amount equal to that excess.

SFAS No. 142, ¶¶18-20.

35. Contrary to GAAP, Constar failed to adequately reflect the deterioration in value of the goodwill so as to inflate reported earnings. As of September 30, 2002 and December 31, 2002, Constar reported goodwill of $331.8 million. The Prospectus also represented that it reported its results in conformity with SFAS No. 142.

36. The Company has ultimately recorded a write-off for $183 million to reflect the impairment in goodwill. In fact, this asset was impaired at the time Constar reported its September 30, 2002, its December 31, 2002 and its first quarter 2003 results but Constar failed to record this impairment.

37. Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

a. The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

    b.  The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

    c.  The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

    d.  The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

    e.  The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

    f.  The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

    g.  The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

h. The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

## COUNT I

### Against All Defendants

### for Violation of §11 of the Securities Act

38. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein, except that to the extent any allegations contained above may be interpreted to sound in fraud, such allegations are expressly not incorporated under this Count.

39. This Count is asserted against Constar and the Individual Defendants for violations of §11 of the Securities Act, 15 U.S.C. §77k, on behalf of all persons who purchased shares of Constar stock issued in connection with or traceable to its IPO commenced in November 2002, as described above.

40. Constar was the registrant for the securities issued in the IPO in November 2002 pursuant to the Registration Statement and Prospectus, and caused the Registration Statement to be signed on its behalf. As the registrant and as a signer of the Registration Statement, Constar is liable to plaintiff and Class members for the misstatements and omissions contained in the Prospectus. The Individual Defendants were officers and/or directors of the Company at the time of the November 2002 IPO, and, along with Constar, were responsible for the contents of the Prospectus. The Individual Defendants are signatories of the Registration Statement, either personally or by attorney-in-fact.

41. Defendants issued, caused to be issued, and participated in the issuance of the materially false and misleading Registration Statement and Prospectus, which misrepresented and failed to disclose, *inter alia*, the material facts concerning Constar's business and financial results, as set forth herein.

42.     Plaintiff and other members of the Class purchased Constar common stock pursuant and traceable to the November 2002 IPO without knowledge of the untruths or omissions alleged herein. Plaintiff and the other members of the Class could not have reasonably discovered the nature of defendants' untruths and omissions.

43.     Plaintiff and the other members of the Class have sustained damages. The value of Constar common stock has declined precipitously due to and subsequent to the disclosure of defendants' violations.

44.     This action was brought within one year after the discovery of the untrue statements and omissions and less than three years after the IPO.

45.     The defendants are liable to plaintiff and the other members of the Class.

## COUNT II

### Against the Individual Defendants for Violations of §15 of the Securities Act

46.     Plaintiff repeats and realleges each and every allegation contained above as fully set forth herein, except that to the extent any allegations above sound in fraud, such allegations expressly are not incorporated in this Count.

47.     This Count is asserted against the Individual Defendants for violation of §15 of the Securities Act, 15 U.S.C. §77o.

48.     The Individual Defendants, by virtue of their positions, stock ownership, and specific acts as described herein, had the power, and exercised the same, to control the representations and actions of Constar.

49.     Each of the Individual Defendants was a culpable participant and is jointly and severally liable to plaintiff and the members of the Class as a "control person" pursuant to §15 of the Securities Act.

50.     As a result of the foregoing, plaintiff and the members of the Class have suffered damages.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff on its own behalf, and on behalf of the other members of the Class, prays for judgment as follows:

    A.    Declaring this action to be a proper class action, certifying plaintiff as the Class representative and its counsel as Class counsel;

    B.    Declaring and determining that the defendants violated the federal securities laws by reason of their conduct as alleged herein;

    C.    Awarding money damages against the defendants, jointly and severally, in favor of the plaintiff and the other members of the Class for all losses and injuries suffered as a result of the acts and transactions complained of herein, together with pre-judgement interest on all of the aforesaid damages which the Court shall award from the date of said wrongs to the date of judgment herein at a rate the Court shall fix;

    D.    Awarding plaintiff its costs and expenses incurred in this action, including reasonable attorneys', accountants', and experts' fees; and

    E.    Awarding such other relief as may be just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: September 5, 2003

LAW OFFICES BERNARD M. GROSS, P.C.
BY:

**DEBORAH R. GROSS (I.D. No. 44542)**
1515 Locust Street, 2nd Floor
Philadelphia, PA 19102
Telephone: 215-561-3600
Fax: 215-561-3000

MILBERG WEISS BERSHAD
 HYNES & LERACH LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
401 B Street, Suite 1700
San Diego, CA 92101
Telephone: 619-231-1058
Fax:  619-231-7423

CAULEY GELLER BOWMAN
 & RUDMAN, LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
200 Broadhollow Road, Suite 406
Melville, NY 11747
Telephone: 631-367-7100
Fax:  631-367-1173 (fax)

SCHIFFRIN & BARROWAY, LLP
MARC A. TOPAZ
Three Bala Plaza East
Suite 400
Bala Cynwyd, PA  19004
Telephone: 610/667-7706

FRUCHTER & TWERSKY
JACK FRUCHTER
One Pennsylvania Plaza
New York, NY 10119
Telephone: 212/687-6655

**Attorneys for Plaintiff**