**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE CONSTAR INT'L INC.** | ) | **Master File No. 03cv05020** |
| **SECURITIES LITIGATION,** | ) | |
| | ) | **CLASS ACTION** |
| **This Document Relates To:** | ) | |
| | ) | |
| **ALL ACTIONS.** | ) | |
| | ) | |

## O R D E R

AND NOW, this ____ day of _____, 2004, upon consideration of the

Motion of Defendants to Dismiss the Consolidated Amended Class Action Complaint (the

"Motion"), and the response thereto, it is hereby ORDERED and DECREED as follows:

1.    The Motion is GRANTED.

2.    The Consolidated Amended Class Action Complaint is hereby
      DISMISSED with PREJUDICE.

3.    The Clerk of the Court shall mark this matter as CLOSED.


_____
Judge Ludwig

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE CONSTAR INT'L INC. SECURITIES LITIGATION,<br><br>This Document Relates To:<br><br>ALL ACTIONS. | Master File No. 03cv05020<br><br>__CLASS ACTION__ |

### MOTION OF DEFENDANTS TO DISMISS
### THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Defendants Constar International, Inc., Crown Cork & Seal Company, Inc.,

Charles F. Casey, William G. Little, Michael J. Hoffman, James C. Cook, Alan W. Rutherford,

John W. Conway, Angus F. Smith and Frank J. Mechura, hereby move this Honorable Court,

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for the entry of an Order

dismissing the Consolidated Amended Class Action Complaint with prejudice.  Grounds

supporting this Motion are set forth in the accompanying Memorandum.

Respectfully,

Steven B. Feirson
Michael L. Kichline
Michael E. Baughman
Dechert LLP
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103
(215) 994-2489

Attorneys for Defendants Constar
International, Inc., Crown Cork &
Seal Company, Inc. and the
Individual Defendants

Dated: September 23, 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE CONSTAR INT'L INC. SECURITIES LITIGATION, ) ) ) This Document Relates To: ) ) ALL ACTIONS. ) ) | Master File No. 03cv05020 <br><br> CLASS ACTION |

MEMORANDUM IN SUPPORT OF
MOTION OF DEFENDANTS TO DISMISS
THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Steven B. Feirson
Michael L. Kichline
Michael E. Baughman
Scott A. Thompson
Dechert LLP
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103
(215) 994-2489

Attorneys for Defendants Constar
International, Inc., Crown Cork &
Seal Company, Inc. and the
Individual Defendants

Dated: September 23, 2004

## TABLE OF CONTENTS

INTRODUCTION ...............................................................................................................1

BACKGROUND .................................................................................................................3

ARGUMENT ...................................................................................................................11

   I.     MOTIONS TO DISMISS WITH PREJUDICE ARE ROUTINELY
           GRANTED IN SECTION 11 CASES ................................................................12

   II.    THE COURT MUST DISMISS A COMPLAINT THAT
           FAILS ADEQUATELY TO PLEAD ONE ALLEGED FALSE AND
           MISLEADING STATEMENT IN THE REGISTRATION STATEMENT ..............14

          A.   Plaintiffs Must Specifically Identify the Alleged False or Misleading
               Statements ...............................................................................................14

          B.   Plaintiffs Must Plead Sufficient Facts to Establish Materiality ...........14

          C.   Forward-Looking Statements: the "Bespeaks Caution" Doctrine ....... 17

   III.   AS A THRESHOLD MATTER, THE STORIES TOLD BY THE
           "CONFIDENTIAL WITNESSES" ARE IRRELEVANT,  UNRELIABLE
           AND INACTIONABLE ....................................................................................19

   IV.   PLAINTIFFS FAIL TO ALLEGE ANY VIABLE SECTION 11 THEORY .............21

          A.   Crown's Financial Situation ...................................................................22

          B.   Constar's Post-IPO Financial Condition.................................................24

          C.   Future Capital Expenditures and Capacity Expansion............................26

          D.   Machinery and Technology .....................................................................33

          E.   Price of Resin..........................................................................................40

          F.   Goodwill .................................................................................................42

   V.    THE CLAIMS AGAINST THE INDIVIDUALS AND CROWN MUST BE
           DISMISSED BECAUSE  PLAINTIFFS FAILED TO DEMONSTRATE A
           COGNIZABLE SECTION 11 VIOLATION AND THUS CANNOT
           ESTABLISH SECTION 15 LIABILITY ...........................................................46

CONCLUSION..................................................................................................................47

## EXHIBITS

Constar's Registration Statement ................................................................................Tab A

Summary of Reasons Why the Amended Complaint Fails as a Matter of Law ...................Tab B

Facial Indicia Of Unreliability and Implausibility of Confidential Witnesses .....................Tab C

Constar's July 29, 2003 Press Release.................................................................................Tab D

Constar's August 14, 2003 Press Release............................................................................Tab E

Relevant Stock Price History ............................................................................................Tab F

## INTRODUCTION

In November 2002, Crown Cork & Seal Company, Inc. ("Crown") conducted an initial public offering ("IPO") in which it sold almost all of the common stock of its subsidiary, Constar International Inc. ("Constar" or the "Company"), to the investing public. Constar is a Philadelphia-based manufacturer of conventional and custom PET (polyethylene terephthalate) plastic containers for the food and beverage industries. Its customers include many of the world's leading branded consumer products companies, including PepsiCo, Coca-Cola, Dr. Pepper, 7-Up and Unilever foods. In connection with the IPO, Constar issued a Registration Statement — reviewed and declared effective by the SEC — providing investors with extensive and detailed information about the Company, its business and finances, its relationship with Crown, and the terms of the offering. This action, based on Section 11 of the Securities Act of 1933, is brought by investors who claim that they lost money because "Constar was not the company that defendants represented" in the Registration Statement.

In their sprawling 60-page Consolidated Amended Class Action Complaint ("Amended Complaint"), plaintiffs attempt to distract attention from their burden of identifying specific supposedly misleading misrepresentations *in the IPO Registration Statement*. They do this by focusing on a series of stories attributed to sixteen "confidential witnesses." In fact, plaintiffs do not make any real effort to meet their pleading burden until page 37 of the Amended Complaint, when finally, buried in the midst of other allegations, plaintiffs make a pass at setting forth what it is that is supposedly misleading. Significantly, apparently as part of their strategy to focus attention elsewhere, the plaintiffs decline to provide the Court with the most basic

document to determine the merits of their claim — the Registration Statement. This approach is clearly intended to create the illusion of a securities violation where none exists.[1]

It is important to note in any analysis of the Amended Complaint that the stories attributed to these "confidential witnesses" add nothing to the claims. It is never difficult, especially in the case of a company with over $700 million in sales and fourteen manufacturing plants world-wide, to find former employees or competitors who are willing to volunteer hearsay or a recollection of a long ago event that concerns a machinery breakdown, product defect, or lost customer. But, half of the "confidential witnesses" relied on by plaintiffs were not even employed at Constar at the time of the IPO. The other half provide little more than anecdotal accounts of isolated, minor problems at specific plants — which is all these low level former employees and competitors could provide. Most of these "problems" occurred years before the IPO, and even if they had an impact on Constar as a whole (which is not alleged), that impact would have been reflected in the disclosed and unchallenged sales and profit figures set forth in the Registration Statement. Accordingly, these accounts of isolated minor incidents stretching back a decade or more prior to the IPO do not support the plaintiffs' chief theory that statements about Constar's **_overall_**, **_worldwide_** operations **_at the time of the IPO_** were false.

When the side-show of the "confidential witnesses'" isolated musings is cleared away, none of the actual statements in the Registration Statement that plaintiffs claim were false

---

[1]     Defendants attach a copy of the Registration Statement hereto as Exhibit A. The Court may properly consider this document because it is the basis of the plaintiffs' claims. See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (holding a court may consider a document "integral to or explicitly relied upon in the complaint" on motion to dismiss).

or misleading can support a viable Section 11 claim.  As the defendants demonstrate below,

many of the challenged statements are "forward-looking" statements that were accompanied by

detailed "risk factors" or cautionary language and, therefore, are protected by the "bespeaks

caution" doctrine.  Information that was allegedly omitted is, in fact, expressly disclosed or

reflected in the specific financial data and analysis in the Registration Statement.  Other

statements are no more than "puffing" or opinion, which is not actionable as a matter of law.

Thus, as detailed below, upon careful review, every allegation fails as a matter of law.[2]

## BACKGROUND

The Registration Statement is the beginning and end of these purported Section 11

claims.  In addition to explicitly disclosing that the IPO was part of a multi-faceted transaction in

which Constar would emerge as a highly-leveraged company, the Registration Statement clearly,

and in great detail, discloses the very "risks and uncertainties" that Constar would face going

forward that plaintiffs now complain they did not know.  On page 1 of the Registration

Statement, investors were warned that **"Investing in our common stock involves risks"** and

were directed to <u>twelve</u> <u>pages</u> of "Risk Factors" to "carefully consider" before investing.  Some

of these "material risks" included the following:

- *"We Had Net Losses In Recent Years And We May Not Generate Profits In The Future"* — "For the fiscal years ended December 31, 2001 and 2000 we had net losses of approximately $13.6 million and $14.8 million respectively."

---

[2] For the Court's convenience, the defendants attach as Exhibit B a chart summarizing the multiple legal defects in each of the plaintiffs' allegations.

3

- ***"We Have To Generate Sufficient Cash Flow To Service Our Debt And Provide For Ongoing Operations"*** — "[W]e may have to defer capital expenditures or sell assets to generate cash . . . . When we complete this offering, we will have approximately $365 million in principal amount of debt . . ."

- ***"Our Debt May Negatively Impact Our Liquidity And Harm Our Competitive Position"*** — "Our debt may have important negative consequences for us, such as . . . limiting our ability to obtain additional financing."

- ***"If We Do Not Have Adequate Funds To Make All Capital Expenditures That Are Necessary To Grow With Our Markets And Maintain Our Facilities, Our Business May Be Impaired And Our Profitability Reduced"*** — "We expect to have substantial capital needs in the near future . . . . If we do not have funds available to satisfy our capital expenditure requirements, we may not be able to pursue our strategy for profitable growth."

- ***"Demand For Our Products May Fluctuate As Our Customers Change Their Product Lines And Marketing Strategies"*** — "[O]ur customers' demand for PET Packaging may fluctuate or decrease permanently."

- ***"The Market For Custom PET Packaging May Not Grow As Large Or As Quickly As We Anticipate"*** — "We believe that an increasing number of products will convert from glass, metal and other packaging to custom PET packaging. A slow rate of conversion would limit our growth."

- ***"Our Business Is Seasonal And Cool Summer Weather May Result In Lower Sales"*** — "In the past, significant changes in summer weather conditions have affected the demand for beverages, which in turn affects the demand for beverage containers."

- ***"We Have A Significant Amount Of Goodwill And A
  Writedown Of Goodwill Could Result In Lower Reported Net
  Income And A Reduction Of Our Net Worth"*** — "We have a
  significant amount of goodwill and a writedown of our
  goodwill would reduce our net worth . . . . One circumstance
  that may indicate the need for an immediate impairment review
  would be if our book value was in excess of our market
  capitalization."

Exh. A at 9-16 (emphasis in original).  Make no mistake, on the heels of a year with over $740

million in sales, Constar believed it was "strongly positioned within the PET industry" because

of its market share in conventional PET applications, opportunities to leverage its strong PET

infrastructure, technology and product development expertise, creative and innovative product

design capability, world class performance and a highly trained workforce. But, as investors

were warned, Constar nevertheless faced substantial "risks and uncertainties."

The market recognized that Constar was a seasoned manufacturer with historical

ups and downs and was operating in an extremely competitive market.  It also recognized that

Constar would be highly leveraged and would face substantial challenges post-IPO.  The

Registration Statement warned investors that:  (i) there has been "no public market for the stock"

and (ii) the "initial public offering price of our stock may not be indicative of the market price

after this offering and our stock price may be volatile." Exh. A at 19.  And, investors were

specifically warned that many factors "could affect" Constar's stock price, including "quarterly

operating results."

In the months following the IPO, the market price for Constar's stock — as

investors had been clearly warned — demonstrated volatility.  The price declined within months

of the IPO by 50%, from $12 to $6.  Then it rebounded by almost 50% to $8.90.  On July 29,

2003, Constar announced its quarterly operating results for the second quarter of 2003:  a net loss

of $4 million.  As CEO Michael J. Hoffman explained:

> The lack of demand for our customer's products was exacerbated
> by poor weather conditions and contributed to reduced volume in
> our domestic conventional market.  Additionally, we experienced
> slower than expected ramp-up of new customers and product
> conversions in the United States and Europe.

July 29, 2003 Press Release, at Exh. D.  On the announcement of these quarterly operating

results, Constar's stock price dropped $2.81 or almost 30%.  In turn, as a result of the drop in the

company's market capitalization, Constar announced a substantial goodwill writedown.

Shortly thereafter, the plaintiffs filed this action.  Despite the fact that Constar's

stock price declined as a result of market factors — the potential for which was disclosed in

advance in the Registration Statement — the plaintiffs now come to this Court seeking to recoup

their investment losses.  But "[t]he securities laws are . . . not an insurance policy against all

losses by investors . . . ."  AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202, 234 (2d Cir.

2000).  Under Section 11 of the Securities Act of 1933, an investor must specifically identify in

the complaint the supposedly materially misleading statements or omissions of material fact in

the Registration Statement.

Here, the plaintiffs have worked overtime to evade this responsibility.  The initial

complaints in this matter avoided any mention of the July 29, 2003 announcement that triggered

the almost 30% stock decline.  That is because the announcement did not disclose any facts that

even remotely suggest that the November 2002 Registration Statement was in any way

misleading.  The announcement merely made clear that several specific "Risk Factors" identified

in the Registration Statement — namely weather, reduced demand, and a slower than expected

rate of conversions from conventional to custom PET containers — had actually materialized and

impacted the Company's "quarterly operating results," which, in turn, "affect[ed] [Constar's]

stock price." Investors had been specifically warned of the potential for these results, and so the

plaintiffs recognized that a claim based solely on the July 29, 2003 announcement would be

defective and summarily dismissed.

Therefore, the plaintiffs spent months roaming through the container/packaging

industry searching for anyone they could find with some axe to grind with Constar. That was

easy enough — the industry is ruthlessly competitive and Constar has been forced to shut down

several plants and lay off employees. The plaintiffs figured that whatever anecdotes, personal

opinions, or hearsay they could scrounge up could be used to paint a portrait of a poorly

managed company. And, while they undoubtedly recognized that claims of poor management

cannot form the basis of a securities claim, they nevertheless hoped that such a picture would

distract attention from the fact that they could not identify any materially false representation or

omission in the Registration Statement. In pursuit of their plan, the plaintiffs managed to recruit

sixteen "confidential witnesses" — all former employees and competitors of Constar — to

produce some anecdotal hearsay information about Constar's pre-IPO business. Examples of

this type of "information" include:

- A "former forklift operator" from the Dallas plant allegedly
  claims that some damaged bottles were shipped to Pepsi. This
  supposedly supports the theory that Constar — a $742 million
  business selling more than 3 billion bottles a year from its 14
  plants worldwide — was "plagued by defective products."

- A "former" employee who left Constar in 1993 — almost ten years before the IPO — apparently told a story that Constar's equipment was "obsolete" in 1996 and thus, he presumes, in 2002.

- A "former" executive of American National Can — a Constar competitor — claims that "a former Constar employee" who went to work for Ball — another Constar competitor — told him that the asset base of Constar was worth between $100 and $150 million a year before the IPO.

And, on and on and on. The first 36 pages of the Amended Complaint are spent regurgitating anecdotes, gossip, and uninformed opinions from dubious and untrustworthy sources.[3]

More importantly, even if the stories attributed to the "confidential witnesses" were to be credited, plaintiffs would still fail to meet their pleading burden. How hard is it to find a handful of former employees — out of several thousand worldwide — to complain about some minor issue or problem, to opine on a management decision, or to generally criticize things? No business is perfect; and Constar did not guarantee investors that it was perfect. On occasion, every global manufacturer has an equipment breakdown, loses a customer or loses a bidding contest. But, these types of events are hardly material, and to extrapolate from individual anecdotes and personal opinions to the broad conclusions asserted in the Amended Complaint — i.e., all of Constar's equipment was "obsolete" or Constar did not possess "technology and product development expertise" or Constar was "not competitive" — is legally unsupportable. Nothing these "confidential witnesses" have to say has any bearing on the truth or falsity of the discussion of Constar's overall, *corporate-wide* business and operations in the

---

[3]    Defendants attach as Exhibit C, a chart summarizing the facial indicia of unreliability and implausibility that require the Court, as a matter of law, to reject the assertions made by the "confidential witnesses."

Registration Statement.  It is only the big picture that matters under the securities laws because the big picture defines what is "material" — i.e., what a reasonable investor would consider to be significant and affect the "total mix" of information.  It is the big picture that the Registration Statement in this case was designed to present — and plaintiffs have failed to plead that it presented that picture inaccurately.

In addition, the plaintiffs Amended Complaint suffers from another fatal defect. There is a complete disconnect between the alleged loss-producing event (the July 29, 2003 announcement) and the alleged misrepresentations/omissions.  In order to present a valid Section 11 case, the plaintiff must allege that a specific fact disclosed in the registration statement (i.e., revenue for a specific time period) was later revealed to be untrue (i.e., the company announces post-IPO that, due to an accounting error, revenue for the period specified in the registration statement was, in fact, overstated).  Here, the plaintiffs claim the Registration Statement misrepresented the state of affairs at Crown, and Constar's post-IPO condition, capital expenditures, capacity expansion, machinery, technology, resin pass-throughs, and goodwill. And, then they claim that these "problems finally came to light" when the July 29, 2003 announcement was made.  But, the announcement does not mention anything having to do with the subjects of the alleged misrepresentations.  Again, the announcement merely confirms that several disclosed "risk factors" had materialized.

While the plaintiffs may hope that the first 36 pages of detours into isolated, minor incidents of a manufacturing problem here, or a contractual problem there, will prevent the Court from ever reaching page 37 of the Amended Complaint, where they actually begin their

9

attempt to state Section 11 claims, this Memorandum confronts each and every alleged "misstatement" head-on.  Not surprisingly, not a single one of them passes muster under the controlling tests for pleading Section 11 claims.  The Amended Complaint exemplifies the judicially-criticized practice of trying to transform an ordinary investment loss into a securities claim by post-hoc attempts to ferret out some misstatement:

> No social purpose would be served by encouraging everyone who suffers an investment loss because of an unanticipated change in market conditions to pick through offering memoranda with a fine-tooth comb in the hope of uncovering a misrepresentation.

Bastian v. Petren Res. Corp., 892 F.2d 680, 685 (7th Cir. 1990) (Posner, J.).  That is precisely what the plaintiffs are doing here — picking through the Registration Statement and using immaterial anecdotes of minor incidents from biased sources concerning events that occurred many years before the IPO to concoct allegations of a securities violation.  Their effort fails.  The Court should dismiss the Amended Complaint with prejudice.

## ARGUMENT[4]

The Supreme Court has observed that securities litigation poses a "danger of vexatiousness different in degree and in kind from that which accompanies litigation in general." Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 189 (1994). And, Congress has expressed a particular concern over abusive securities class actions: "If a defendant cannot win an early dismissal of the case, the economics of litigation may dictate a settlement even if the defendant is relatively confident that it would prevail at trial." S. Rep. No. 104-98, at 14 (1995) (internal quotation marks omitted); see also H.R. Conf. Rep. No. 104-369, at 37 (1995) ("The cost of discovery often forces innocent parties to settle frivolous securities class actions."). Accordingly, "in the context of securities litigation, motions to dismiss serve a special function of weeding out insufficient claims before the discovery process commences." In re Credit Acceptance Corp. Sec. Litig., 50 F. Supp. 2d 662, 670 (E.D. Mich. 1999).

---

[4]   For purpose of this motion to dismiss pursuant to Rule 12(b)(6), this Court must accept "all well pleaded allegations in the complaint as true, [] viewing them in the light most favorable to plaintiff." In re Burlington Coat Factory, 114 F.3d at 1420. In the securities context, however, the Third Circuit allows the trial court to go beyond the pleadings and take judicial notice of prices of stocks traded on national markets, public documents filed with the SEC, and, of course, documents "integral to or explicitly relied upon in the complaint." Id. at 1426. Here, the Court may therefore consider the Registration Statement, Constar's stock price history, and the July 29, 2003 and August 14, 2003 press releases relied upon by the plaintiffs. See In re NAHC, Inc. Secs. Litig., No. 00-4020, 2001 U.S. Dist. LEXIS 16754, at *20-21 (E.D.Pa. Oct. 17, 2001) (holding it could consider stock prices on judicial notice for purposes of motion to dismiss); In re Burlington Coat Factory, 114 F.3d at 1426 (court may consider a document "integral to or explicitly relied upon in the complaint" on motion to dismiss); Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000) (taking judicial notice of public disclosure documents filed

This "gatekeeper" role is especially important where, as here, the plaintiffs initiate litigation that challenges virtually every aspect of a company's business over a substantial time period.  Here, the plaintiffs have filed a sprawling complaint taking issue with every aspect of Constar's business — operations, customers, machinery, quality control, labor, technology, capital expenditures, accounting, financing, etc. — since 1992.  Cf. Sturm v. Marriott Marquis Corp., 85 F. Supp. 2d 1356, 1366 (N.D. Ga. 2000) (noting that "district courts . . . serve a 'gatekeeping role' at the motion to dismiss stage of private class action securities fraud cases"). If all of these claims are allowed to proceed, the plaintiffs will no doubt seek to turn the Company upside down with discovery from the board room to the assembly-line.

As demonstrated below, there is simply no basis for allowing this case to proceed at all, and certainly not on each of the allegations in the Amended Complaint.  Thus, consistent with its "gatekeeping" function, we respectfully request that this Court carefully and rigorously examine each alleged misstatement to determine whether or not the plaintiffs have met their pleading burdens.  See, e.g., In re Numerex Corp. Sec. Litig., 913 F. Supp. 391 (E.D. Pa. 1996) (carefully examining each alleged misstatement to determine whether it was actionable).

## I.    MOTIONS TO DISMISS WITH PREJUDICE ARE ROUTINELY GRANTED IN SECTION 11 CASES

The law is clear that Section 11 cases must be carefully scrutinized at the earliest stage of litigation.  Kapps v. Torch Offshore, Inc., 379 F.3d 207, 216 (5th Cir. 2004) (affirming dismissal of Section 11 claims and noting that "many Section 11 cases have been properly

with SEC); Ieradi v. Mylan Lab., Inc., 230 F.3d 594, 600 n. 3 (3d Cir. 2000) (taking

dismissed on the pleadings"). Indeed, the courts within the Third Circuit (and throughout the country) routinely dismiss Section 11 cases with prejudice at the motion to dismiss stage. See, e.g. Klein v. General Nutrition Cos., 186 F.3d 338 (3d Cir. 1999) (affirming dismissal of Section 11 claims with prejudice because alleged misstatements were immaterial as a matter of law); In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357 (3d Cir. 1993) (same); In re Craftmatic Sec. Litig., 890 F.2d 628, 630 (3d Cir. 1989) (affirming dismissal Section 11 claims with prejudice because alleged omissions immaterial as a matter of law); In re U.S. Interactive, Inc. Sec. Litig., No. 01-CV-522, 2002 U.S. Dist. LEXIS 16009 (E.D. Pa. Aug. 23, 2002) (dismissing Section 11 claims with prejudice in part because alleged misstatements were immaterial as a matter of law); Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc., 114 F. Supp. 2d 316 (D.N.J. 2000) (dismissing Section 11 claims with prejudice because alleged misstatements were immaterial as a matter of law; see also Rosenzweig v. Azurix Corp., 332 F.3d 854 (5th Cir. 2003) (affirming dismissal of Section 11 claims with prejudice); Demaria v. Andersen, 318 F.3d 170 (2d Cir. 2003) (same); Romine v. Acxiom Corp., 296 F.3d 701 (8th Cir. 2002) (affirming dismissal of Section 11 claims); Oxford Asset Mgmt. v. Jaharis, 297 F.3d 1182 (11th Cir. 2002) (affirming dismissal of Section 11 case with prejudice).

---

judicial notice of stock prices).

II.   **THE COURT MUST DISMISS A COMPLAINT THAT
      FAILS ADEQUATELY TO PLEAD *ONE* ALLEGED FALSE AND
      MISLEADING STATEMENT IN THE REGISTRATION STATEMENT**

The courts have developed a number of tests to determine, on a motion to dismiss, whether a plaintiff has pled the elements of a viable Section 11 claim. These tests should be rigorously applied to the instant Amended Complaint.

A.   **Plaintiffs Must Specifically Identify the Alleged False or Misleading
     Statements**

To state a viable Section 11 claim, a plaintiff is required to first specifically identify the supposedly misrepresented facts or omissions in the Registration Statement and then allege sufficient facts to explain why each of these is materially false or misleading — bare conclusions will not suffice.  See Castlerock, 114 F. Supp. 2d at 323-24 (finding that complaint failed to allege that any statements in the registration statement were actually false); In re Union Carbide Class Action Sec. Litig., 648 F. Supp. 1322, 1326 (S.D.N.Y. 1986) (plaintiffs cannot "assert vaguely that a false and misleading impression was created"); see also Wallace v. Systems & Computer Tech. Corp., No. 95-cv-6303, 1996 U.S. Dist. LEXIS 5328, at *18 (E.D. Pa. April 19, 1996) ("[U]pon a Rule 12(b)(6) motion, the court need not accept inferences drawn by plaintiff if they are unsupported by facts set out in complaint.").

B.   **Plaintiffs Must Plead Sufficient Facts to Establish Materiality**

The requirement that a statement be "materially false" dictates that not every minor inaccuracy or vaguely worded statement of optimism is actionable.  To the contrary "the question is whether it is substantially likely that omitted or misrepresented facts would have assumed actual significance to a reasonable investor contemplating the purchase of securities."

In re Craftmatic, 890 F.2d at 639 (emphasis added); accord In re Advanta Corp. Sec. Litig., 180 F.3d 525, 538-39 (3d Cir. 1999).  In other words, the plaintiffs must identify a fact or omission that is important enough that a reasonable person — reading the entire Registration Statement in context — might actually rely on the fact or omission in deciding to purchase the securities.  In determining whether a statement or omission is material, several rules apply.

   *The alleged misstatement or omission must be evaluated in context.*  The Court must view the statements in the context of the entire Registration Statement and all other information reasonably available to the average investor.  In re NAHC Inc. Sec. Litig., 306 F.3d 1314, 1330 (3d Cir. 2002) ("[A] fact or omission is material only if 'there is a substantial likelihood that it would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information' available to the investor.") (emphasis added).  A plaintiff may not manufacture a securities claim by plucking statements out of context.  See In re Donald J. Trump Casino, 7 F.3d at 369 ("[M]ateriality is a relative concept, so that a court must appraise a misrepresentation or omission in the complete context in which the author conveys it.").  So, for example, seeming inaccuracies when a statement is viewed in isolation, may be clarified or explained elsewhere in the offering document, making the alleged misstatement immaterial as a matter of law.  See, e.g., In re U.S. Interactive Inc., 2002 U.S. Dist. LEXIS 16009, at *25 (cautioning that courts should not examine the alleged misstatements in isolation "because accompanying statements may render them immaterial as a matter of law").

   *A company need not disclose the obvious.*  It is only where a reasonable investor is likely to be mislead by a statement or omission that the information may be deemed material.

Thus, for example, a corporation is not required to disclose facts that a reasonable investor would already be aware of. See, e.g., Wallace v. Systems & Computer Tech. Corp., No. 95-cv-6303, 1997 U.S. Dist. LEXIS 14677, *84 (E.D. Pa.. Sept. 23, 1997) ("There is no general duty to disclose general economic conditions because federal securities laws do not compel disclosure of the obvious."); see also Parnes v. Gateway 2000, 122 F.3d 539, 546 (8th Cir. 1997) (Matters that are "common knowledge [so] that a reasonable investor can be presumed to understand them" are immaterial as a matter of law); see also Hillson Partners Ltd. P'ship v. Adage, Inc., 42 F.3d 204, 213-14 (4th Cir. 1994) ("It is not a violation of any securities law to fail to disclose a result that is obvious even to a person with only an elementary understanding of the stock market."). And there is no duty to disclose information that is already publicly available. See In re Adams Golf, Inc. Secs. Litig., No. 03-3045, 2004 U.S. App. LEXIS 18030, at *26 (3d Cir. August 25, 2004) (holding no duty to disclose information "discernable from information already available in the public domain"); In re Tseng Labs, Inc. Secs. Litig., 954 F. Supp. 1024, 1029 (E.D. Pa. 1996) (holding "there can be no liability under the securities laws because of an alleged failure to disclose information that is already available to the public. This is because such information is already part of the 'total mix'").

*Statements of optimism or subjective worth are not material.* Reasonable investors also understand that not every statement of optimism made by a company is a guarantee of future performance or a statement of "hard fact" about the company's operations. In re Advanta Corp. Sec. Litig., 180 F.3d 525, 538 (3d Cir. 1999) ("vague and general statements of optimism constitute no more than 'puffery' and are understood by reasonable investors as such," and are thus not actionable) (internal quotation marks omitted). Investors understand that

a company's offering materials are designed to promote the company, so expressions of opinion, unaccompanied by guarantees or specific facts, are not actionable as a matter of law. <u>In re U.S. Interactive, Inc.</u>, 2002 U.S. Dist. LEXIS 16009 at *34 (noting that a "reasonable investor would <u>expect</u> a professional services firm to say that it was the <u>best</u> at integrating [certain] skills" and that "[s]uch 'puffing' would not significantly alter the 'total mix' of information available to a reasonable investor") (emphasis added); <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1427 (3d Cir. 1997) ("Claims that these kinds of vague expressions of hope by corporate managers could dupe the market have been almost uniformly rejected by the courts.").

C.    **Forward-Looking Statements: the "Bespeaks Caution" Doctrine**

Protection for so-called "forward looking" statements is well-established in the securities laws. Courts in the Third Circuit and elsewhere have almost universally recognized the "bespeaks caution doctrine," a doctrine which holds that certain predictive statements or omissions are immaterial, as a matter of law, where they are tempered by cautionary language, such as that found in a "Risk Factors" section of a Registration Statement. Under the "bespeaks caution" doctrine:

> [W]hen an offering document's forecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the "total mix" of information the document provided investors. In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law.

<u>In re Donald J. Trump Casino</u>, 7 F.3d at 368, 371. Indeed, courts routinely dismiss Section 11 claims based on this doctrine. <u>See</u> <u>id.</u> (affirming dismissal of Section 11 claim under the

bespeaks caution doctrine); In re Adams Golf Inc. Sec. Litig., 2004 U.S. App. LEXIS 18030, at

*28-29 (3rd Cir. 2004) (affirming dismissal of Section 11 claims under the bespeaks caution

doctrine); Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc., 114 F. Supp. 2d 316, 325-26 (D.N.J.

2000) (same); In re Numerex Corp., 913 F.Supp. at 397 (same); see also Rombach v. Chang, 355

F.3d 164 (2d Cir. 2004) (affirming dismissal of Section 11 case based on bespeaks caution

doctrine); Parnes v. Gateway 2000, 122 F.3d 539 (8th Cir. 1997) (same).

*     *     *     *     *

An example of how a district court should properly apply each of these tests to

examine the sufficiency of a Section 11 complaint on a motion to dismiss is the court's opinion

in In re Numerex Corporation Securities Litigation, 913 F.Supp. 391 (E.D.Pa. 1996).  In

Numerex, the court methodically analyzed each of the alleged misstatements, using the above-

described tests and viewing the entire Registration Statement in context.  Id. at 397 (noting "we

must view a statement not in a vacuum but in the context of the entire document").  The court

determined that certain statements were not actionable because (i) they were not false, see id. at

398 (analyzing statements on profit growth); (ii) they were rendered immaterial by the bespeaks

caution doctrine, see id. at 398-400 (analyzing statements regarding British Telecom and global

expansion strategy), and (iii) they were immaterial as a matter of law because they were either

obvious or unimportant to the reasonable investor, see id. at 400-01 (analyzing statements

regarding growth in the British market and volatility and the failure to disclose the resignation of

a top management official).

**III.    AS A THRESHOLD MATTER, THE STORIES TOLD BY THE
         "CONFIDENTIAL WITNESSES" ARE IRRELEVANT,
         UNRELIABLE AND INACTIONABLE**

In an attempt to deter the Court from applying the requisite pleading tests and to mask the legal deficiencies in their claims, the plaintiffs have filled the first 36 pages of the Amended Complaint with page-after-page of anecdotal stories attributed to sixteen "confidential witnesses." First of all, it is important to note what this case is not about — the mere fact that "confidential witnesses" might offer evidence of minor operational issues at Constar, or claims that the Company was somehow mismanaged, does not create a Section 11 claim. See Sante Fe Industries v. Green, 430 U.S. 462 (1977) (claims of mismanagement are not actionable under the securities laws); In re Craftmatic Secs. Litig., 890 F.2d 628, 639-40 (3d Cir. 1989) (same). Rather, the plaintiffs must show that the "evidence" offered by their confidential witnesses renders specific statements in the Registration Statement materially misleading. As is shown below, the two simply do not add up. Thus, the stories told by these confidential witnesses are inactionable and irrelevant.

It is also worth noting that, while the plaintiffs attempt to portray these individuals as knowledgeable insiders with damning information about the state of Constar's business at the time of the IPO in November 2002, the plaintiffs have failed to plead any facts demonstrating that their secret sources are reliable or plausible. The entire body of information supplied by these sources is suspect and facially unreliable:

- ***Each source is inherently untrustworthy and biased.*** None of the sixteen "confidential witnesses" is a current Constar employee. They are all either former employees, who have refused to disclose the circumstances of their departures, or

19

who work for Constar's competitors (directly or as consultants). These witnesses are obviously biased.

- ***Most sources had no firsthand knowledge concerning Constar at the time of the IPO.*** Eight sources were not even employed at Constar at the time of the IPO in 2002 (some left more than 6 years before the IPO), and still others, who were employed at Constar, do not provide information relating to the fall of 2002.

- ***Even those sources who were employed at Constar did not have access to company wide information.*** Of the eight Constar employees still employed at the time of the IPO, only one had a position in which he could have been privy to information beyond a single plant — and the other seven represented only 4 of Constar's 14 plants. These sources cannot possibly plausibly support allegations concerning Constar's company wide machinery, technology, customers, or finances.

The multiple problems with each of the sources cited by the plaintiffs are cataloged at

Exhibit C.[5]

---

[5]    In the context of cases subject to the Private Securities Litigation Reform Act or Rule 9(b), many courts look unfavorably upon attempts by plaintiffs attorneys to manufacture necessary factual specificity by attributing stories to anonymous sources. See In re Silicon Graphics, Inc. Sec. Litig., 183 F.3d 970, 985 (9th Cir. 1999) (finding it insufficient for a plaintiff "to set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate [the plaintiff's] claim"); accord In re Party City Secs. Litig., 147 F. Supp. 2d 282, 304 (D.N.J. 2001); In re Nice Sys., Ltd. Sec. Litig., 135 F. Supp. 2d 551, 571 (D.N.J. 2001). At a minimum, courts have held that use of confidential witnesses does not satisfy the pleading standard of the Reform Act or Rule 9(b) where the plaintiff fails to plead facts "provid[ing] an adequate basis for believing that the defendants' statements were false." Novak v. Kasaks, 216 F.3d 300, 314 (2nd Cir. 2000); see also In re Infonet Servs. Corp. Secs. Litig., 310 F. Supp. 2d 1080, 1097 (C.D. Cal. 2003) (rejecting claim based on unnamed source in Section 11 case.) As one court has said, the plaintiffs "must plead 'with substantial specificity' how confidential witnesses 'came to learn of the information they provide in the complaint. . . .' The Court must be able to tell whether a confidential witness is speaking from personal knowledge, or 'merely regurgitating gossip and innuendo.'" In re Metawave Communications Corp. Sec. Litig., 298 F. Supp. 2d 1056, 1068 (W.D. Wash. 2003) (citations omitted).

At bottom, the first 36 pages of the Amended Complaint consist of nothing more than anecdotes — gossip, innuendo, and uninformed opinions  — cobbled together to try to support a story that Constar was not the company represented in the Registration Statement. These statements are not actionable in and of themselves,[6] and, as is shown next, these anecdotes fail to establish that Constar's statements in the Registration Statement — about the Company's overall operations — were materially false or misleading.

## IV.    PLAINTIFFS FAIL TO ALLEGE ANY VIABLE SECTION 11 THEORY

Applying the controlling tests for pleading a Section 11 claim, it is clear that the allegations of the Amended Complaint fail.  The plaintiffs have not alleged and cannot allege any violation regarding the topics they complain about:  Crown's financial condition, Constar's post-

---

[6]     Indeed, the plaintiffs do not allege that the "facts" stated by the confidential witnesses should have been disclosed, nor could they credibly make such an allegation.  Obviously such minor, isolated incidents concerning product defects or the loss of a particular customers well before the IPO would not themselves be actionable, especially when the impact of these events, if any, would have been reflected in the unchallenged earnings and sales figures in the Registration Statement.  See Romine v. Acxiom Corp., 296 F.3d 701 (8th Cir. 2002) (affirming dismissal of Section 11 claims because "failing to describe or predict the possible impact of specific customer contracts" is not a material omission); see also Shoenhaut v. Amer. Sensors, Inc., 986 F. Supp. 785, 794 (S.D.N.Y. 1997) (holding that the failure to disclose that sales to customer were decreasing is not material as a matter of law because prospectus did not list current volume of sales to the customer, predict sales levels or suggest that the customer would remain a customer); Brown v. Reptron Elecs., No. Civ. A. 94-6332, 1996 U.S. Dist. LEXIS 2970, at *39 (S.D.N.Y. Mar. 13, 1996) (rejecting plaintiffs' claim that defendant should have disclosed the current status of the contractual minimum requirements of its customer, stating "[t]here is no basis for believing that such information would have really added anything of significance on the question of whether the slight sales fluctuations announced in the press release would or would not occur); In re Verifone Sec. Litig., 784 F. Supp. 1471, 1484 (N.D. Cal. 1992) (finding no duty to disclose the fact that customers listed in prospectus were not currently ordering from the company because the prospectus did not contain any representations about current or future orders from those customers).

IPO condition, future capital expenditures and capacity expansion, the state of machinery and technology, the price of resin, or goodwill.  The plaintiffs cannot link anything their "confidential witnesses" have to say to any statements in the Registration Statement and, therefore, have not alleged that anything in the Registration Statement is materially misleading.

### A.    Crown's Financial Situation

Plaintiffs claim that the defendants failed adequately to disclose the "true state of affairs at Crown" because Constar did not disclose Crown's heavy debt burden and "desperate need of cash."  Amend. Compl. at ¶ 21.  Plaintiffs contend that "had defendants disclosed the true state of affairs at Crown . . . in the Registration Statement, defendants would not have been able to market and sell the IPO . . . at $12 a share."  Amend. Compl. ¶ 21.

First of all, plaintiffs' portrayal of Crown as a company desperate to close the IPO to stave off financial crisis is completely untrue and unsupported by the facts alleged.  But in any event, the plaintiffs fail to explain why Crown's financial position would even be relevant to a reasonable investor.  Crown was Constar's parent company, and, after the IPO, Constar would be an independent Company.  Investors were acquiring shares in Constar — not Crown.  Accordingly, Crown's financial situation was irrelevant, and immaterial as a matter of law.  Cf. Dower v. Mosser Indus., Inc., 648 F.2d 183, 187 (3d Cir. 1981) (affirming district court's decision that information about a corporate parent "exceeded the scope of information that a reasonable investor would find significant" and thus was immaterial in securities context).

In any event, and perhaps more importantly, the plaintiffs later admit in their

Amended Complaint that the very things they are complaining were not disclosed were, in fact,

public knowledge:

> Having overextended itself to acquire assets in the 1990's, by the
> start of 2002, Crown was in a precarious financial position,
> needing substantial sums of money to pay off its heavy debt
> burden.  Amend. Compl. ¶ 68.

> Crown's financial condition was so adversely impacted by its
> crushing debt that, **as reported by the news media**, it was
> teetering on the edge of bankruptcy . . . as noted in the *Daily Deal*.
> Id. ¶ 69 (emphasis added).

Thus, out of one side of their mouths, plaintiffs say that the Registration

Statement should have reported Crown's "true state of affairs."  Out of the other, they

acknowledge that the true state of affairs was publicly reported by the news media.  As set forth

above, there is no duty to disclose any information that is in the public domain.  See In re Adams

Golf, Inc. Secs. Litig., 2004 U.S. App. LEXIS 18030 (3d Cir. 2004) (holding no duty to disclose

information "discernable from information already available in the public domain"); Klein v.

General Nutrition Cos., 186 F.3d 338, 343  (3d Cir. 1999) (holding that there is no duty to

disclose facts that are already publicly known because "[f]ederal securities laws do not require a

company to state the obvious"); In re Tseng Labs, Inc. Sec. Litig., 954 F. Supp. 1024, 1029 (E.D.

Pa. 1996) (holding "there can be no liability under the securities laws because of an alleged

failure to disclose information that is already available to the public. This is because such

information is already part of the 'total mix'").  This claim, therefore, fails as a matter of law.

**B.**    **Constar's Post-IPO Financial Condition**

Next, the plaintiffs complain that the Registration Statement failed to disclose that

"[a]s part of the IPO, Crown caused Constar's asset base to become further impaired by

effectively transferring a portion of its debt to Constar." Amend. Compl. ¶ 22.  The plaintiffs

contend:

> [B]y the time it became a publicly held company, Constar's
> financing was already exhausted, leaving the Company with no
> underlying capital with which to upgrade its manufacturing
> equipment.  This, in turn, adversely impacted Constar's
> competitive position, ensuring additional customer loss and
> reduced cash flows, and further impairing Constar's goodwill.

Amend. Compl. ¶ 23.

However, the Registration Statement (which plaintiffs conveniently omit from the

Amended Complaint) explicitly advised — on page 1 — that "[Constar] will not receive any of

the proceeds from the sale of shares of our common stock in this offering." Exh. A at 1.

Investors were told that "[t]he net proceeds from the sale of our common stock will be paid to

Crown, the selling shareholder." Id. at 22.  In addition, the Registration Statement specifically

disclosed that "on October 15, 2002, we distributed to Crown a note in the principal amount of

$350 million." Id. at 88.  And, the $350 million debt to Crown was reflected on the financial

statements included within the Registration Statement.  The Registration Statement explicitly

disclosed, not only that Constar would not receive any proceeds from the IPO, but that Constar

would also incur enormous debt to repay the $350 million note to Crown:

> The proceeds from the concurrent $175 million note offering . . .
> the proceeds of our $150 million term loan and $27.6 of our initial
> borrowing under our revolving loan facility will be used to pay off
> our $350 million note to Crown.

Exh. A at 22; see also id. (noting that "Crown will use its proceeds from [the IPO] and from

repayment of intercompany debt to pay a portion of its debt.").

   The Registration Statement is also loaded with warnings about the risks this debt

load posed to Constar's performance going forward:

-  *"We had net losses in recent years and we may not generate profits in the future."* Exh. A. at 9 (emphasis in original)  The Registration Statement further backed up this statement by stating "Continuing operating losses may limit our ability to service our debt and fund our operations and we may not generate net income form operations in the future."  Id.

-  *"We must generate sufficient cash flow to service our debt and provide for ongoing operations."* Id. (emphasis in original).  The Registration Statement explicitly stated that after the offering Constar would have "approximately $365 million in principal amount of debt" and that servicing this debt would require annual payments of "approximately $31.6 million."  Id.  Given this enormous debt, it stated that without sufficient cash flow, Constar might "have to defer capital expenditures or sell assets to generate cash, which could weaken our competitive position."  Id.

-  *"Our debt may negatively impact our liquidity and harm our competitive position."* Id. (emphasis in original).  The Registration Statement also set forth clear examples of "important negative consequences" of this debt.  For example, the Registration Statement notes that the debt "significantly increasing our interest expense", "limiting our ability to obtain additional financing" and "increasing our vulnerability to economic downturns and changing market conditions."  Id.

   Thus, Constar clearly and cogently explained to investors that it had a significant

debt burden, that much of that debt was owed to Crown, that it would receive no money from the

IPO, and the Company's debt could harm it going forward.  Indeed, in light of all of these

disclosures, it is simply absurd for the plaintiffs to contend that Constar somehow failed

adequately to disclose the nature and impact of Constar's debt, or what it owed to Crown.  At the

very best for the plaintiffs, they are nit-picking these disclosures — precisely the type of post-hoc attempt to manufacture a claim that Judge Posner explained is improper.  See Bastian v. Petren Res. Corp., 892 F.2d 680, 685 (7th Cir. 1990) (rejecting the practice of plaintiffs "pick[ing] through offering memoranda with a fine-tooth comb in the hope of uncovering a misrepresentation").  Therefore, the allegation that Constar failed to disclose this information fails as a matter of law.

### C.   Future Capital Expenditures and Capacity Expansion

Equally insufficient are the allegations relating to future capital expenditures and capital expansion.  These allegations fail, as a matter of law, for multiple reasons.

#### 1.   Capital Expenditures

The plaintiffs target two explicitly disclosed risk factors where the Registration Statement discusses problems that might result if Constar is unable to make significant capital expenditures in the future due to its debt burden:

- If we are unable to generate sufficient cash from operations to service our debt and fund our operations, or if we are unable to refinance our debt, we may have to defer capital expenditures or sell assets to generate cash, which could weaken our competitive position.

- If we do not have adequate funds to make our capital expenditures or if the expected benefits of capital expenditures are not achieved, our business may be impaired and our profitability reduced.  Our business is capital intensive, and our equipment is currently operating at near full capacity.  We expect to have substantial capital needs in the near future for capacity expansion.  If we do not have funds available to satisfy our capital expenditure requirements, we may not be able to pursue our strategy for profitable growth.  We cannot be

> certain that the expected benefits of any capital expenditures
> will be achieved.

Amend. Compl. at ¶¶ 158, 159, 162, 163 (quoting Registration Statement at 9, 13).

According to the plaintiffs, these statements are misleading because their "confidential witnesses" told them that Constar's debt burden would make it nearly impossible for Constar to make capital expenditures going forward and, in fact, at the time of the Registration Statement, Constar was already ignoring needed capital improvements. Amend. Compl. at ¶ 163. Plaintiffs appear to contend that the Registration Statement both inaccurately disclosed Constar's present capital expenditures and misleadingly suggested that Constar could make capital expenditures in the future, when it could not. This, too, is nonsense.

### a.  *Present Capital Expenditures*

First, to the extent plaintiffs are claiming that Constar somehow misrepresented that it was making capital expenditures in November 2002 when, in fact, it was not, it is clear that such statements could not be materially misleading, because the factual information about the Company's capital expenditures was accurately disclosed. See In re U.S. Interactive Class Action Sec. Litig., 2002 U.S. Dist. LEXIS 16009, at *25 ("[A]ccompanying statements may render [allegedly misleading statements] immaterial as a matter of law.") (citation omitted). While the plaintiffs offer vague statements from their sources that Constar did not make specific capital expenditures in specific plants on specific occasions, see Amend. Compl. at ¶ 84 (former production supervisor claims that Constar was planning to introduce a new statistical control program but lacked the money to do so), they ignore the fact that the Company's past and present capital expenditures are specifically and accurately disclosed in the Registration Statement:

Capital expenditures increased $1.1 million, or 7.5%, to $15.7 million in the nine months ended September 30, 2002 from $14.6 million in the nine months ended September 30, 2001.

Capital expenditures were $23.5 million in 2001 compared to $34.9 million in 2000 and $32.2 million in 1999. New capacity investments included in those amounts were:

- Acquisition of equipment from a U.K. self-manufacturer during 2000 in conjunction with our entry into a long-term supply arrangement with this customer;

- Installation of a high-speed manufacturing line in 2000 and 2001 to serve the hot fill beverage market in the U.S.;

- Acquisition of new multi-layer injection machines in 2000 and 2001 to support our growth into the market for oxygen-sensitive beer, juices and teas; and

- Purchase of new molds for new business in each year.

Due to reductions in the amount of capital expenditures required to satisfy our customer's requirements and the use of an operating lease for the acquisition of one hot-fill production line, our capital spending was lower in 2001 than in 2000.

Exh. A at 46.

None of these statements are alleged to be false. Because the facts underlying Constar's capital expenditures are accurately disclosed, there was no duty to disclose the isolated accounts of specific decisions not to make capital expenditures — even assuming those anecdotal stories are true. See In re Bell Atlantic Secs. Litig., No. 91-0514, 1997 U.S. Dist. LEXIS 4938 at *127 (E.D. Pa. Apr. 16, 1997) (holding that statements commenting on company's results were not material because "[t]he historical figures were accurately disclosed from which a reasonable investor could deduce" the information for himself), aff'd without opinion, 142 F.3d 427 (3d Cir. 1998). Thus, plaintiffs' unquantified claim that capital expenditures were "inadequate" is irrelevant and inactionable because Constar "has provided accurate hard data from which

analysts and investors can draw their own conclusions about the company's conditions and the value of its stock." In re Ultrafem Inc. Secs. Litig., 91 F. Supp. 2d 678, 699 (S.D.N.Y. 2000) (quoting In re Syntex Corp. Sec. Litig., Civ. No. 92-20548, 1993 U.S. Dist. LEXIS 20420, *22 (N.D. Cal. Sept. 1, 1993)).[7]

### b.  *Future Capital Expenditures*

To the extent that the plaintiffs are claiming that Constar somehow represented that it would make future capital expenditures when it could not reasonably have believed that such expenditures would be possible, the plaintiffs' allegations also fail as a matter of law.

First of all, the plaintiffs nowhere plead that Constar did not, in fact, make capital expenditures after the IPO.[8] Thus, even if the language in question suggested that Constar expected to make capital expenditures in the future, the plaintiffs have not alleged that any such "implication" is false. Without even an allegation of falsity, the claim must fail.

Second, even if the supposed implication later turned out to be "false," any projections about future performance that might be made in these statements are forward looking statements about future risks. As such, they are subject to a unique and specific set of rules. Initially, it is important to note that the statements were not just provided with adequate

---

[7]     The Registration Statement also disclosed considerable information about Constar's debt, and after telling investors that the Company needed sufficient cash to support its debt, specifically warned that "[w]hen we complete this offering, we will have approximately $365 million in principal amount of debt . . . ." Exh. A at 9.

[8]     In fact, Constar did continue to make capital expenditures, spending $47.1 million on capital expenditures in 2003 — $17.1 million more than in the previous year. See Constar's Annual Report Form 10-K for year end 2003 (available at www.sec.gov).

"cautionary language," see In re Donald J. Trump Casino, 7 F.3d at 371, the entire statement

itself is an explicit warning about what might happen in the future.  Thus, these statements would

discourage investment in Constar, not encourage it, and they could not possibly be material.  See

Zeid v. Kimberley, 930 F. Supp. 431, 437 (N.D. Cal. 1996) ("[W]arnings regarding potential

adverse factors are not actionable as a matter of law."); In re Foundry Networks Inc. Secs. Litig.,

No. 00-4823, 2003 U.S. Dist. LEXIS 18244, at *34-35 (N.D. Cal. Feb. 14, 2003) (noting that

risk factors cannot be actionable as a matter of law); see also Williams v. WMX Techs., 112 F.3d

175, 179 (5th Cir. 1997) (noting "the 'risk factors' section of a prospectus is not intended to

make promises or claims regarding the future, but is meant to warn investors of factors that can

affect a company's future performance");  Steinberg v. PRT Group, Inc., 88 F. Supp. 2d 294

(S.D.N.Y. 2000) (dismissing claims that risk factors are misleading because even the alleged

'facts' were either disclosed or not inconsistent with statement).[9]

### 2.      Capacity Expansion

The allegations relating to capacity expansion fare no better.  On capacity

expansion, Constar stated in the Registration Statement that:

> We plan to be a leader in the markets we serve by . . . investing in
> capacity expansion in all categories of PET bottle markets where
> profitable growth can be sustained by appropriate contractual terms
> with our customers.

---

[9]      In Voit v. Wonderware Corp., 977 F. Supp. 363, 370-71 (E.D. Pa. 1997), Judge Joyner
suggested that Zeid might be inconsistent with Third Circuit precedent, and that
statements in cautionary language can be misleading if the event about which caution is
expressed has already occurred.  Even if the Voit court were correct, here the plaintiffs
have failed to plead any facts showing that, in fact, Constar had stopped making capital
expenditures in the years preceding the IPO.  In fact, as explained above, the financials in
the Registration Statement show just the opposite.

Amend. Compl. at ¶ 154 (quoting Registration Statement at 53).  Plaintiffs appear to claim that

this is materially misleading because Constar had not been engaging in any capacity expansion at

the time of the IPO, and would be unable to do so in the future.

### a.     *Present Capacity Expansion*

Although plaintiffs claim that this statement is misleading because their sources

supposedly told them that Constar was not engaging in capacity expansion, the sources cite only

isolated instances where Constar determined not to bid on particular contracts where it would

have been required to engage in capacity expansion in the years prior to the IPO.  Amend.

Compl. at ¶¶ 110-18 (former Constar operation's manager, maintenance person, and technician

said that Constar lost a contract with Folgers because Constar "would not upgrade its equipment

to manufacture [a] new line of plastic coffee containers."); see also id. at ¶¶ 127-34 (former

account manager from 1999-2001 describes several instances in which Constar refused to bid on

certain business because it would have required capacity expansion.); id. at ¶¶ 96-99 (former

sales account manager says Constar refused to make serious bid on a Clorox contract because

they would have required "substantial capital investments" to "upgrade technical manufacturing

capabilities").

Even if these statements were true, specific instances of decisions not to go after

business that might have required capacity expansion are perfectly consistent with what the

Registration Statement said — that it would invest in capacity expansion "where profitable

growth can be sustained by appropriate contractual terms with our customers." Exh. A at 53.

Capacity expansion is an expensive endeavor, and thus even contracts with large purchasers may

not be profitable.  The Registration Statement states that the cost of a single high speed

production unit "costs approximately $10 million and investments may occur in increments of two, three or more production units." Exh. A at 46. The decisions cited by the confidential witnesses are nothing more than <u>business</u> decisions — in which the confidential witnesses played no part — that particular contracts were not worth the cost of capacity expansion.

Moreover, the plaintiffs do not, and cannot dispute, that, as pointed out in the Registration Statement, Constar made <u>other</u> capacity expansions — ones management apparently deemed profitable. Exh. A at 46. Obviously, if Constar only invests in capacity expansion where it can be done with "profitable growth" and "appropriate contractual terms," there must be circumstances where Constar chooses to forego contracts that it does not deem profitable. These specific instances where the Company chose not to engage in capacity expansion are immaterial as a matter of law. The simple fact is that any reasonable investor understands that a company does not take every opportunity that presents itself.

### b.   *Future Capacity Expansion*

To the extent that the plaintiffs say this statement was misleading because it suggested that Constar would be able to engage in capacity expansion in the future, when defendants' must have known that was not the case, again the claim fails.

First, as with the capital expenditures, the plaintiffs nowhere plead that, in fact, Constar did not engage in capacity expansion after the IPO. Thus, they have not pleaded that this statement is false.

In any event, the statement is protected because it is a forward looking statement. The statement about capacity expansion is not a statement about what Constar did in the past, but

rather what it planned to do in the future.  The Registration Statement tells potential investors

that phrases that start like this — with the word "plan" — "are subject to risks, uncertainties and

assumptions . . . .  In light of these risks, uncertainties and assumptions, the forward-looking

events discussed in this prospectus might not occur and the forecasts included in this prospectus

might not be accurate . . . ." Exh. A at 21.  There are also specific disclosures in the Registration

Statement that, if the company is unable to generate sufficient cash from operations, future

capacity expansion will not be possible.  Id. at 9, 12 (noting risks that may occur if company

cannot afford capacity expansion).  Given the cautionary language, and express disclosures of

risk factors throughout the Registration Statement, this forward looking statement is immaterial

as a matter of law and protected by the bespeaks caution doctrine.  See, e.g., In re Donald J.

Trump Casino, 7 F.3d at 368.

### D.  Machinery and Technology

The plaintiffs also claim that the Registration Statement presents a misleading

portrayal of the state of Constar's machinery and technology.  Again, the plaintiffs cite to no

hard statements of fact that were supposedly misleading, but instead cite to projections, risk

factors, and forward looking statements to try to create misleading statements where none exist.

### 1.  Constar's Manufacturing and Machinery

The plaintiffs claim the following statements in the Registration Statement about

Constar's manufacturing function were materially misleading:

- "We plan to be a leader in the markets we serve by . . .
  remaining a high-quality operator implementing best-practices
  manufacturing disciplines in every manufacturing activity we

undertake." Amend. Compl. at ¶ 153 (quoting Registration
Statement at 53).

- A <u>risk factor</u> which said: "Significant technological changes
could render our existing technology or our products and
services obsolete. We attribute much of our competitive
success to our existing technology, and our ability to compete
may dissipate if our existing technology is rendered obsolete.
If we are unable to successfully respond to these developments
or do not respond in a cost effective way, our net sales and
profitability may decline . . . . Similarly, the equipment we use
may be rendered obsolete by new technologies." <u>Id.</u> at ¶ 160
(quoting Registration Statement at 12).

- "We are able to maintain our competitive cost position as we
grow by purchasing state-of-the-art manufacturing equipment
for our high-volume product lines and redeploying existing
machines to lower volume and specialty production lines." <u>Id.</u>
at ¶ 164 (quoting Registration Statement at 32-33).

- "Because our machinery has been continuously maintained and
upgraded, and because the speed and capacity of our equipment
are generally comparable to the equipment of our competitors,
we believe that our manufacturing platform is cost competitive.
Equipment suppliers to our industry have continually made
improvements in output and performance at lower capital costs
per unit of output. Subject to demand for the capacity, we seek
to maintain and improve our competitive cost position by
acquiring the highest speed state of the art equipment on each
occasion that we increase capacity. We believe that we are
advantaged by opportunities that exist to deploy existing high
speed equipment in some of the newly converting specialty
custom applications, enhancing both operating efficiency and
capital efficiency throughout our system." <u>Id.</u> at ¶ 166
(quoting Registration Statement at 46).

The plaintiffs contend that these allegedly positive portrayals of Constar's

equipment were false and misleading because they failed to disclose that, in fact, "Constar had

been using obsolete equipment and technology since at least 1996," and the manufacturing

equipment led to numerous production problems and defective products.  Amend. Compl. at ¶ 161.

First, as a matter of law, the attempt to portray Constar's equipment as "obsolete" at the time of the offering fails.  It is undisputed that, as is disclosed in the financials, Constar had over $742 million in sales in 2001, the last full year before the IPO.  Exh B. at 7.  In addition, Constar signed a substantial five year contract with PepsiCo just a month before the IPO.  Id. at 37.  Constar's equipment could not have been "obsolete" if it continued to do significant business on that machinery.  See Schoenhaut v. American Sensors, Inc., 986 F. Supp. 785, 794 (S.D.N.Y. 1997) (recognizing that plaintiffs' claim that prospectus was misleading because it failed to disclose that issuer's products were "obsolete" failed "as a matter of law" when sales figures showed that company was still selling product) (citing In re Seagate Technology II Secs. Litig., No. 88-20489, 1989 U.S. Dist. LEXIS 10466, at *14 (N.D. Cal. May 3, 1989) (finding product was not "obsolete" because it made up a substantial portion of company's sales).

Second, the "evidence" offered by the plaintiffs' "confidential witnesses" does not in any way suggest that Constar's manufacturing equipment was "obsolete."  The plaintiffs submit CW3 — a former Constar officer who left the Company in 1996, six years before the IPO, and CW4 — another Constar officer who left the Company in 1993, nine years before the IPO — who suggest that Constar was using a Sidel SB01 machine instead of a Sidel SB02 machine.  Amend. Compl. at ¶ 83.  Since these people left Constar years before the IPO they are obviously not in a position to provide any evidence that as of the IPO, Constar's equipment was "obsolete."

See In re Metawave Communications Corp. Sec. Litig., 298 F. Supp. 2d 1056, 1068 (W.D. Wash. 2003) (holding that plaintiffs must explain why confidential witnesses were in a position to know what they are talking about).  In fact, the Registration Statement cites specific examples where high speed equipment was purchased in 2000 and 2001, and the plaintiffs' sources who never worked at Constar do not and cannot claim that these assertions are untrue.  Exh. A at 46.

Third, even if Constar had been using older machines in some of its manufacturing operations, that is perfectly consistent with what the Registration Statements says — Constar does not say that it would use state-of-the-art manufacturing equipment in all of its operations; it says that it purchases such equipment "as we grow . . . for our high-volume product lines and redeploy[s] existing machines to lower volume and specialty production lines."  Exh. A at 33; see also id. at 46 ("Subject to demand for the capacity, we seek to maintain and improve our competitive cost position by acquiring the highest speed state of the art equipment on each occasion that we increase capacity.").

Fourth, there was no obligation to disclose any of the individual instances of equipment malfunctioning identified in the Complaint.  According to the Registration Statement, Constar operates fourteen manufacturing plants in North America alone.  The fact that a former "forklift operator" in the Dallas, Texas plant noticed certain manufacturing defects, Amend. Compl. at ¶¶ 140-41, or another former supervisor in the Havre de Grace facility complained about a particular machine breaking down, id. at 86, is simply not material because it does not render statements about Constar's corporate wide manufacturing function false or misleading. Marx v. Computer Sciences Corp., 507 F.2d 485, 491 (9th Cir. 1974) ("A company, of course,

need not detail every corporate event, current or prospective . . . ."). In any complex manufacturing system, equipment will occasionally breakdown. Isolated breakdowns do not make the Registration Statement misleading.

This is particularly so because the Registration Statement provides <u>specific financial data</u> on its maintenance of machines: "The average annual expense for annual preventative maintenance activity is approximately $8 million, in addition to the approximately $12 million spent annually on weekly and monthly maintenance and on running repairs." Exh. A at 46. None of these hard facts are alleged to be false. Given that Constar has accurately told investors exactly how much it spent on maintenance, investors can judge for themselves whether Constar had been adequately servicing its equipment. <u>See</u> In re Bell Atlantic Secs. Litig., 1997 U.S. Dist. LEXIS 4938, at *127.

Fifth, in the context of the entire Registration Statement, Constar's comments that "the speed and capacity of our equipment are <u>generally comparable</u> to the equipment of our competitors," is nothing more than a subjective evaluation of the Company's equipment which is not actionable as a matter of law. It is precisely the type of "vague and general statements of optimism," and "opinions, motives, and intentions" that courts routinely hold are immaterial as a matter of law. <u>See</u> In re Advanta Corp., 180 F.3d at 538-39. There is no express or implied representation that Constar's equipment is the best in the entire industry or flawless — it is described as "generally comparable" to that of Constar's competitors.

Sixth, and similarly, the statement that "we plan to [remain] a high-quality operator implementing best-practices manufacturing disciplines in every manufacturing activity

we undertake" is nothing more than a subjective evaluation of Constar that, given Constar's

"generally comparable" machinery, it intended to remain a "high-quality operator." As a point

of caution, however, the Registration Statement elsewhere expressly discloses that "[s]ome of

our competitors have greater financial, technical and marketing resources than we do." Exh. A at

13. Such broad statements could not possibly mislead a reasonable investor.

Finally, to the extent that these statements are simply risk factors or forward

looking statements, they cannot be actionable, as a matter of law, for the reasons explained

above. See supra at part IV(C)(1).

### 2.    Technology

The plaintiffs also take issue with Constar's description of its technology,

particularly its patented "Oxbar" manufacturing technology. The complained of statements are:

- "We believe that we have the patented technology and full-service design capabilities necessary to capture expected large scale conversion opportunities for PET packaging." Amend. Compl. at ¶ 151 (quoting Registration Statement at 1) (emphasis added).

- "We believe we are strongly positioned within the PET industry because of our . . . Technology and Product Development Expertise." Id. at ¶ 156 (quoting Registration Statement at 52) (emphasis added).

- "We believe that our Oxbar oxygen-scavenging technology, which increases product shelf life by inhibiting oxygen from penetrating the packaging, is the best performing technology for the preservation of oxygen sensitive products and is cost competitive with other available technologies." Id. at ¶ 169 (quoting Registration Statement at 1) (emphasis added).

The plaintiffs claim that these statements were rendered materially misleading because, in fact, the "Oxbar technology was not effective." Amend. Compl. at ¶ 172.

The only facts pleaded to support the conclusion that Oxbar did not work, however, are the musings of one, unnamed former Constar account representative, who claims that Anheuser-Busch "switched all of its business to Owens-Illinois" because of complaints about the Oxbar system, resulting in a loss of "between $3 million and $4.5 million for the Company." Amend. Compl. at ¶¶ 108-09.

Even if CW11 knew what he was talking about (and he did not), the fact that a single customer complained about Oxbar does not mean that "Oxbar's technology was not effective." Constar had almost $750 million in sales in 2001, due in fair measure to its Oxbar technology. Exh. A at 31. Constar had no duty to disclose the loss of a single contract, which constituted less than 1% of its sales. See 17 C.F.R. § 229.101(c)(vii) (requiring disclosure if sales to the customer are "equal to 10 percent or more of the registrant's consolidated revenues and the loss of such customer would have a material adverse effect on the registrant"); Romine v. Acxiom Corp., 296 F.3d 701, 708 (8th Cir. 2002) (finding no duty to disclose that contract with client would cause a five percent decline, or roughly $1.036 million, "which is not a material decline" considering the defendants' quarterly revenues totaled $211 million).

Moreover, these statements are nothing more than vague, optimistic statements and opinions about Constar's products and technology. "Puffery or projections of future performance not worded as a guarantee, are generally found to be immaterial, and thus inactionable, under Federal securities law." Mobile Media, 28 F.Supp.2d at 927; accord In re

Burlington Coat Factory, 114 F.3d at 1427-28 (noting that a company's "belief" about the future

trends has been uniformly held immaterial).  Additionally, "a company can be expected to 'puff'

its own product."  Kane v. Madge Networks N.V., No. 6-96-20652, 2000 U.S. Dist. LEXIS

19984, at *11 (N.D. Cal. May 25, 2000) (noting that "companies almost always anticipate strong

demand for their products.  Not surprisingly, courts have rejected forecasts of 'strong demand' as

immaterial"); see also In re U.S. Interactive, Inc., 2002 U.S. Dist. LEXIS 16009, at *34 (noting

that investors expect firms to claim they are the best at what they do, and thus such claims are

not material).  Moreover, the Registration Statement expressly warns investors that statements

beginning with the term we "believe" are forward looking statements that are subject to risk and

may be inaccurate.  Exh. A at 22.  Thus, on their face, these statements are immaterial as a matter

of law.

    E.    **Price of Resin**

        The Registration Statement explains that, with respect to many of Constar's

customers, its contracts permit Constar to pass increases in the price of the raw material for PET

products, resin, through to customers.  The plaintiffs take issue with several such statements:

- A risk factor that disclosed (in part) that "[a]lthough most of our contracts permit us to pass the price of resin through to our customers, market conditions may not permit us to fully pass through any future resin prices.  Significant increases in resin prices, coupled with an inability to promptly pass such increases on to customers, may increase our cost of products sold and reduce our profitability."  Amend. Compl. at ¶ 173 (quoting Registration Statement at 13-14).

- "Most of our customer contracts contain provisions permitting us to pass resin price changes through to our customers as adjustments to selling price. . . .  When we use this mechanism to pass resin price changes through to our customers, the price

changes generally affect our net sales and cost of sales in
approximately equal amounts and do not generally affect our
gross profit except as a result of valuation and timing issues."
Id. at ¶ 180 (quoting Registration Statement at 35.

- "Our agreements with customers typically have provisions that
  insulate our gross profit from changes in resin prices." Id. at ¶
  182 (quoting Registration Statement at 35).

In a futile attempt to show that these statements are somehow misleading, the

plaintiffs tout CW1 — a former executive at one of Constar's competitors — who never worked a

day at Constar.  CW1 allegedly told the plaintiffs that Constar's largest customer, PepsiCo, was

able to avoid the pass through of resin prices because, when the price of resin increases, PepsiCo

simply switched from PET products to aluminum cans or other packaging materials.  Amend.

Compl. at ¶¶ 122-26.

Even if CW1 were in some position to know anything about Constar's contract

with PepsiCo (and he is not), there is no requirement to disclose CW1's "economics 101"

explanation that when prices rise for sustained periods of time, customers are likely to seek

cheaper alternatives.  See Wallace v. Systems & Computer Tech. Corp., No. 95-cv-6303, 1997

U.S. Dist. LEXIS 14677, at *84 (E.D. Pa. Sept. 23, 1997) ("There is no general duty to disclose

general economic conditions because federal securities laws do not compel disclosure of the

obvious."); see also Parnes v. Gateway 2000, 122 F.3d 539, 546 (8th Cir. 1997) (Matters that are

"common knowledge [so] that a reasonable investor can be presumed to understand them" are

immaterial as a matter of law); see also Hillson Partners Ltd. Partnership v. Adage, Inc., 42 F.3d

204, 213-14 (4th Cir. 1994) ("It is not a violation of any securities law to fail to disclose a result

that is obvious even to a person with only an elementary understanding of the stock market.").

Moreover, even if there was some duty to disclose the laws of economics, <u>Constar did disclose it</u>. The plaintiffs conveniently omit the last two sentences in the Registration Statement's risk factor discussing resin which contains the entire point behind the <u>risk</u>: "A sustained increase in the price of resin may slow the rate of conversion of alternative packaging materials, such as glass and metal, to PET, <u>or may make these alternative packaging materials more attractive than PET</u>. If this reduces the demand for PET packaging, it may significantly reduce our prospects for growth." Exh. A at 14.

Thus, Constar's statements about the pass through of resin were full and complete, not materially misleading.

F.    <u>Goodwill</u>

Finally, seizing on the fact that Constar announced that it would write down its goodwill on August 14, 2003,[10] the plaintiffs argue that the goodwill on the Registration Statement filed a year earlier must have been overstated. Amend. Comp. at ¶ 193.

The plaintiffs claim that the value of Constar was overstated because CW1 heard, <u>from someone else</u>, that Crown was trying to sell Constar for around $200 million prior to the IPO and CW2 claims that he thought Constar's asking price of $12 a share was too high. Amend. Compl. at ¶¶ 71-73. This, of course, is nothing but third-hand hearsay, and bears no indicia of reliability. This type of gossip and innuendo could not possibly show that Constar's goodwill was overstated on the financial statements.

---

[10]    <u>See</u> August 14, 2003 Press Release, Exh. E.

In any event, what happened before the IPO is wholly irrelevant because <u>the</u>

<u>market</u> set the price for Constar in the course of the IPO, and that price was common knowledge.

Indeed, while plaintiffs allege that Constar's goodwill was impaired because "the offering price

in the IPO was repeatedly lowered to reflect the market's reaction to the Offering," all this shows

is that the public knew of the information plaintiffs point to, translated that into a lowered valued

for Constar before the IPO, and hence took this information into account in pricing the

Company.

Indeed, one need look no further than the August 14, 2003 announcement to

determine that the market had already discounted the goodwill carried on Constar's books — the

day after the announcement of the writedown, the stock actually <u>increased</u> in value.  See <u>In re</u>

<u>NAHC, Inc. Sec. Litig.</u>, 306 F.3d 1314, 1330 (3d Cir. 2002) (holding, "If the disclosure of

certain information has no effect on stock prices, it follows that the information disclosed was

immaterial as a matter of law."); <u>Oran v. Stafford</u>, 226 F.3d 275, 282 (3d Cir. 2000) (same); <u>In re</u>

<u>Burlington Coat Factory Secs. Litig.</u>, 114 F.3d 1410, 1425 (3d Cir. 1997) (same).[11]  Surely, if the

---

[11]     In <u>In re Adams Golf, Inc. Secs. Litig.</u>, No. 03-3945, 2004 U.S. App. LEXIS 18030 (3d
Cir. Aug. 25, 2004), the Third Circuit stated that, in a case brought under Section 11, the
defendants may not offer a lack of change in stock price to negate the inference of loss
causation, as loss causation is an affirmative defense under Section 11.  To the extent
<u>Adams</u> can be read to say anything about the issue of <u>materiality</u>, any such
pronouncements are dicta since the court went on to note that, unlike <u>Burlington Coat</u>
<u>Factory</u>, "here, after disclosure . . . the number of Adams Golf shares traded jumped from
58,000 to 1.2 million, and resulted in a 17 percent decline in the stock price." <u>Id.</u> at *21
n.11.  In the case of Constar, by contrast, the stock price actually <u>increased</u> on the
announcement that goodwill would be written down.

market were somehow surprised about the writedown in goodwill, Constar's stock price would have dropped upon the announcement of the writedown.[12]

    The remainder of the plaintiffs' claims with respect to goodwill boil down to Constar's failure to predict that it would have to further write down goodwill in light of certain alleged ongoing business trends, including "declining demand for [Constar's] products" and that "the industry was experiencing downward pricing pressure combined with increasing resin prices." Amend. Compl. at ¶ 193. First of all, there was no failure to disclose these facts — the demand for Constar's products was reflected in the financial statements, and there is no duty to disclose industry trends since they are common knowledge. In re Burlington Coat Factory, 114 F.3d at 1427-28 (noting that a company's "belief" about future trends has been uniformly held immaterial). In any event, the Registration Statement repeatedly warns investors that Constar had recently changed its accounting methodology for reporting goodwill, that it had just taken a $50 million charge to goodwill, and that further reductions in goodwill could happen in the future:

> We have a significant amount of goodwill and a writedown of our goodwill would reduce our net worth. At September 30, 2002, we had $331.8 million of goodwill. In July 2001, the Financial Accounting Standards Board issued Statements of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets." We adopted this standard on January 1, 2002 and recorded a charge for the cumulative effect of a change in accounting for $50.1 million. Under the new standard we will no longer amortize goodwill reflected on our balance sheet. We are, however, required to evaluate goodwill reflected on our balance sheet to determine whether the goodwill is impaired under the

---

[12]   See Exhibit F for a chart setting forth the stock price history for Constar during the relevant period.

guidelines of that standard.  Accordingly, we will need to test the value of our goodwill for impairment at least annually and, under certain circumstances, recognize an impairment charge.  <u>One circumstance that may indicate the need for an immediate impairment review would be if our book value was in excess of our market capitalization.</u>  This could occur at any time after the completion of this offering.  If we recognize an impairment charge, our net worth will be reduced.

Exh. A at 16.  Elsewhere, Constar makes clear that the figure for goodwill on the financial statements involves numerous assumptions, and that many factors could require future adjustments to goodwill.  <u>Id.</u> at 49.  That is exactly what happened here — the decline in market capitalization resulted in a goodwill charge.

Given these "storm warnings," any reasonable investor would certainly understand that the goodwill set forth in the financial statements was subject to future adjustments.  The defendants had no obligation to predict in November 2002 that it would subsequently write down additional goodwill, where it specifically warned investors that such a writedown could occur "at any time" — and specified why it might occur (i.e., drop in market capitalization).  <u>In re Donald J. Trump Casino</u>, 7 F.3d at 377 ("We therefore conclude that the prospectus adequately cautioned potential investors that the Taj Mahal would face intense competition.  These warnings undermine any claim that the prospectus made material omissions on this issue."); <u>see also</u> <u>In re NAHC, Inc.</u>, 306 F.3d at 1330 (stating that because company had previously disclosed adverse facts which eventually caused a restatement of goodwill, "any subsequent misstatement regarding the goodwill of the company . . . did not alter the 'total mix of information available' to Appellants").

V.    THE CLAIMS AGAINST THE INDIVIDUALS AND
      CROWN MUST BE DISMISSED BECAUSE PLAINTIFFS
      FAILED TO DEMONSTRATE A COGNIZABLE  SECTION 11
      <u>VIOLATION AND THUS CANNOT ESTABLISH SECTION 15 LIABILITY</u>

In addition to seeking relief from Constar, the plaintiffs claim that Constar directors and/or board members Charles F. Casey, Michael J. Hoffman, James C. Cook, William G. Little, Alan Rutherford, John W. Conway, Angus F. Smith and Frank J. Mechura (collectively, the "Individual Defendants") and Crown are also liable pursuant to Section 15 of the Securities Act of 1933 (the "Act"). <u>See</u> 15 U.S.C. § 77o.  However, liability under Section 15 is derivative and must be predicated upon an independent violation of Sections 11 or 12 of the Act. <u>See</u> <u>In re Advanta Corp. Sec. Litig.</u>, 180 F.3d 525, 541 (3d Cir. 1999); <u>In re U.S. Interactive, Inc. Class Action Sec. Litig.</u>, No. 01-cv-522, 2002 U.S. Dist. LEXIS 16009, at *19 n.7 (E.D. Pa. Aug. 23, 2002); <u>In re EquiMed, Inc. Sec. Litig.</u>, No. 98-cv-5374, 2000 U.S. Dist. LEXIS 6209, at *29 (E.D. Pa. May 9, 2000); <u>Gannon v. Continental Ins. Co.</u>, 920 F. Supp. 566, 575-76 (D.N.J. 1996).  Because claims under Section 11 fail as a matter of law, the claims under Section 15 must also be dismissed. <u>Shapiro v. UJB Fin. Corp.</u>, 964 F.2d 272, 279 (3d Cir. 1992).

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice.

Steven B. Feirson
Michael L. Kichline
Michael E. Baughman
Scott A. Thompson
Dechert LLP
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103
(215) 994-2489

Attorneys for Defendants Constar
International, Inc., Crown Cork &
Seal Company, Inc. and the
Individual Defendants

Dated: September 23, 2004

## CERTIFICATE OF SERVICE

I, Scott A. Thompson, do hereby certify that on September 23, 2004, I caused a true and correct copy of Motion of Defendants to Dismiss the Consolidated Amended Class Action Complaint, Memorandum of Law in Support of Motion of Defendants to Dismiss the Consolidated Amended Class Action Complaint, and a proposed Order, to be served upon the following by Federal Express or hand delivery as designated below:

**(Hand Delivery)**

Marc J. Sonnenfeld
Karen Pieslak Pohlmann
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-5000

*Attorneys for Defendants Salomon Smith Barney, Inc.,*
*d/b/a Citigroup Global Markets, Inc., Citigroup,*
*Deutsche Bank Securities, Inc., J.P. Morgan Securities, Inc.,*
*and Lazard Freres & Col., LLC*

Deborah R. Gross
Law Offices of Bernard M. Gross, P.C.
1515 Locust Street, Second Floor
Philadelphia, PA 19102
Telephone: (215) 561-3600

*Liaison Counsel for Lead Plaintiffs and the Class*

**(Federal Express)**

Sandy A. Liebhard
Jeffrey M. Haber
Bernstein Liebhard & Lifshitz, LLP
10 East 40th Street, 22nd Floor
New York, NY 10016
Telephone: (212) 779-1414

Steven W. Pepich
Brian O. O'Mara
Lerach Coughlin Stoia & Robinson LLP
401 B Street, Suite 1700
San Diego, CA 92101
Telephone: (619) 231-1058

*Attorneys for Plaintiffs*


Scott A. Thompson, Esquire