## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF PENNSYLVANIA

_____

IN RE CONSTAR INT'L INC.
SECURITIES LITIGATION

This Document Relates To:

ALL ACTIONS.
_____

)
)
)
)
)
)
)
)
)

**Master File No. 03cv05020**

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT

**LAW OFFICES BERNARD M. GROSS, P.C.**
Deborah R. Gross, I.D. No. 44542
1515 Locust Street, Second Floor
Philadelphia, PA 19102
Telephone: (215) 561-3600

**Liaison Counsel for Lead Plaintiffs
and the Class**

| | |
|---|---|
| **BERNSTEIN LIEBHARD<br>& LIFSHITZ, LLP**<br>Jeffrey M. Haber<br>Timothy J. MacFall<br>Stephanie M. Beige<br>10 East 40th Street, 22nd Floor<br>New York, NY 10016<br>Telephone: (212) 779-1414 | **LERACH COUGHLIN STOIA GELLER<br>RUDMAN & ROBBINS LLP**<br>Steven W. Pepich<br>Andrew J. Brown<br>Brian O. O'Mara<br>401 B Street, Suite 1700<br>San Diego, CA 92101<br>Telephone: (619) 231-1058 |

**Lead Counsel for Lead Plaintiffs and the Class**

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ i

Introduction ....................................................................................................... 1

I.    STATEMENT OF FACTS ............................................................................ 5

      A.    Crown and its Acquisition of Constar ................................................ 5

            1.    Constar's Value and Goodwill Became Substantially
                  Impaired Following the Acquisition ........................................ 5

                  a.    Constar's Antiquated Technology Causes
                        the Loss of Customers and Key Personnel ................... 6

                  b.    Constar's Business Losses ......................................... 6

                  c.    Lost Business Opportunities ...................................... 7

                  d.    Constar Was Plagued by Defective Products ................. 8

                  e.    Crown Fails to Write-Off Constar's Diminished Goodwill ... 9

                  f.    Crown Seeks to Privately Sell Constar ....................... 9

                  g.    The IPO and Its Aftermath ...................................... 10

II.   ARGUMENT .......................................................................................... 12

      A.    The Complaint Readily Satisfies the Pleading
            Requirements of the Securities Act ................................................. 12

            1.    Applicable Standards .......................................................... 12

      B.    The Registration Statement Contains Material
            Misrepresentations and Omissions ................................................. 13

            1.    Constar's Obsolete Technology ............................................. 14

            2.    The Misstatements Concerning Constar's Equipment
                  Were Material and Lacked any Reasonable Basis ...................... 18

            3.    Misstatements Concerning the Company's Technology ............... 22

4.      The Misleading Statements Concerning Capital
Expenditures and Expansion...................................................27

      a.      Capital Expenditures ..................................................27

      b.      Capacity Expansion ...................................................29

5.      Material Omissions Concerning Constar's Financial Condition...............30

6..     Material Misrepresentations And Omissions Concerning Resin ..............32

7.      Defendants' False Statements Concerning Goodwill................................33

C.     Defendants' Attack on the Confidential Sources is Improper ................................36

D.     Defendants' False And Misleading Statements Are Not
Immunized By Purported "Risk Disclosures"........................................................39

1.      Defendants' False and Misleading Statements Are
Not Protected Under the Bespeaks Caution Doctrine..............................39

2.      The Purported Risk Disclosures Are Not Adequate ................................40

E.     Defendants' Loss Causation Arguments Are Baseless
And Should Be Rejected.........................................................................................45

F.     The Underwriter Defendants are Liable for Constar's False
and Misleading Prospectus and Registration Statement ........................................47

G.     The Complaint Adequately Alleges Section 11 Liability
Against the Underwriter Defendants ......................................................................48

H.     The Complaint Pleads Securities Violations and
Not Corporate Mismanagement.............................................................................49

I.     The Defendants Are Liable Under Section 15(a) of the Securities Act................49

J.     If Necessary, Leave to Amend Should Be Granted ...............................................51

III.     CONCLUSION.................................................................................................................52

# TABLE OF AUTHORITIES

## CASES

*ALA, Inc. v. CCAIR, Inc.*,
  29 F.3d 855 (3d Cir. 1994) ........................................................................12

*Akerman v. Oryx Communications, Inc.*,
  810 F.2d 336 (2d Cir. 1987) ......................................................................46

*Angelastro v. Prudential-Bache Sec., Inc.*,
  764 F.2d 939 (3d Cir. 1985) ........................................................................4

*Asher v. Baxter Intern. Inc.*,
  No. 03-3189, 2004 WL 1687885 (7th Cir. July 29, 2004)..........................41, 44

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)........................................................................13, 20, 25

*Bastian v. Petren Res. Corp.*,
  892 F.2d 680 (7th Cir. 1990) ......................................................................46

*Billet v. Storage Tech. Corp.*,
  72 F.R.D. 583 (S.D.N.Y. 1976) ..................................................................46

*Carol Gamble Trust 86 v. E-Rex, Inc.*,
  No. 03-15032, 2004 WL 43216 (9th Cir. Jan. 5, 2003)....................................37

*Celotex Corp. v. Cotreff*,
  477 U.S.317 (1986)......................................................................................46

*Ellison v. Am. Image Motor Co., Inc.*,
  36 F. Supp. 2d 628 (S.D.N.Y. 1999)............................................................51

*Emmi v. First Mfr Nat=l Bank*,
  336 F. Supp. 629 (D. Me. 1971) ..................................................................46

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976)....................................................................................48

*Falkowski v. Imation Corp.*,
  309 F.3d 1123 (9th Cir. 2002) ..............................................................37-38

*Fecht v. Price Co.*,
  70 F.3d 1078 (9th Cir. 1995) ......................................................................43

*Foman v. Davis*,
  371 U.S. 178, 83 S. Ct. 227 (1962)..............................................................51

*Ganino v. Citizens Util. Co.*,
   228 F.3d 154 (2d Cir. 2000) ......................................................................24, 35

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983)...................................................................................13, 48

*Huddleston v. Herman & MacLean*,
   640 F.2d 534 (5th Cir. 1981) .............................................................28, 36, 44

*In re ATI Tech. Inc., Sec. Litig.*,
   216 F. Supp. 2d 418 (E.D. Pa. 2002) ...............................................................31

*In re Applied Magentics Corp. Sec. Litig.*,
   No. CV 93-6195 DT (JRX), 1994 WL 486550
   (C.D. Cal. May 16, 1994) .................................................................................28

*In re Adams Golf, Inc. Sec. Litig.*,
   381 F.3d 267 (3d Cir., 2004) ....................................................................44, 47

*In re Advanta Corp. Sec. Litig.*,
   180 F.3d 525 (3d Cir. 1999) .....................................................................19, 40

*In re Apple Computer Sec. Litig.*,
   886 F.2d 1109 (9th Cir. 1989) .........................................................................28

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997) ...................................................4, 12, 38, 51

*In re Cabletron System Inc.*,
   311 F.3d 11 (1st Cir. 2002)................................................................................1

*In re Cell Pathways Inc. Sec. Litig.*,
   No. 99-725, 2000 WL 805221
   (E.D. Pa. June 21, 2000) ............................................................................35, 45

*In re Compaq Sec. Litig.*,
   848 F. Supp. 1307 (S.D. Tex. 1993) ...............................................................45

*In re Donald J. Trump Casino Sec. Litig.*,
   7 F.3d 357 (3d Cir. 1993) .........................................................................39, 44

*In re Enron Sec., Derivative & "ERISA" Litig.*,
   235 F. Supp. 2d 549 (S.D. Tex. 2002) ............................................................50

*In re Fortune Syst. Sec. Litig.*,
   680 F. Supp. 1360 (N.D. Cal. 1987) ...............................................................46

*In re Home Health Corp. of Am. Sec. Litig.*,
   No. Civ. A. 98-834, 1999 WL 79057,
   (E.D. Pa. Jan. 29, 1999) ...................................................................................49

*In re Initial Public Offering Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003)...............................................................38

*In re Metawave Communications Corp. Sec. Litig.*,
    298 F. Supp. 2d 1056 (W.D. Wash. 2003).....................................................37

*In re MobileMedia Sec. Litig.*,
    28 F. Supp. 2d 930 (D.N.J. 1998) .......................................................28, 36, 50

*In re NationsMart Corp. Sec. Litig.*,
    130 F.3d 309 (8th Cir. 1997) ...................................................................41, 47

*In re Pemstar, Inc. Sec. Litig.*,
    No. Civ. 02-1821 DWFSRN, 2003 WL 21975563
    (D. Minn. Aug. 15, 2003) ...............................................................................44

*In re Ravisent Tech., Inc. Sec. Litig.*,
    No. Civ. A. 00-CV-1014, 2004 WL 1563024
    (E.D. Pa. July 13, 2004)........................................................................ *passim*

*In re Resource America Sec. Litig.*,
    No. Civ. 98-5446, 2000 WL 1053861
    (E.D. Pa. July 26, 2000) .................................................................................35

*In re Seagate Technology II Securities Litigation*,
    No. C 88-20489 RPA, 1989 WL 222969
    (N.D. Cal. May 3, 1989) .................................................................................16

*In re Sprint Corp. Sec. Litig.*,
232 F. Supp. 2d 1193 (D. Kan. 2002) ...................................................19, 26

*In re Time Warner, Inc. Sec. Litig.*,
    9 F.3d 259 (2d Cir. 1993) ......................................................................19, 26

*In re Towne Serv. Sec. Litig.*,
    184 F. Supp. 2d 1308 (N.D. Ga. 2001) .........................................................43

*In re Unisys Corp. Sec. Litig.*,
    No. Civ. A. 00-1849, 2000 WL 1367951
    (E.D. Pa. Sept. 21, 2000) ..................................................................12, 24, 25

*In re U.S. Interactive, Inc. Class Action Sec. Litig.*,
    No. 01-CV-522, 2002 WL 1971252
    (E.D. Pa. Aug. 23, 2002)................................................................................40

*In re ValuJet, Inc. Sec. Litig.*,
    984 F. Supp. 1472 (N.D. Ga. 1997) .......................................................28, 36

*In re Viropharma, Inc. Sec. Litig.*,
    No. Civ. A. 02-1627, 2003 WL 1824914
    (E.D. Pa. Apr. 7, 2003) ...................................................................................12, 40, 43

*In re Westinghouse Sec. Litig.*,
    90 F.3d 696 (3d Cir. 1996) ..............................................................................25, 42, 481

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) .........................................................................................39

*Isquith v. Middle S. Util., Inc.*,
    847 F.2d 186 (5th Cir. 1988) ..............................................................................18, 29, 38

*Kaplan v. Rose*,
    49 F.3d 1363 (9th Cir. 1994) .........................................................................................48

*Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.*,
    238 F.3d 363 (5th Cir. 2001) .........................................................................................47

*Lucia v. Prospect St. High Income Portfolio, Inc.*,
    36 F.3d 170 (1st Cir. 1994) ......................................................................................45-461

*Lyne v. Arthur Andersen & Co.*,
    772 F. Supp. 1064 (N.D. Ill. 1991) ..............................................................................45

*Mayer v. Mylod*,
    988 F.2d 635 (6th Cir. 1993) ..................................................................................19, 26

*Miller v. New Am. High Income Fund*,
    755 F. Supp. 1099 (D. Mass 1991), ............................................................................45

*Neuberger v. Shapiro*, No.
    Civ. A. 97-7947, 1998 WL 408877
    (E.D. Pa. July 17, 1998) ................................................................................................47

*Newman & Schwartz v. Asplundh Tree Expert Co. Inc.*,
    102 F.3d 660 (2d Cir. 1996) ............................................................................................4

*Nielsen v. Greenwood*,
    849 F. Supp.1233 (N.D. Ill. 1994) ...............................................................................46

*Parnes v. Gateway 2000, Inc.*,
    122 F.3d 539 (8th Cir. 1997) .........................................................................................44

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996) .......................................................................................44

*Schaffer v. Evolving Sys., Inc.*,
    29 F. Supp. 2d 1213 (D. Colo. 1998) ...........................................................................40

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992) ........................................................................20

*Shoenhaut v. Am. Sensors, Inc.*,
    986 F. Supp. 785 (S.D.N.Y. 1997)…………………………………………16

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976)....................................................................................20

*Tracinda Corp. v. Daimlerchrysler AG*,
    197 F. Supp. 2d 42 (D. Del. 2002)..............................................................12

*Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*,
    140 F.3d 478 (3d Cir. 1998) ..................................................................12, 38

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) ....................................................................47

*Virginia Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991)......................................................................19, 26, 39

*Voit v. Wonderware Corp.*,
    977 F. Supp. 363 (E.D. Pa. 1997) ..............................................................44

*Weiner v. Quaker Oats Co.*,
    129 F.3d 310 (3d Cir. 1997) .......................................................................19

## FEDERAL STATUTES

15 USC 877 k(a)(1)-(3)................................................................................48

15 U.S.C. '77k(e).........................................................................................46

Fed. R. Civ. P. 8(a) ...............................................................................2, 3, 38

Fed. R. Civ. P. 12(b)(6) .......................................................................3, 38, 45

Fed. R. Civ. P. 15(a) ...................................................................................51

By this consolidated opposition brief, Lead Plaintiffs hereby oppose Defendants' motions to dismiss the Consolidated Amended Class Action Complaint (the "Complaint").[1]

## Introduction

When Crown purchased Constar in 1992, Constar was a successful, profitable company. Over the next 10 years, however, Crown was unable to continue to grow Constar's business in the competitive plastic containers industry. As a result of Crown's increasing financial problems, the Constar business suffered. Crown did not spend the money necessary to upgrade Constar's manufacturing equipment or even to properly maintain what was becoming increasingly out-dated equipment. Over the course of the 1990s, Crown's financial position worsened, as it continued to lose money and amass a substantial amount of debt. As Crown's financial position worsened, so did Constar's ability to compete within its market. Over time, Constar's production and equipment problems worsened, adversely affecting Constar's ability to retain customers or compete for new business. As a consequence, Constar began losing major customers.

By 2001, Crown's financial condition had become precarious, ending 2001 with a net loss of almost $1 billion. Crown was laying-off workers and closing plants. Its ability to access capital markets was deteriorating, with its unsecured bonds and its $2.5 billion credit facility relegated to "junk" status by ratings agencies. To solve its cash

---

[1] "Constar Defendants" refers to Charles F. Casey, William G. Little, Michael J. Hoffman, James C. Cook, Alan W. Rutherford, John W. Conway, Angus F. Smith, and Frank J. Mechura (collectively, the "Individual Defendants"), Constar International, Inc. ("Constar" or the "Company"), and Crown Cork & Seal Company, Inc. ("Crown"). "Underwriters" or "Underwriter Defendants" refers to Salomon Smith Barnet Inc., Deutsche Bank Securities, Inc., JP Morgan Securities Inc., and Lazard Fréres & Co. LLC. The Constar Defendants and the Underwriter are collectively referred to herein as "Defendants."

crisis, Crown began selling "non-core" assets, one of which was Constar.   Initially, Crown attempted to sell Constar to its competitors for a price in the "low $200 million range," but could find no takers.   Instead, Crown decided to spin-off the Company in a public offering in November 2002 (the "IPO").

The Registration Statement and Prospectus (the "Registration Statement") that Defendants filed in connection with the IPO, however, was false and misleading in many material respects.   For example, it portrayed Constar as a highly competitive, growing company when, in fact, the opposite was true.   It represented that Constar utilized "state of the art" equipment, and that its "machinery had been continuously maintained and upgraded" when, in fact, its machinery was two generations behind its competitors and the Company had failed to maintain that aging equipment.   Most importantly, the Registration Statement incorporated financial statements that were materially false and misleading, overstating Constar's "goodwill" by at least $183 million.   Accordingly, the financial statements in the Registration Statement violated generally accepted accounting principles ("GAAP"), as well as Constar's own publicly-stated accounting policies.   Had Defendants been truthful concerning Constar's business and balance sheet, they would not have been able to complete the IPO at $12 per share.   As it was, the IPO price had to be reduced twice – from $18 per share to $15 per share, then to $12 per share.

Because the Complaint alleges the foregoing in significant detail, Defendants are "on notice" of the basis for their liability consistent with the pleading requirements of Fed. R. Civ. P. 8(a).   In the face of these detailed allegations, Defendants argue the courthouse doors are, nonetheless, closed to Plaintiffs and the class of shareholders they seek to represent.   The arguments asserted by Defendants in support of their respective

2

motions to dismiss the Complaint, however, improperly raise disputed issues of fact, improperly challenge the *sources* of Plaintiffs' allegations, mischaracterize the allegations of the Complaint, and misstate the law.   None of their arguments are, therefore, sufficient to sustain their heavy burden on this Rule 12(b)(6) motion.

For example, Defendants expend a great deal of effort attacking the various confidential sources identified as the bases for certain of the allegations in the Complaint. Relying on cases decided under Rule 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"), Defendants claim Plaintiffs' sources are "unreliable," or otherwise are not credible.   In this case, however, the Complaint - which asserts only allegations under the Securities Act of 1933 - is subject to neither the particularity requirements of Rule 9(b), nor the heightened pleading standards of the PSLRA.   Indeed, the proper pleading standard – under Fed. R. Civ. P. 8(a) – does not require Plaintiffs to identify any sources at all.   Therefore, the challenge to the sufficiency of factual allegations that Plaintiffs are not even required to make, can hardly support a motion to dismiss for failure to state a claim. At best, Defendants' "credibility" arguments raise issues of disputed fact that cannot be decided here.

Similarly, Defendants' assertion that many of the false statements in the Registration Statement are not actionable because they are not "material," should be rejected.   Because the materiality of the misrepresentations identified in the Complaint involve disputed issues of fact, such determinations are not appropriate for resolution in connection with this Rule 12(b)(6) motion.   *Basic Inc. v. Levinson*, 485 U.S. 224, 237 (1988).   Moreover, Plaintiffs have properly alleged that the specific false statements in the Registration Statement would have been material to a reasonable investor because, at

a minimum, such statements altered the "total mix of information" concerning Constar. *Id*.

Defendants also incorrectly contend that these statements are entitled to protection of the "bespeaks caution" doctrine because the Registration Statement contains cautionary risk-disclosing warnings. This assertion is not only wrong, but many of the so-called risk factors are themselves misleading because many of the things ***that had already occurred at Constar*** were described as mere future contingencies. Even then, many of the so-called risk disclosures were so general and vague that Defendants did not properly caution the reader to the specific adverse conditions identified in the Complaint. Accordingly, the "bespeaks caution" doctrine is inapplicable here.

Neither the Constar Defendants nor the Underwriter Defendants have sustained their burden that the Complaint fails to state a claim for which relief can granted under Sections 11 and 15 of the Securities Act. Accordingly, both motions should be denied.[2]

---

[2]    In considering a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a court must limit itself to "facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Newman & Schwartz v. Asplundh Tree Expert Co. Inc.*, 102 F.3d 660, 662 (2d Cir. 1996); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 n.16 (3d Cir. 1997) ("As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings.") (*citing Angelastro v. Prudential-Bache Sec., Inc.*, 764 F.2d 939, 944 (3d Cir. 1985). Defendants' brief, to the extent it transgresses this limitation, should be disregarded. For example, the Court must reject Defendants' reference to, and reliance on, Exhibits B and C attached to Defendants' motion to dismiss. These documents are nothing more than Defendants' mischaracterizations of Plaintiffs' allegations and an attempt to impose the pleading standard for fraud onto Plaintiffs' Section 11 claim. As such, both of these documents should be disregarded in their entirety.

## I.     STATEMENT OF FACTS

### A.     Crown and its Acquisition of Constar

Crown primarily manufactures metal beverage cans and cork-filled bottle caps for the beverage and food storage markets.  ¶ 12. [3]  In 1989, Crown began an aggressive acquisition campaign to enter new markets and new product areas.  ¶¶ 12, 64.  To pay for this aggressive diversification, however, Crown incurred a substantial amount in debt. ¶ 64.  As part of this strategy, and to hedge against the growing dominance of plastic containers in the food and beverage industry, Crown acquired Constar in 1992 for $519 million, a price considered high by many industry observers.  ¶ 62.  Because the value of Constar's hard assets were much less than $519 million, Crown booked more than 93% of the purchase price as goodwill. *Id.*

### 1.     Constar's Value and Goodwill Became Substantially Impaired Following the Acquisition

Prior to the acquisition, Constar was a leading player in the polyethylene terephthalate ("PET") food and beverage container market.  ¶¶ 6-9.  Constar's customers included major brand marketers, such as Buffalo Rock, Anheuser-Busch, PepsiCo, the Minute Maid Company, and Proctor & Gamble.  At the time of the acquisition, Constar was relatively debt-free and profitable, as opposed to Crown, which had become heavily leveraged.  ¶ 13.

Crown's financial condition worsened after the Constar acquisition.  ¶ 68.  By 1995, Crown committed a significant portion of its cash flow to servicing its heavy debt. Consequently, Crown could not, and did not, make critical capital expenditures to upgrade Constar's property, plants and equipment.  This failure was material, as the

---

[3]        References to "¶ __," are to paragraphs of the Complaint.

manufacture of PET containers is capital intensive. Crown's refusal or inability to invest the capital in Constar resulted in the Company being unable to maintain technological parity with its competitors.

### a. Constar's Antiquated Technology Causes the Loss of Customers and Key Personnel

As a result of Crown's failure to adequately capitalize Constar's operations, the Company could not acquire the state-of-the-art equipment necessary to maintain Constar's competitive position. ¶¶ 82-90. For example, by 1996, when the Sidel No. 2 (the "SB02") became the industry-standard machine for the manufacture of preforms, Constar was still using the older model, the Sidel No. 1 (the "SB01"), as its primary preform manufacturing equipment.[4]  ¶ 83. The SB01 produced fewer bottles per hour than the newer model. *Id*. By the time of the IPO in 2002, Constar's primary manufacturing equipment was two-generations older than that of its competitors. While Constar was still using the SB01, the Sidel No. 2+ (the "SB02+") was the industry-standard for the manufacture of preforms. *Id*.

The competitive disadvantage resulting from Constar's reliance on older, slower equipment was exacerbated by the Company's financial inability to adequately maintain and repair its aging equipment.  ¶¶ 85-90, 119-21. Constar's aging, inadequately maintained manufacturing base resulted in widespread product defects; an inability to offer competitive pricing and the resulting loss of longstanding customers; an inability to compete for new business; and an erosion of margins. ¶¶ 81–121. In addition, the Company experienced an exodus of key employees following the acquisition by Crown.

---

[4]     Preforms are test tube-shaped intermediate products in the manufacturing process for bottles and are purchased by customers or other PET container manufacturers that operate equipment to convert preforms into bottles. ¶ 83.

¶ 65.

### b.    Constar's Business Losses

The Company's inability to competitively price its products due to its reliance on outdated, inefficient, and poorly maintained equipment, caused the loss of critical, longstanding customer accounts.   Those accounts included the loss of a contract to manufacture motor oil containers for Exxon (after 13 years), and the loss of business from the Consolidated Pepsi Facility in 1999 or early 2000.  ¶¶ 92-95.

In addition, Constar lost customers due to its failure to invest in new equipment necessary to meet the customers' new product needs.  These losses included the loss of the existing Clorox business in the spring of 2001, and the loss of business from Folgers Coffee after 17 years.  ¶¶ 97, 110-11, 113-14.  Constar did not submit bids on certain accounts or potential accounts because it would have required a significant capital investment to upgrade its equipment.  *Id.*

Similarly, pervasive product defects stemming from technological and production problems caused the Company to lose business from Buffalo Rock, a major independent Pepsi bottler, which resulted in the closure of Constar's Birmingham, Alabama plant.  ¶¶ 103-04.  In addition, problems with the efficacy of the Company's proprietary Oxbar technology caused the loss of business from Anheuser-Busch in 2002.  ¶¶ 107-08.  The Company also lost an account to manufacture motor oil quart containers for Mobil Oil about the time of the Company's IPO in the fall of 2002.  ¶¶ 119-21.

### c.    Lost Business Opportunities

Constar was also unable to capitalize on myriad new business opportunities because of its antiquated manufacturing infrastructure.  ¶ 128. For example, Constar attempted to solicit the production of 200 million custom-plastic bottles from Austin

Nichols & Company during the summer of 2001. ¶ 129. After a year of negotiations, Constar pulled out of consideration for the business because the Company did not want to upgrade its equipment to manufacture bottles with an EVOH liner that could withstand high temperatures during the beverage-fill process. *Id.*

During the summer of 2001, Constar also solicited Riley Foods to produce 25 million units of customer containers and closures (caps) on an annual basis for different-flavored instant powered teas. ¶ 131. Constar was unable to secure the business, however, because the Company had initiated a practice of adding a 20% premium to its planned bid price on certain products to bolster margins. ¶¶ 131-32. The 20% increase, however, rendered Constar's bid too high, and the Company lost the account to its competitors Ring Can and Phoenix Closure. ¶ 132.

Similarly, Constar lost a contract with Dole Foods for the production of 20 to 30 million units of conventional PET water-bottles in mid-to-late 2001. ¶ 134. A competitor, whose bid was based on the use of a six-station Seidel machine that produced 6,000 units per hour, beat the Constar bid, which was based on the use of two Seidel machines, each of which had two stations. *Id.* Constar would not, or could not, invest the approximately $5 million necessary to purchase the six-station machine. *Id.*

### d.      Constar Was Plagued by Defective Products

Constar's use of outdated machinery also caused pervasive product defects that strained the Company's relationships with many of its customers. ¶ 135. For example, chronic problems with 2-liter bottles produced for PepsiCo-Tulsa caused it to threaten canceling its contract with Constar in May 2002, endangering the Company's relationship with PespsiCo on a national level. ¶¶ 135-41.

### e.    Crown Fails to Write-Off Constar's Diminished Goodwill

Over time, Constar's value became substantially impaired.  Nonetheless, Crown continued to amortize the goodwill associated with Constar on a 40 year straight line basis, with no adjustment to reflect its true value.  ¶ 187.  By November 2002, Constar's goodwill was still valued at more than $331 million, representing almost half of the Company's $700 million in total assets.  *Id*.  In truth, however, Constar's goodwill, had become impaired by at least $183 million.[5]

### f.    Crown Seeks to Privately Sell Constar

Crown's financial position became so precarious that by 2002, Crown was forced to sell off assets merely to service its debt.  One of these assets was Constar.  Crown started shopping Constar as early as 2001, but Crown could not generate serious interest because its asking-price was far too high. ¶¶ 70-74.  Unable to sell Company outright, the Constar Defendants decided to spin off the Company to the investing public in the IPO. ¶ 75.  Nonetheless, Crown failed to take an appropriate charge for the impairment of goodwill prior to the IPO - even though it was required to conduct impairment checks as of January 1, 2002 under Statement of Financial Accounting Standards ("SFAS") 142 - because had it written off the full $183 million of impaired goodwill, it would have reduced total assets by at least 24% and goodwill by 55%.  This would have prevented Crown from successfully completing the IPO at the inflated price of $12 per share.

---

[5]    Crown took a $50.059 million charge several months before the IPO for its European reporting unit due to the cumulative effect of a change in accounting principles as of January 1, 2002.  ¶ 191.  However, the Company failed to take any write-down for its U.S. operations at that time. ¶ 193.

### g.      The IPO and Its Aftermath

On November 14, 2002, the Constar Defendants filed with the SEC the Registration Statement for the issuance of 10.5 million shares of Constar common stock. ¶ 149. The IPO was solely comprised of shares sold by Crown and was priced at $12 per share for total proceeds of $117 million after underwriting discounts and commissions. *Id*.

As part of the IPO, Crown caused Constar's asset base to become further impaired by transferring substantial debt to Constar. Crown, which had total control over Constar prior to the IPO, caused the Company to issue a $350 million note to Crown. However, because the Company received nothing of value in return, the $350 million note was, in effect, a "dividend" for Crown, despite the fact that Constar had insufficient retained earnings to declare a dividend of this magnitude. ¶ 76. Payment of the $350 million note was to be made, in part, from the proceeds of $175 million of senior subordinated notes to be issued by Constar. The remainder of the $350 million was to be paid from a loan that Constar agreed to secure following the IPO. *Id*. Constar was left with no working capital or capital available for financing following the IPO. ¶ 77.

On July 29, 2003, the true state of Constar's financial problems partially came to light when the Company alerted the market of its disappointing financial results for the second quarter of 2003. ¶ 208. The Company attributed this loss to, among other things, "slower than expected ramp-up of new customers and product conversions in the United States and Europe." *Id.* Defendants further stated that without the expected growth, "we were unable to offset the previously announced business losses and the price concessions given in exchange for added volume and contract extensions." *Id.*

Defendants' announcement was followed up with a conference call with analysts, wherein Defendants Hoffman and Cook disclosed that Constar's poor financial results were due to the loss of customers, including Folgers, Powerade, and Buffalo Rock. ¶ 209. Significantly, Hoffman admitted that Constar's margins had eroded because the Company lacked the technology to produce custom PET products. *Id.*

As a result of these disclosures, the price of Constar stock dropped almost 30%, from a trading high of $9.17 per share on July 28, to a trading low of $6.00 per share on July 30, with trading volume of over 1.56 million shares on that day. As the market continued to digest Defendants' disclosures, the price of Constar stock continued to decline. By August 5, 2003, the price of Constar stock had fallen to $5.25 per share. ¶ 210. However, Defendants' disclosures were far from complete.

On August 14, 2003, approximately two weeks after Constar's partial disclosure, the Company belatedly admitted that its financial position was not as previously represented because the Company had failed to recognize an impairment of goodwill. ¶ 211. Without providing specific details, Defendants stated that the "Company is currently assessing the potential impact of the impairment, and while the assessment is not yet complete, the Company expects the impairment charge will be material." *Id.* As a result, the Company delayed filing its quarterly report on Form 10-Q for the second quarter of 2003. *Id.* The Company subsequently acknowledged that it would take a $183 million charge to write-off its impaired goodwill. *Id.*

In the days following this announcement, it was reported that Constar was closing a number of its manufacturing plants, including its Reserve, Louisiana and Birmingham, Alabama facilities. ¶ 213. As reported on September 5, 2003 in the *Philadelphia*

*Inquirer*, "Contributing to the poor financial results are the losses of at least two significant customers. Also, Constar agreed to price reductions to secure contract extensions with PepsiCo Inc. Constar expected the lower prices to lead to higher volumes, which failed to materialize." *Id.*

## II.   ARGUMENT

### A.   The Complaint Readily Satisfies the Pleading Requirements of the Securities Act

#### 1.   Applicable Standards

"The purpose of a Rule 12(b)(6) motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of a case." *In re Ravisent Tech., Inc. Sec. Litig.*, No. Civ. A. 00-CV-1014, 2004 WL 1563024, at *2 (E.D. Pa. July 13, 2004) (citing *Tracinda Corp. v. Daimlerchrysler AG*, 197 F. Supp. 2d 42, 53 (D. Del. 2002)). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations." *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998) (*citing ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994)). *See also In re Unisys Corp. Sec. Litig.*, No. Civ. A. 00-1849, 2000 WL 1367951, at *3 (E.D. Pa. Sept. 21, 2000); *In re Viropharma, Inc. Sec. Litig.*, No. Civ. A. 02-1627, 2003 WL 1824914, at *1 (E.D. Pa. Apr. 7, 2003). Thus, in deciding a Rule 12(b)(6) motion, "the court should not look to whether plaintiffs will 'ultimately prevail,' it should only consider whether they should be allowed to offer evidence in support of their claims." *Ravisent*, 2004 WL 1563024, at *2 (citing *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997)).

To plead a *prima facie* claim under Section 11 of the Securities Act, the plaintiff must allege:  (i) that the registration statement contained a misstatement or omission when it became effective; (ii) that the misstatement or omission was material; (iii) and the plaintiff purchased the security pursuant to such statement. *In re Adams Golf Inc. Sec. Litig.*, 381 F.3d 267, 274 n. 5 (3d Cir. 2004). *Ravisent*, 2004 WL 1563024, at *12 (*citing Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)).  Moreover, "pleading an action under Section 11 does not require proof of scienter, or a general motive or intent to manipulate." *Ravisent*, 2004 WL 1563024, at *12.  Indeed, liability under Section 11 "approximates the tort standard of strict liability." *Id*. *See also Adams*, 381 F3d 274 n. 7 ("Sections 11 and 12(a)(2) are virtually absolute liability provisions . . .").  The Complaint readily satisfies this liberal pleading standard.

As discussed below, the Complaint alleges that Plaintiffs purchased Constar stock pursuant and traceable to the Registration Statement (¶¶ 31-32), which contained materially false and misleading statements at the time that it became effective.  ¶¶ 151-84, 193-95.  No more is required to plead a viable claim under Section 11.

### B.      The Registration Statement Contains Material Misrepresentations and Omissions

Lacking any meritorious basis for challenging the allegations of the Complaint, Defendants attack the sufficiency of allegations that Plaintiffs never made, distort those that Plaintiffs did make, impermissibly inject disputed issues of fact into the determination of the adequacy of Plaintiffs' allegations, and improperly engraft the pleading standard for fraud onto Plaintiffs' strict liability Section 11 claim.  A plain reading of the straightforward allegations of the Complaint and application of the correct pleading standards, however, demonstrates the viability of Plaintiffs' claims and the

paucity of merit in Defendants' arguments.  Defendants' motions should, therefore, be denied.

### 1.     Constar's Obsolete Technology

The Registration Statement is replete with materially false and misleading statements that paint Constar as a vibrant company utilizing cutting-edge manufacturing equipment and practices to maintain a cost-competitive industry position.  In reality, however, for years leading up to the IPO, Constar's debt-laden parent was unable and unwilling to make the capital investments necessary to upgrade Constar's manufacturing equipment to remain competitive. ¶ 18.  Constar's inability to meet customer demands and the pervasive quality-control problems caused by the Company's outdated manufacturing equipment resulted in an exodus of key customers by the time of the IPO.

Specifically, the Registration Statement states that Constar "was able to maintain [its] competitive cost position as [it] grew by purchasing state-of-the-art manufacturing equipment for [its] high-volume product lines . . .," (¶ 164), and that the Company's "manufacturing platform is cost competitive" because Constar's machinery "has been continuously maintained and upgraded, and because the speed and capacity of [its] equipment are generally comparable to the equipment of [its] competitors. . . ." ¶ 166.

These statements were materially false and misleading because Constar utilized manufacturing equipment that: (i) did not have the speed and capacity that was "generally comparable" to that of the equipment used by the Company's competitors; (ii) did not result in a cost competitive manufacturing platform; and (iii) had not been continuously upgraded.  ¶¶ 165, 167-68.  In addition, the Company had not "maintained its competitive position by purchasing state-of-the-art manufacturing equipment for [its] high volume business." *Id.*

The primary manufacturing equipment used by the Company was the Sidel SB01. ¶ 83. The Sidel SB01 was two generations old by the time of Constar's IPO. ¶¶ 82-85. As far back as 1996, the industry "workhorse" was the Sidel SB02. ¶ 83. Moreover, while the rest of the industry had moved on from the Sidel SB02 to the Sidel SB02+ by the time of the IPO, Constar continued to use the SB01.[6] *Id.* ¶¶ 70, 83. Constar's use of outdated manufacturing equipment, and its refusal or inability to upgrade that equipment, is corroborated by former Constar employees. ¶¶ 84-86, 96-99, 103, 112-18.

Because Constar used the Sidel SB01 at the time of the IPO, the speed and capacity of its equipment was not "generally comparable" to that of the Company's competitors. As explained by a former Constar corporate officer and industry consultant, the newer Sidel machines produced more bottles per hour than the older equipment used by Constar. ¶ 83. Therefore, the statements in the Registration Statement concerning the "upgrading" and "comparability" of Constar's equipment, were materially false and misleading.

Likewise, far from being able to maintain its competitive position in the high volume sector by purchasing state-of-the-art manufacturing equipment, numerous former employees reported that Constar's competitive position steadily worsened in the period leading up to the IPO precisely because of the Company's failure to purchase state-of-the-art equipment. ¶¶ 85-86, 96-99, 103. The Company's failure to adequately maintain its equipment also hampered operations and contributed to Constar's increasing inability to effectively compete. ¶¶ 86-90, 100-04.

---

[6]     Defendants, who have raised a host of impermissible factual issues on this motion, do not dispute that the Company's primary manufacturing equipment at the time of the IPO was the Sidel SB01, or that its competitors primarily used the SB02.

Defendants argue that the fact that Constar "continued to do significant business with that machinery" undermines Plaintiffs' allegations.  Defs. Mem. at 35.[7]  Plaintiffs, however, do not allege that Constar's equipment was unusable, but rather that the Company's equipment had not "been continually . . . upgraded," and that the speed and capacity of the equipment was not "generally comparable" to the newer equipment used by its competitors.[8]  In other words, Plaintiffs do not allege that Constar could not manufacture products because of its outdated machinery, but that the use of such equipment adversely impacted its competitive position and profitability, causing it to lose key customer accounts.  ¶¶ 18-20, 82-84.

In addition, Plaintiffs allege that the Registration Statement falsely states that "[s]ubject to demand for capacity, we seek to maintain and improve our competitive cost position by acquiring the highest speed state of the art equipment on each occasion that we increase capacity."  ¶ 166.  This statement, which Defendants now ignore, is false and misleading because Defendants failed to disclose that rather than expanding its capacity,

---

[7]      References to "Defs. Mem. at ___," are to the Memorandum in Support of motion of Defendants to Dismiss the Consolidated Amended Class Action Complaint filed by the Constar Defendants.

[8]      Defendants' reliance on *Shoenhaut v. American Sensors, Inc.* 986 F. Supp. 785 (S.D.N.Y. 1997), and *In re Seagate Technology II Securities Litigation*, No. C 88-20489 RPA, 1989 WL 222969 (N.D. Cal. May 3, 1989), are unavailing.  Those cases involved claims that were dismissed because the plaintiffs' allegations that the defendants' products were obsolete were belied by the continued sale of the products at issue.  In sharp contrast, here, Plaintiffs allege that Constar's *manufacturing equipment* was "obsolete" in the sense that it was two generations old and substantially less efficient than its competitors' equipment.  *See Miriam-Webster Online Dictionary* ("obsolete" defined as "no longer in use **or** no longer useful.") (emphasis added); *Encarta Dictionary* (defining "obsolete" as "superseded by something newer, though possibly still in use").  That Constar still used such equipment does not mean that the Company's competitive position was not adversely affected, or that the statements in the Registration Statement concerning Constar's "state of the art" equipment were true.

Constar was actually reducing capacity at this time through plant closures necessitated by customer defections.  ¶ 168.

Likewise, Defendants ignore Plaintiffs' allegation that the Registration Statement falsely states "[w]e believe that we are advantaged by opportunities that exist to deploy existing high speed equipment in some newly converting specialty custom applications . . . ." ¶ 168.  This statement is false because Constar failed to disclose that the Company lacked the capital to exploit any of the opportunities to deploy such high speed equipment. *Id*.

Defendants further argue that because the Registration Statement stated that Constar purchased state-of-the-art equipment as it grew its operational capacity, the Company's use of outdated equipment pending increases in its capacity was consistent with its representations.  Defs. Mem. at 36.  This argument is unavailing, however, because the misstatements concerning the Company's manufacturing equipment are not limited to the statement about the growth of Constar's capacity.  The Registration Statement expressly states, "[b]ecause our machinery has been continuously *maintained and upgraded* . . . we believe that our manufacturing platform is cost competitive." ¶ 166 (emphasis added).  As discussed, above, Constar's machinery had not been upgraded, continuously or otherwise, nor was its manufacturing platform cost competitive.  *See infra* at 16.

Defendants also assert that Plaintiffs' allegations concerning the falsity of the statements concerning the continuous maintenance of Constar's equipment must fail because it is predicated on information provided by one employee with respect to a single plant.  Defendants also contend that the allegation is deficient because the Registration

17

Statement discloses how much the Company spent on maintaining its equipment.  Defs. Mem. at 36-37.  These arguments are similarly lacking in merit.

The information concerning the maintenance problems with the Company's equipment was corroborated by several sources.  ¶¶ 86-90, 100-03, 119-21, 137-41.  For example, in addition to the problems at the Havre de Grace facility (¶¶ 86-90), according to a former Constar Manager at the Company's Birmingham, Alabama plant, major technical and production problems caused product defects that, in large part, caused the Company to lose its Buffalo Rock account.  ¶¶ 100-03.

Further, the mere disclosure of the dollar value of the Company's annual maintenance expenditures does not address the issue of the adequacy of such expenditures.  In other words, without an appropriate context, such disclosure is meaningless.  *See Isquith v. Middle S. Utils., Inc.*, 847 F. 2d 186, 201 (5th Cir. 1988) (the adequacy of a disclosure depends upon the context in which it is made). Therefore, that the dollar amount of Constar's annual maintenance expenditures is disclosed in the Registration Statement, does not, standing alone, negate the falsity of the statements identified in the Complaint.[9]

### 2. The Misstatements Concerning Constar's Equipment Were Material and Lacked any Reasonable Basis

Defendants incorrectly assert that the statement concerning the general comparability of the speed and capacity of Constar's machinery, as well as the statements

---

[9]     To the extent that Defendants contend that they were not required to disclose "any of the individual instances of malfunctioning equipment identified in the Complaint," their argument must fail.  Defs. Mem. at 36.  That allegation is illustrative of Defendants failure to adequately maintain Constar's equipment, evidencing the falsity of the statements in the Registration Statement.

concerning its ability to leverage its "strong customer relationships" by remaining a "high-quality, low cost operator implementing best practices manufacturing disciplines," are merely the expression of "vague and general optimism" and the expression of "opinion, motive, and intentions," which are inactionable. Defs. Mem. at 36-37.

However, "merely packaging a false or misleading statement as a belief or opinion does not automatically insulate the speaker from . . . liability." *In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1214 (D. Kan. 2002). In *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093-94 (1991), the Supreme Court determined that statements couched as opinion or belief are actionable if the opinion is (1) known by the speaker to be false when made or (2) made without a reasonable basis in fact. *See Mayer v. Mylod*, 988 F.2d 635, 639 (6th Cir. 1993) ("Material statements which contain the speaker's opinion are actionable under Section 10(b) of the Securities Exchange Act if the speaker does not believe the opinion and opinion is not factually well-grounded."); *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 266 (2d Cir. 1993) (acknowledging opinions or belief may be actionable). Here, the Complaint contains numerous allegations detailing the reasons that Defendants' statements were "not factually grounded." ¶¶ 70, 83-86, 96-99, 103, 112-18.

Furthermore, by arguing that the foregoing statements are "puffery," Defendants assert, in substance, that the statements are not material. *See In re Advanta Corp. Sec. Litig.*, 180 F. 3d 525, 538 n. 10-11 (3d Cir. 1999); *Ravisent*, 2004 WL 1563024, at * 8. The determination of materiality, however, is ordinarily a fact specific issue that is not appropriate for resolution on a Rule 12(b)(6) motion. *See Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3d Cir. 1997) ("[T]he emphasis on a fact-specific determination of

materiality militates against a dismissal on the pleadings."). As this Court is well-aware, materiality determinations are a mixed question of law and fact ordinarily decided by the trier of fact, and may only be ruled on as a matter of law "if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281 n.11 (3d Cir. 1992).

A statement or omission is considered material if there is a "substantial likelihood" that it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Because "[t]he determination [of materiality] requires delicate assessments of the inferences of a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, these assessments are peculiarly ones for the trier of fact." *Basic*, 485 U.S. at 237. A misrepresentation or omission may be deemed immaterial as a matter of law only if it is so obviously unimportant to the reasonable investor that reasonable minds could not differ on the question of materiality. *TSC Indus.*, 426 U.S. at 450.

The misstatements concerning the Company's manufacturing equipment were plainly material.[10] The Company's lack of competitiveness, and its corresponding loss of

---

[10]     The Company acknowledged as much in the Registration Statement. Under "Risk Factors," Constar stated, "[s]ignificant technological changes could render our existing technology or our product and services obsolete. We attribute much of our competitive success to our existing technology, and *our ability to compete may dissipate if our existing technology is rendered obsolete. If we are unable to successfully respond to these developments or do not respond in a cost effective way, our net sales and profitability may decline. . . .* Similarly the equipment that we use may be rendered obsolete by new technologies." ¶ 160 (emphasis added). While the foregoing statement

business, was a direct consequence of its use of manufacturing equipment that did not provide speed and capacity that was generally comparable to that used by its competitors.

The success of Constar's shift in emphasis from lower volume, higher-margin custom products to the higher-volume, lower-margin soft drink and water bottle business was especially dependent on production volume.   ¶82.   However, this high-volume business could be profitable only if production is run on state-of-the-art equipment at full volume capacity.[11]   ¶ 82.   Newer machines produced more bottles per hour and increased profitability.   Constar's use of generations-old machinery, therefore, adversely impacted the Company's competitiveness and profitability in the high volume industry segment.

The Company lost the Buffalo Rock business due to product defects and an inability to compete with competitor Plastipak resulting from the continued use of antiquated manufacturing equipment.   ¶¶ 100-04. Likewise, the Company ended its longstanding relationship with Folgers because it would not – or could not – upgrade its manufacturing equipment to accommodate Folgers' introduction of a plastic, blow-molded coffee canister to replace the metal coffee canister.   ¶¶ 110-18.   During the July 30, 2003 analyst conference call, the loss of certain key customers, including Folgers and Buffalo Rock, were cited as substantial factors in the Company's earnings loss.   ¶¶ 208-09.   Constar's facilities in Birmingham, Alabama – which manufactured bottles for

---

was, at the time it was made, materially false and misleading because it describes events that had already transpired as mere future contingencies, it also demonstrates that the Company's undisclosed use of generations-old manufacturing equipment was material.

[11]   One of Plaintiffs' confidential sources explained that because certain operational costs - such as raw materials, labor, and warehousing expenses - are generally the same throughout the industry, the greater the number of units produced per hour, the greater the profitability.   ¶ 82.

Buffalo Rock – and Reserve, Louisiana – which manufactured containers for Folgers – were ultimately closed following the loss of those customers.  ¶¶ 103, 117.

The Complaint recites numerous other examples of lost business, lost business opportunities, and product defects that were a direct consequence of the Company's failure to upgrade and/or adequately maintain its manufacturing equipment.  *See* ¶¶ 87-90, 92-104, 110-21, 127-41.  This lost business and the Company's pervasive product defects stand in stark contradiction to the statement in the Registration Statement concerning Constar's ability to leverage strong customer relations by being a high-quality, low cost operator implementing best-practices manufacturing.

In light of the adverse impact of the Company's use of outdated manufacturing equipment, and its failure to adequately maintain that equipment, a reasonable investor would have viewed Defendants' optimistic statements as having significantly altered the "total mix" of available information concerning Constar.  *See In re Applied Magentics Corp. Sec. Litig.*, No. CV 93-6195 DT (JRX), 1994 WL 486550, at **3-4 (C.D. Cal. May 16, 1994) (finding statement, "Applied Magnetics will continue to leverage its strong position and demonstrated ability to advance ferrite technology in targeting major-customer opportunities and growing its share of the market," among others, actionable under Section 10(b) where the useful life of ferrite technology had "virtually come to an end").  Therefore, Defendants' arguments in this regard should be rejected.

### 3.	Misstatements Concerning the Company's Technology

The Registration Statement states that the Company "believes that [its] Oxbar oxygen-scavenging technology . . . is **the best performing technology** for the preservation of oxygen sensitive products," and that "Oxbar . . . **is recognized as the best available technology** for the protection of Oxygen sensitive foods."  ¶¶ 169, 171

(emphasis added).  The statements, however, were materially false and misleading at the time of the IPO.

Anheuser-Busch contracted with Constar to provide plastic beer bottles manufactured with the Company's Oxbar technology.  In the spring of 2002, Anheuser-Busch began to complain to Constar about the quality of the bottles the Company produced.  ¶ 105-07.  Specifically, it complained that the Constar bottles failed to meet Anheuser-Busch's specifications for the prevention of oxygen transmission.  ¶ 107.  An analysis showed that the Company's Oxbar technology performed less effectively than that of its competitors, including Owen-Illinois, Inc. ("Owen").  ¶¶ 107-08.  As a consequence of the poor performance of the Company's Oxbar technology, Anheuser-Busch dropped Constar as a supplier, and selected Owen to manufacture all of its plastic beer bottles.  ¶ 109.  The loss of the Anheuser-Busch account had an adverse impact beyond the loss of $3-$4.5 million in revenue.  *Id*.  In addition, the loss of this account hampered the Company's efforts to secure other contracts for products manufactured with Oxbar.  *Id*.

Defendants attempt to trivialize the loss of the Anheuser-Busch contract by stating that the Anheuser-Busch contract accounted for less than 1% of the Company's sales.  Defs. Mem. at 39.  Specifically, Defendants assert that the Company had "almost $750 million in sales in 2001, *due in fair measure* to its Oxbar technology. . . ." *Id*. (Emphasis added).  Defendants then argue that the Company was under no obligation to disclose the loss of a single contract for less than 1% of the Company's annual sales.  *Id*.

There are several obvious problems with Defendants' contentions not the least of which is that the statements that Constar believed that Oxbar was the "best performing"

technology for preserving oxygen sensitive foods, and that Oxbar was recognized as the "best available" technology of this type, were false and misleading in light of the circumstances surrounding the loss of the Anheuser-Busch contract.[12] Moreover, the loss of the Anheuser-Busch business prevented the Company from pursuing other business opportunities utilizing Oxbar technology.[13] ¶ 109.

Furthermore, Defendants' assertion that the Anheuser-Busch contract accounted for less than 1% of the Company's annual sales is meaningless because Defendants do not quantify the percentage of such sales attributable to products made using the Oxbar technology. Defendants' vague assertion that the Company's annual sales were "due in fair measure" to the sales of Oxbar products, lacks the requisite specificity to make any determination concerning the volume of Oxbar product sales, and what percentage of such sales was lost when Anheuser-Busch switched to Owens' product. Indeed, the portion of the Registration Statement to which Defendants cite (Statement of Operation, Ex. A, p. 31) does not attribute the Company's sales to any particular technology. Accordingly, the percentage of sales attributable to Constar's Oxbar-based products is an issue of fact inappropriate for consideration on this motion.

---

[12]    Not only did Anheuser-Busch's switch to Owens' products establish that Anheuser-Busch did not believe that Oxbar was the "best available" oxygen-scavenging technology, but the fact that an analysis showed that Oxbar was not as effective at preventing oxygen transmission as certain competing technologies, establishes that Constar lacked any basis for its belief that Oxbar was the "best performing" technology of this type. Compare ¶¶ 107-08, with ¶¶ 169, 171.

[13]    Contrary to Defendants' contention, however, Plaintiffs never alleged that Constar was obligated to disclose the loss of the Anheuser-Busch contract. Defs. Mem. at 39. Although given its significance to the sale of Oxbar-based products, it was a material event that should have been disclosed. *See Unisys,* 2000 WL 1367951, at **3-4; *Ganino v. Citizens Utils. Co.*, 228 F. 3d 154, 162 (2d Cir. 2000).

Moreover, Defendants' argument is, in substance, an assertion that the loss of the Anheuser-Busch contract is not material because that contract constituted a small percentage of the Company's annual revenues. However, in *Unisys*, 2000 WL 1367951, at **4-6, the court considered and rejected the same rigid arithmetic approach to materiality that Defendants urge here. In *Unisys*, the court explained:

> Thus, the real issue is whether there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having "significantly altered the 'total mix' of information" available to that investor. . . .  To demonstrate that the BT and GSA were not material, defendant argues that the BT contract represented less than .6% of Unisys' annual revenue, and similarly the GSA contract also represented less than .6% of Unisys' annual revenue. To support its mathematical approach to materiality, defendant cites, among other cases, *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 714-15 (3d Cir. 1996), because in that case, the inadequate loan loss reserve that gave rise to the litigation only represented .54% of the company's net income. However, the *In re Westinghouse Sec. Litig.* Court only concluded that the loan loss reserve was not material because plaintiff alleged no additional facts to demonstrate that this reserve inadequacy would be relevant to a reasonable investor. . . .
>
> In this case, the Court finds that it cannot conclude, as a matter of law, that defendants' misrepresentations were not material. Each contract was part of a separate announcement signifying their individual importance to the company.

*Id.*[14] Here, as in *Unisys*, the significance of the Anheuser-Busch business is not merely determinable based on the percentage of annual sales it represented. The loss of that

---

[14]    Indeed, the Supreme Court, in *Basic*, 485 U.S. at 236 n.14, expressly rejected the notion that materiality can be determined solely on the basis of simple arithmetic:

> Although ... ideally it would be desirable to have absolute certainty in the application of the materiality concept . . . such a goal is illusory and unrealistic. The materiality concept is judgmental in nature and it is not possible to translate this into a numerical formula.

business was a major setback for the Company because it foreclosed Constar from securing other business utilizing its Oxbar technology.   ¶ 109.

To the extent that Defendants argue that their statements concerning the efficacy and customer perception about Oxbar are expressions of belief concerning future performance or puffery (Defs. Mem. at 39-40), those characterizations are belied by the very language of the statements cited in the Complaint.  First, the statements do not relate to the future performance of the technology inasmuch as the Registration Statement states "we believe Oxbar . . . **is** the best performing technology for the preservation of oxygen sensitive foods . . .," and that "Oxbar . . . **is** recognized as the best available technology for the protection of Oxygen sensitive foods."  ¶¶ 169, 171 (emphasis added).

In any event, "merely packaging a false or misleading statement as a belief or opinion does not automatically insulate the speaker from . . . liability."  *Sprint Corp.*, 232 F. Supp. 2d at 1214.  In *Virginia Bankshares*, 501 U.S. at 1093-94, the Supreme Court determined that statements couched as opinion or belief may be actionable if the opinion is (1) known by the speaker to be false when made or (2) made without a reasonable basis in fact.  *See Mayer*, 988 F.2d at 639 ("Material statements which contain the speaker's opinion are actionable under Section 10(b) of the Securities Exchange Act if the speaker does not believe the opinion and opinion is not factually well-grounded."); *Time Warner,* 9 F.3d at 266 (acknowledging opinions or belief may be actionable).  As alleged in the Complaint, there was no reasonable basis for the statements in the Registration Statement because analysis had shown that Oxbar was not the "best performing technology for the

*Id*. (quoting *House Committee on Interstate and Foreign Commerce, Report of the Advisory Committee on Corporate Disclosure to the Securities and Exchange Commission*, 95th Cong., 1st sess., 327 (Comm. Print 1997)).

preservation of oxygen sensitive foods," and because Anheuser-Busch's cancellation of its business with the Company demonstrated that Oxbar was not "recognized as the best available technology for the protection of Oxygen sensitive foods."

### 4. The Misleading Statements Concerning Capital Expenditures and Expansion

#### a. Capital Expenditures

Plaintiffs also allege that certain "Risk Factors" in the Registration Statement are materially false and misleading because they describe as future contingencies events or conditions that had already occurred.  For example, numerous former Constar employees described the Company's inability to make the capital expenditures necessary to upgrade its manufacturing equipment, as well as the adverse impact of the failure to make such expenditures.  ¶¶ 85-90, 96-104, 110-21, 127-34.

Nevertheless, the Registration Statement warns only of the possibility that the Company may not be able to make necessary capital expenditures in the future: "[i]f we do not have adequate funds to make our capital expenditures or if the expected benefits of capital expenditures are not achieved, our business *may by* impaired or our profitability reduced."  ¶ 162 (emphasis added).  Likewise, while the Company had failed to make critical capital expenditures to preserve its competitive position, the Registration Statement merely warns that "[i]f we are unable to generate sufficient cash from operations to service our debt and fund our operations . . . we ***may have*** to defer capital expenditures . . . which ***could*** weaken our competitive position."  ¶ 158 (emphasis added).

Because the Registration Statement couches events that had already transpired as mere future possibilities, such statements are materially false and misleading:

> To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.

*Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981), *aff'd in relevant part and rev'd in part on other grounds*, 459 U.S. 375 (1983). *See also In re Apple Computer Sec. Litig.*, 886 F. 2d 1109, 1115 (9th Cir. 1989) ("There is a difference between knowing that any product-in-development may run into a few snags, and knowing that a particular product has already developed problems. . . ."); *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 930 (D.N.J. 1998) ("Warnings of possible adverse events are insufficient to make omissions of present knowledge of certain future events legally immaterial. . . . Allegations based upon omissions of existing facts or circumstances do not constitute forward looking statements protected by the safe harbor of the Securities Act."); *In re ValuJet, Inc. Sec. Litig.*, 984 F. Supp. 1472, 1479 (N.D. Ga. 1997) (refusing to apply safe harbor because of defendants' alleged failure to disclose existing facts).

Once again, Defendants mischaracterize Plaintiffs' allegations by asserting that because the Company disclosed the capital expenditures it did make, it was under no obligation to disclose the expenditures that it chose not to make. Defs. Mem. at 28-29. Plaintiffs, however, make no such allegation. Rather, Plaintiffs allege that Defendants' warnings were misleading because the events described as future possibilities had, at the time such statements were made, already occurred.[15]

---

[15]     Defendants erroneously contend that Plaintiffs allege that the Company's forward-looking statements concerning future capital expenditures are misleading. Defs. Mem. at 29-30. As discussed, herein, Plaintiffs have made no such allegation. Instead, Plaintiffs allege that Defendants' warning that the Company may be adversely affected by its inability to make necessary capital expenditures in the future, when Constar's

Defendants also assert that the mere disclosure of financial data concerning the capital expenditures that Constar did make, in conjunction with the Company's debt load, somehow cures this deficiency.  This is incorrect.  As noted above, "courts interpreting the securities laws have long recognized that reviewing the context in which a disclosure appears is an essential part of determining the disclosure's adequacy."  *Isquith*, 847 F. 2d at 201.  Here, the disclosure of raw financial data regarding capital expenditures and outstanding debt provides no context from which the investing public can ascertain the sufficiency of those capital expenditures.  This is especially true because the Registration Statement also contained misleading statements concerning Constar's manufacturing equipment, capacity expansion, technology, and capital expenditures.  ¶¶ 153-72.

### b.    Capacity Expansion

The Registration Statement also states that the Company planned to "invest[] in capacity expansion in all categories of PET bottle markets where profitable growth can be sustained by appropriate contractual terms with our customers."  ¶ 154.  This statement is materially false and misleading, however, because the Company not only lacked the financial wherewithal to expand capacity (¶ 155), but it also had actually reduced capacity through plant closures caused by lost business.  ¶¶ 103, 117.

Defendants argue that the Company's decision not to pursue certain contracts, such as the Folgers' canister contract or the Clorox contract, were simply business decisions that did not reflect Constar's inability to make the capital expenditures necessary to secure that new business.  Defs. Mem. at 31-32.  This assertion, however, raises a factual issue - whether Constar failed to expand capacity to pursue these new

operations and business had already been affected by its failure to make such expenditures, is materially false and misleading.

business opportunities because it lacked the capital to do so, or decided to forego such opportunities in the exercise of its business judgment - which cannot be resolved on this motion.[16]   *Ravisent*, 2004 WL 1563024, at *2.   Further, Defendants' improper factual assertion ignores the detailed information provided by myriad former employees that the Company lacked the funding to perform routine maintenance on existing equipment (¶¶ 85-90) or complete projects that had already been started (*id.*, ¶ 85), let alone purchase new equipment.   ¶¶ 96-99, 110-16, 119-21, 127-29, 134.

### 5.   Material Omissions Concerning Constar's Financial Condition

The Registration Statement omits material information about the financial relationship between Crown and Constar that made other statements materially misleading.   For example, while the Registration Statement discloses that the proceeds of the IPO would be used to pay off part of the Company's debt, including a $350 million note to Crown (Defs. Mem. at 23-24), the Registration Statement does not disclose that the $350 million note to Crown was, in effect a "dividend" for Crown, despite the fact that Constar had insufficient retained earnings to pay a dividend of that magnitude.   ¶ 22. In other words, the Registration Statement failed to disclose that Crown – which provided no value in exchange for the $350 million payment – was able to effectively transfer a substantial amount of its staggering debt to Constar, while leaving the Company with little or no working capital upon completion of the IPO.   *Id.*

Defendants argue that Plaintiffs have alleged that the Registration Statement omits material information concerning Crown's financial condition and its desperate need

---

[16]   To the extent that Defendants assert that such language is forward-looking and subject to "bespeaks caution" doctrine, as explained below, their arguments must also fail.

for cash to service its enormous debt.  Defs. Mem. at 22.  Defendants spend the next two pages explaining why Plaintiffs' allegation must fail because, *inter alia*, information concerning Crown's financial condition was public knowledge.  Defs. Mem. at 22-23. Once again, however, Defendants attack an allegation that Plaintiffs never made.

Plaintiffs allege that the Registration Statement failed to disclose material information about the financial relationship between Crown and Constar.  ¶ 22-23. Plaintiffs do not challenge the absence of information about Crown's heavy debt, except to the extent that the IPO afforded Crown an opportunity to unload $350 million of that debt onto Constar.  ¶ 23.  Indeed, Defendants' "interpretation" of Plaintiffs' allegation is nothing more than the by-product of the misleading use of an ellipse.  *Compare* ¶ 22 ("Had Defendants disclosed the true state of affairs at Crown **and Constar** in the Registration Statement . . ." (emphasis added)), *with* Defs. Mem. at 22 ("Plaintiffs contend that 'had defendants disclosed the true state of affairs at Crown . . . in the Registration Statement . . . .'" (citing ¶ 22)).

Defendants also argue that the Registration Statement is not misleading because it discloses the debt to Crown, warns that failure to generate sufficient cash flow to service Constar's debt may adversely impact capital expenditures, the Company's liquidity, and its competitive position.  Defs. Mem. at 25-26.  Defendants' argument ignores, however, that the Registration Statement omitted any mention of the fact that the Company received nothing in exchange for the $350 million note it issued to Crown.  In light of the fact that the Company was using outdated and slower machinery than its competitors, could not afford to provide necessary and adequate maintenance for that equipment, and

was experiencing mass customer defections due to its lack of competitiveness, resulting in plant closures and financial losses, this information is material.

### 6.      Material Misrepresentations And Omissions Concerning Resin

Plaintiffs allege that the statement that most of the Company's contracts contain provisions that permit Constar to pass through increases in the price of resin to its customers was materially false and misleading. ¶¶ 173-74. While the Registration Statement does warn that market conditions "may" not permit the Company to fully pass through price increases and that such inability "may" adversely affect Constar's profitability (¶ 173), the Registration Statement failed to disclose that it was virtually impossible to pass through such price increases to PepsiCo – Constar's largest customer. ¶ 174.

Mischaracterizing the information provided by one of Plaintiffs' confidential sources, Defendants argue that they were under no obligation to disclose the "economics 101" explanation that PepsiCo used alternate packaging materials when resin prices increased. Defs. Mem. at 41. Defendants miss the point.

First, the Registration Statement states that the switch to alternative packaging is a mere risk, whereas CW1 stated that it was a regular practice by PepsiCo to avoid the Company invoking the pass-through provisions of its contract. ¶¶ 174-75. Moreover, CW1 also stated that PepsiCo used other strategies to avoid invocation of the resin price pass-through provisions. ¶ 176. Thus, for example, PepsiCo would threaten to raise product defect issues, which could cause the shutdown of an entire production line, to avoid the pass-throughs. *Id.*

In addition, the Registration Statement provides that PepsiCo could choose to supply the Company with an increasing amount of resin, which could diminish the Company's leverage with other resin suppliers and, thereby, adversely impact profitability. ¶ 177. However, the Registration Statement fails to disclose that PepsiCo forced Constar to purchase inferior quality Futura resin - instead of Eastman resin - which caused widespread product defects and adversely impacted the Company's margins. ¶¶ 178-79.

Likewise, the Registration Statement falsely states that the resin price increase pass through provisions "insulate our gross profits from changes in resin prices. . . ." ¶ 182. This statement is false because the Company was unable to pass through such increases to Pepsi-Co, which accounted for 35% of Constar's 2001 revenues. ¶¶ 174-76. Therefore, these contractual provisions did not insulate the Company from the effects of such price increases.

### 7.    Defendants' False Statements Concerning Goodwill

At the time of the IPO, Constar reported $331 million in goodwill on its balance sheet – nearly 50% of the Company's total asset value. The $331 million represented a carry-forward of the goodwill Constar recognized when it was purchased by Crown in 1992. ¶¶ 3(d), 62.

By the time of the IPO, however, at least $183 million of Constar's goodwill was impaired because of the adverse events and conditions described in the Complaint. Moreover, there were numerous red flags that the Company's goodwill was substantially overstated by the time of the IPO, including: (i) declining demand for the Company's products; (ii) the loss of key customers; (iii) downward industry pressures coupled with

increasing resin prices; and (iv) substantial goodwill writedowns by Constar's competitors in 2002.  ¶¶ 193-05.

Constar's failure to writedown goodwill prior to the IPO was a violation of GAAP, as well as accounting rule SFAS 142.  Further, the Company's overstatement of goodwill by more than 55%, made the financial results incorporated into the Registration Statement were materially false and misleading.  ¶¶ 184-92.

Defendants do not - and, indeed, cannot - deny that the Company's goodwill was overstated or that the financial results in the Registration Statement were materially false and misleading.  Instead, Defendants improperly attempt to "explain away" their failure to properly account for goodwill by asserting that they were not required to tell the truth concerning Constar's goodwill because the market must have already known of the goodwill impairment and took such impairment into account.  Defendants contend that the fact that the initial IPO share price had to be reduced and "the market set the price for Constar in the course of the IPO," somehow establishes that the market understood that the Company's goodwill was overstated.  Defs. Mem. at 42-43.  This is absurd.

Obviously, a number of factors go into the pricing of an IPO.  *See, e.g.* Reg S-K (Requiring defendants to list factors considered in setting the IPO Price).  Defendants' contention that the market understood that the Company's goodwill was materially overstated and, therefore, drove down the price of Constar's offering prior to the IPO is rank speculation.  In support of this argument, Defendants assert that the fact that the price of the Company's stock did not fall upon announcement of the goodwill writedown - ten months after the IPO - demonstrates that the public had already discounted the value of Constar's goodwill.  Defs' Mem. at 43-44.  However, that the market may or may not

34

have been aware of the overstatement of the value of the Company's goodwill in *August 2003*, demonstrates nothing about what the market knew in *November 2002*.

Moreover, Defendants' contention about what the market knew about Constar's overstated goodwill is a factual issue not appropriate for decision on a motion to dismiss. *See In re Cell Pathways Inc. Sec. Litig.*, No. 99-725, 2000 WL 805221, at *8 (E.D. Pa. June 21, 2000) ("At this stage of the proceedings . . . [it is] inappropriate . . . to dismiss the Complaint based merely on [defendants'] vehement insistence on their version of the contested issues in this case."). *Cf. Ganino v. Citizens Utils. Co.,* 228 F.3d at 167 ("The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint . . ."); *In re Resource America Sec. Litig.*, No. Civ. 98-5446, 2000 WL 1053861, at *5 (E.D. Pa. July 26, 2000) (" To prevail on a 'truth on the market' defense at this stage of the litigation, [the defendants] must establish that defense as a matter of law on the basis of the allegations of the Amended Complaint, and they have not done so."). Thus, only a full factual record, after all discovery is completed, would justify consideration of this argument.

Defendants also assert certain risk disclosures – disclosures that do not reflect the true amount of goodwill – to relieve them of liability. For instance, Defendants claim that they disclosed that Constar had recently changed its accounting method for reporting goodwill, had just taken a write down to goodwill, and cautioned investors that further reductions could happen in the future. Accordingly, Defendants argue that they had no obligation to predict that Constar would subsequently write down additional goodwill. Again, Defendants miss the point.

Plaintiffs do not allege that Defendants violated the securities laws by failing to predict that goodwill would need to be written down in the future. Plaintiffs allege that "goodwill was overstated and should have been written down prior to the IPO." ¶ 205. Thus, at the time the Registration Statement was issued, it contained materially false and misleading financial statements. The Complaint contains a detailed analysis explaining why Constar's goodwill was impaired and should have been written down prior to the IPO. ¶¶ 193-07. Indeed, Constar's own accounting policies required no less. *See* ¶¶ 67, 193-205; *see also supra* at §§I.A.1-3. Therefore, Plaintiffs have adequately alleged that the Registration Statement was materially false and misleading, not because of a failure to predict future events, but because the Company failed to properly write down its impaired goodwill prior to the IPO.

In addition, because the Company's goodwill was already substantially impaired at the time the Registration Statement became effective, the Company's "warning" that a goodwill write-down could occur is itself misleading. *Huddleston*, 640 F.2d at 544; *MobileMedia*, 28 F. Supp. 2d at 930 ("Warnings of possible adverse events are insufficient to make omissions of present knowledge of certain future events legally immaterial.... Allegations based upon omissions of existing facts or circumstances do not constitute forward looking statements protected by the safe harbor of the Securities Act."); *ValuJet,* 984 F. Supp. at 1479 (refusing to apply safe harbor because of defendants' alleged failure to disclose existing facts).

## C.     Defendants' Attack on the Confidential Sources is Improper

Defendants go to great lengths to discredit the confidential sources cited in the Complaint in order to undermine Plaintiffs' allegations. Defs. Mem. at 19-21; Defs. Ex. C.

In so doing, Defendants seek to impermissibly impose the "particularity" requirement of Rule 9(b) and/or the heightened pleading standards of the Private Securities Litigation Reform Act ("PSLRA") to measure Plaintiffs' Section 11 allegations.  *See* Defs. Mem. at 20 n.5.  Indeed, the primary authority cited by Defendants, *In re Metawave Communications Corporation Securities Litigation*, 298 F. Supp. 2d 1056 (W.D. Wash. 2003), concerned the adequacy of allegations regarding the bases of the confidential witnesses' knowledge under the heightened pleading standards of the PSLRA in a securities fraud action brought under Section 10(b) of the Exchange Act.  *Id*. at 1067. [17]

Rule 9(b), however, pertains only to those actions sounding in fraud.  *See Ravisent*, 2004 WL 1563024, at **13-14.  Here, Defendants have not – and, indeed, cannot – argue that Plaintiffs' allegations sound in fraud.  Therefore, the requirements of Rule 9(b) are simply inapplicable here.  Likewise, the heightened pleading standards of the PSLRA do not apply to claims brought under Section 11.  *Adams Golf*, 381 F3d at 274 n. 5.  *See Carol Gamble Trust 86 v. E-Rex, Inc.*, No. 03-15032, 2004 WL 43216, at *2 (9th Cir. Jan. 5, 2003) (violations of sections 11 and 12 of the 1933 Act are not governed by the PSLRA); *Falkowski v. Imation Corp.,* 309 F.3d 1123, 1133 (9th Cir.

---

[17]     All the authorities upon which Defendants rely in this regard (Defs. Mem. at 20, n.5) relate to claims sounding in fraud.  Therefore, the adequacy of the allegations in those cases was determined under both the PSLRA and Rule 9(b).  In any event, the allegations of the Complaint provide sufficient information concerning the bases of the information provided by various confidential witnesses.  *See In re ATI Tech. Inc., Sec. Litig.*, 216 F. Supp. 2d 418, 436 n.11 (E.D. Pa. 2002) ("we held that unnamed sources of information comport with heightened pleading so long as sufficient information is given 'to support the probability that a person in the position occupied by the source would possess the information alleged'") (citations omitted).

2002) (same); *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 338 (S.D.N.Y. 2003) ("the PSLRA pleading requirements have no application to claims that arise under Section 11 or other provisions of the Securities Act . . . *e.g.,* Section 15"). Plaintiffs need "plead only misrepresentations and/or omissions that satisfy the liberal pleading standard of Rule 8(a)." *Ravisent*, 2004 WL 1563024, at *14. Therefore, Defendants' challenge to the bases of the witnesses' knowledge is irrelevant for purposes of this motion.

Further, Defendants' arguments amount to little more than a challenge to the evidentiary support for the allegations of the Complaint. Because Plaintiffs' allegations must be accepted as true for the purposes of this motion (*Trump Hotels & Casino Resorts*, 140 F.3d at 483; *Unisys*, 2000 WL 1367951, at *3), any rebuttal evidence or attempted impeachment of witnesses must await a proper record and trial on the merits. *See Ravisent*, 2004 WL 1563024, at *2 (in deciding a Rule 12(b)(6) motion, "the court should not look to whether plaintiffs will 'ultimately prevail,' it should only consider whether they should be allowed to offer evidence in support of their claims") (citing *Burlington Coat Factory*, 114 F.3d at 1420).

In other words, Plaintiffs are not required to plead *any* sources under Rule 8(a). That Plaintiffs did so here does not undermine the allegations, which are taken as true, because the detail is not necessary to satisfy Plaintiffs' pleading burden. [18] *Ravisent*, 2004 WL 1563024, at *14.

---

[18]    In addition to a statement regarding jurisdiction and a demand for relief, Rule 8(a) requires only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief. . . ."

### D.      Defendants' False And Misleading Statements Are Not Immunized By Purported "Risk Disclosures"

Defendants argue that they are insulated from liability for their false and misleading statements and omissions, claiming alternatively that (i) they are immunized under the "bespeaks caution" doctrine because they adequately disclosed the true facts and risks involved; and (ii) that their misstatements and omissions are not material. Defs. Mem. at 14-19. Defendants are wrong both legally and factually.

### 1.      Defendants' False and Misleading Statements Are Not Protected Under the Bespeaks Caution Doctrine

The "bespeaks caution" doctrine is narrow in scope, relying as it does on Supreme Court precedent that holds "not every mixture with the tru[th] will neutralize the deceptive." *Virginia Bankshares*, 501 U.S. at 1097. Hence, federal courts have cautioned that the "bespeaks caution" doctrine applies only when "optimistic projections are coupled with cautionary language -- in particular, relevant specific facts or assumptions -- affecting the reasonableness of reliance on the materiality of those projections." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1414 (9th Cir. 1994).

> [A]n overbroad application of the doctrine would encourage management to conceal deliberate misrepresentations beneath the mantle of broad cautionary language. To prevent this from occurring, the bespeaks caution doctrine applies only to precise cautionary language which directly addresses itself to future projections, estimates or forecasts in a prospectus. By contrast, blanket warnings that securities involve a high degree of risk [are] insufficient to ward against a federal securities fraud claim.

*Id.*

Thus, the cautionary language must be detailed and specific to the future projection at issue. *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371-72 (3d Cir. 1993) ("To suffice, the cautionary language must be substantive and tailored to the

specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge."). Here, the bespeaks caution doctrine cannot insulate Defendants' untrue and misleading present tense statements that:

- "we are able to maintain our competitive cost position as we grow by purchasing state-of-the-art manufacturing equipment for our high-volume product lines and redeploying existing machines to lower volume and specialty product lines;"

- "We believe that we have the patented technology and full-service deign  [sic] capabilities necessary to capture expected large scale conversion opportunities for PET packaging;" and

- "We believe that we are advantaged by opportunities that exist to deploy existing high speed equipment in some of the newly converting specialty custom applications, enhancing both operating efficiency and capital efficiency throughout our system."

Defs. Mem. at 34, 38. (emphasis added).  *See Viropharma*, 2003 WL 1824914, at *8 (finding that the language cited by Defendants as cautionary was verbose, and fell far short of advising investors about any specific risks); *Schaffer v. Evolving Sys., Inc.,* 29 F. Supp. 2d 1213, 1221 (D. Colo. 1998) (the bespeaks caution doctrine "does not apply to misleading statements concerning 'present factual conditions'").[19]

### 2.    The Purported Risk Disclosures Are Not Adequate

Even if the "bespeaks caution" defense were appropriate for resolution on a motion to dismiss, the language quoted in Defendants' motion is not sufficiently tailored

---

[19]    The authorities relied upon by Defendants do nothing to weaken Plaintiffs' argument. Defs. Mem. at 16-17.  *See Advanta*, 180 F.3d at  538  (statements alleged to be false and misleading were accurate reports of past earnings and expressions of optimism for the future not statements of present facts); *In re U.S. Interactive, Inc. Class Action Sec. Litig.*, No. 01-CV-522, 2002 WL 1971252, *18 (E.D. Pa. Aug. 23, 2002) (statements found to be actionable because they were not expressions of opinion, but rather "representations of the current situation of USIT" at the time the statements were made).

to the adverse events and conditions identified in the Complaint to insulate Defendants

from liability.  *See Asher v. Baxter Intern. Inc.*, No. 03-3189, 2004 WL 1687885, at *5

(7th Cir. July 29, 2004) (Easterbrook, J.) ("cautions must be tailored to the risks that

accompany the particular projections"); *In re NationsMart Corp. Sec. Litig.*, 130 F.3d

309, 317 (8th Cir. 1997) ("Cautionary statements . . . cannot be general risk warnings or

mere boilerplate; they must be detailed and specific.").   Instead, the Registration

Statement merely contains generic warnings concerning the possible adverse effects of

various then-existing events. For example, the Registration Statement "warns":

- "***We Had Net Losses In Recent Years And We May Not Generate Profits In the Future***" – "For the fiscal years ended December 31, 2001 and 2000 we had net losses of approximately $13.6 million and $14.8 million respectively."

- "***We Have To Generate Sufficient Cash Flow To Service Our Debt And Provide For Ongoing Operations***" – "[W]e may have to defer capital expenditures or sell assets to generate cash .... When we complete this offering, we will have approximately $365 million in principal amount of debt..."

- "***Our Debt May Negatively Impact Our Liquidity And Harm Our Competitive Position***" - "Our debt may have important negative consequences for us, such as...limiting our ability to obtain additional financing."

- "***If We Do Not Have Adequate Funds To Make All Capital Expenditures That Are Necessary To Grow With Our Markets and Maintain Our Facilities, Our Business May Be Impaired And Our Profitability Reduced***" – "We expect to have substantial capital needs in the near future .... If we do not have funds available to satisfy our capital expenditures requirements, we may not be able to pursue our strategy for profitable growth."

- "***Demand For Our Products May Fluctuate As Our Customers Change Their Product Lines And Marketing Strategies***" – "[O]ur customers' demand for PET Packaging may fluctuate or decrease permanently."

- "***We Have A Significant Amount of Goodwill And A Writedown of Goodwill Could Result In Lower Reported Net Income And A***

> ***Reduction Of Our Net Worth***" – "We have a significant amount
> of goodwill and a writedown of our goodwill would reduce our
> net worth.... One circumstance that may indicate the need for an
> immediate impairment review would be if our book value was in
> excess of our market capitalization."

Defs. Mem. at 3 (emphasis added).

This broad recitation of general market economics simply does not warn of the specific, undisclosed, then-existing adverse conditions and events identified in the Complaint. For example, the Registration Statement failed to disclose that (i) Constar's manufacturing equipment was already outdated, rendering the Company less competitive than its peers (¶¶ 82-90); (ii) Constar could not upgrade its manufacturing equipment due to the Company's lack of adequate capitalization (¶¶ 85-89, 98, 112, 121, 129, 134); (iii) Constar had lost, and was losing, key customer accounts (¶¶ 92-126); (iv) the Company's manufacturing and technological limitations adversely affected Constar's ability to develop new business (¶¶ 98-99, 128-30); (v) the lack of adequate capitalization prevented the Company from adequately maintaining its manufacturing infrastructure (¶¶ 86-89, 100-02); and (vi) it was virtually impossible for Constar to pass through any increase in resin prices to PepsiCo and, therefore, that the Company's profitability was not insulated from the effects of resin price increases by contractual provisions. ¶¶ 174-76.

In *In re Westinghouse Sec. Litig.*, 90 F. 3d 696, 714 (3d Cir. 1996), the Third Circuit explained:

> An omitted fact is material if there is a "substantial likelihood that, under
> all the circumstances, the omitted fact would have assumed actual
> significance in the deliberations of the reasonable shareholder." . . . "In
> other words, the issue is whether there is a substantial likelihood that the
> disclosure would have been viewed by the reasonable investor as having
> 'significantly altered the "total mix" of information' available to that
> investor." Moreover, "[m]ateriality is a mixed question of law and fact,

> and the delicate assessments of the inferences a reasonable shareholder
> would draw from a given set of facts are peculiarly for the trier of fact."
> Therefore, "[o]nly if the alleged misrepresentations or omissions are so
> obviously unimportant to an investor that reasonable minds cannot differ
> on the question of materiality is it appropriate for the district court to rule
> that the allegations are inactionable as a matter of law."

*Id.* (citations omitted). *See also Fecht v. Price Co.,* 70 F.3d 1078, 1081 (9th Cir. 1995)

("whether adverse facts were adequately disclosed is a mixed question to be decided by

the trier of fact"). Here, the descriptions of generalized market risks contained in the

Registration Statement lack the specificity necessary to meaningfully warn investors of

the adverse conditions and events identified in the Complaint. Therefore, such

"warnings" do not insulate Defendants from liability for the misstatements and omissions

in the Registration Statement.

Further, the "risk disclosures" are couched as contingencies, even though those

events had already occurred. For example, as discussed above, the Registration

Statement contains "warnings" concerning the adverse consequences that could occur if

Constar lacked sufficient funding to make necessary capital expenditures. *See* Section 4.

a., *supra*; ¶¶ 85-90, 96-104, 110-21, 127-34.

This renders the disclosures inadequate. "[A] defendant may not use cautionary

language to protect himself when he is already aware that the risks he is cautioning

against have come to fruition." *Viropharma,* 2003 WL 1824914, at *8. *See also Cell*

*Pathways*, 2000 WL 805221, at *11 ("bespeaks caution doctrine 'is only available for

forward-looking statements, and cannot be invoked for misleading statements of existing

fact'") (citations omitted); *In re Towne Servs. Sec. Litig.*, 184 F. Supp. 2d 1308, 1319

(N.D. Ga. 2001) (declining to dismiss §11 claim where "the Prospectus' open-ended,

general, and future-oriented warnings about [defendant's] computer systems (and the

possibility of customer attrition) are misleading in light of severe, discrete problems [that defendant] had already suffered in this regard"). Accordingly, Defendants may not insulate themselves from liability simply by characterizing events as future risks, when those events have already occurred.[20]

Indeed, because the various "risks" described in the Registration Statement had already come to fruition, the "warnings" themselves were materially false and misleading. "There is no reason to think - at least, no reason that a court can accept at the pleading stage, before plaintiffs have access to discovery - that the items mentioned in [Defendants'] cautionary language were those thought at the time to be the (or any of the) 'important' sources of variance." *Asher*, 2004 WL 1687885, at * 7. *See also Voit v. Wonderware Corp.*, 977 F. Supp. 363, 370 (E.D. Pa 1997) (statements couched as cautionary warnings may themselves be false and misleading); *Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1996) (reversing summary judgment because so-called risk disclosures were themselves misleading when made).[21]

---

[20]     *See also Huddleston*, 640 F.2d at 544 ("To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit; *In re Pemstar, Inc. Sec. Litig.*, No. Civ. 02-1821 DWFSRN, 2003 WL 21975563, at *9 (D. Minn. Aug. 15, 2003) (denying motion to dismiss §11 claim where defendant had disclosed that certain adverse trends could adversely affect demand for defendants' services in the future but failed to disclose that problems had already begun).

[21]     Defendants' authorities do not compel a different result. Unlike here, in Defendants' cases the companies included specific, non-generic risk disclosures in their public filings. *See*, *e.g.*, *Donald J. Trump Casino*, 7 F.3d at 372 (finding that the prospectus contained abundant and meaningful cautionary language); *Adams Golf*, 381 F.3d at 279(finding that "the cautionary statements relate directly to the claim on which plaintiffs allegedly relied"); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 548-549 (8th Cir. 1997)(finding that the prospectus truly "bespeaks caution" because defendants went

Because the adequacy of the alleged cautionary language that purportedly neutralized Defendants' untrue and misleading statements is uniquely a question of fact, it is inappropriate for resolution on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).   Indeed, some courts have determined that resolution of this issue is inappropriate even at the summary judgment stage. *In re Compaq Sec. Litig.*, 848 F. Supp. 1307, 1318 (S.D. Tex. 1993) ("Although the disclosures that contain optimistic statements also contain cautionary language, the court is not persuaded that these inclusions justify the conclusion, at the summary judgment stage, that the statements 'bespoke caution' as a matter of law.   Statements must contain more than vague cautionary language concerning such broad factors as competition, economic recession, and foreign exchange rates to 'bespeak caution.'").[22]

### E.   Defendants' Loss Causation Arguments Are Baseless And Should Be Rejected

Defendants argue in passing that there is a "complete disconnect between the alleged loss-producing event (the July 29, 2003 announcement) and the alleged misrepresentations/omissions."   *See* Defs. Mem. at 9.   This argument – an attempt at arguing a lack of loss-causation  –  is improper on a motion to dismiss.

Loss causation is not an element of a Section 11 claim.   *Lyne v. Arthur Andersen & Co.*, 772 F. Supp. 1064, 1067 (N.D. Ill. 1991); *Miller v. New Am. High Income Fund*, 755 F. Supp. 1099, 1106-09 (D. Mass 1991), *aff'd sub nom., Lucia v. Prospect St. High*

---

to great lengths to warn potential investors and convey the riskiness of the investment and directly addressed the substance of the statements that plaintiffs had challenged).

[22]   As such, Defendants' argument and the question of whether "optimistic statements regarding own product are inactionable" cannot be resolved here on a motion to dismiss.   *See* Defs. Mem. at App. B, at 2.

*Income Portfolio, Inc.*, 36 F.3d 170 (1st Cir. 1994); *Billet v. Storage Tech. Corp.*, 72

F.R.D. 583, 586 n.6 (S.D.N.Y. 1976); *Emmi v. First Mfr. Nat'l Bank,* 336 F. Supp. 629,

635 (D. Me. 1971).   Rather, in enacting Section 11(e), Congress unmistakably made

"negative causation" an affirmative defense.   *Akerman v. Oryx Communications, Inc.*,

810 F.2d 336, 341 (2d Cir. 1987). *See also Bastian v. Petren Res. Corp*., 892 F.2d 680,

685 (7th Cir. 1990) ("absence of loss causation is an explicit defense"); *Nielsen v.

Greenwood*, 849 F. Supp. 1233, 1247 (N.D. Ill. 1994) ("[it is] well-settled that loss

causation is not a requirement . . . under § 11"); *In re Fortune Sys. Sec. Litig.*, 680 F.

Supp. 1360, 1364 (N.D. Cal. 1987) (once plaintiffs allege omission under Section 11,

"causation is presumed and the burden is then on defendants to show that 'factors other

than' the omissions caused the decline in the value of the stock for which plaintiffs seek

to recover").   The measure and the causation of damages is not "an essential element of

[plaintiffs'] case" that must be plead by Plaintiffs. *See Celotex Corp. v. Cotreff*, 477

U.S.317, 323 (1986).   Thus, the burden remains on Defendants to plead and prove that

other factors caused the decline in the price of Constar's stock.   *See Akerman*, 810 F.2d at

341-343.[23]

---

[23]      In any event, damages in suits brought under the Securities Act of 1933 are determined by statute and are measured as the difference between the offering price and the stock price at the time of suit. 15 U.S.C. §77k(e).  Under this formulation, Plaintiffs can readily establish that the members of the Class sustained damages.

**F.    The Underwriter Defendants are Liable for Constar's False
and Misleading Prospectus and Registration Statement[24]**

The Underwriter Defendants move separately to dismiss the Complaint, but offer little in the way of new arguments (or authority) in support of their motion. Essentially, the Underwriters assert that the Complaint "does not contain a single factual allegation suggesting any improper conduct on the part of the Underwriter Defendants," *See* Memorandum of Law in Support of Underwriter Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint ("Underwriters Mem.") at 1.[25] The Underwriters, however, misapprehend what Plaintiffs must plead to state a viable claim. As shown below, in their Complaint, Plaintiffs need only plead that the Underwriters participated in an IPO completed pursuant to a materially false and misleading Registration Statement. Because Plaintiffs have done so, the Underwriters' motion should be denied.

---

[24]    The Underwriter Defendants have incorporated by reference the arguments presented by the Constar Defendants. Therefore, the arguments set forth in response to the Constar Defendants' motion to dismiss apply equally to the arguments presented by the Underwriters.

[25]    The Underwriters also assert the opposite position – that Plaintiffs allege intentional misconduct by the Underwriters and, to the extent the allegations can be read to plead fraud, Plaintiffs have not satisfied the particularity requirements of Rule 9(b). *See* Underwriters' Mem. at 3 n.4. As discussed herein, Plaintiffs need not plead their Section 11 claims with particularity because such claims are based on negligence and strict liability - not fraud. *See Adams Golf*, 381 F.3d at 273; *Neuberger v. Shapiro*, No. Civ. A. 97-7947, 1998 WL 408877, at *5 (E.D. Pa. July 17, 1998) (Rule 9(b) not applicable to claim under §11 where complaint "ma[de] no mention of intentional or reckless violations of the securities laws"); Other circuits are in accord. *See Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.*, 238 F.3d 363, 369 (5th Cir. 2001); *NationsMart*, 130 F.3d at 318-19; *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003). Therefore, the Complaint is subject only to the liberal notice pleading standard of Fed. R. Civ. P. 8.

**G.      The Complaint Adequately Alleges Section 11 Liability Against the Underwriter Defendants**

Pursuant to the plain language of the statute, Section 11 imposes strict liability against every underwriter who participated in the Constar IPO, unless the underwriters establish the affirmative defense of due diligence.   15 U.S.C. §77k(a)(1)-(3). In *Huddleston*, 459 U.S. at 381-82, the Supreme Court explained:

> Section 11 of the 1933 Act allows purchasers of a registered security to sue certain enumerated parties in a registered offering when false or misleading information is included in a registration statement. The section was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering.  If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements. *Other defendants bear the burden of demonstrating due diligence.* See 15 U.S.C. § 77k(b).

*Id.* (emphasis added) (footnotes omitted). *See also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 200 (1976) (underlying congressional policy was to create express liability regardless of fault); *Kaplan v. Rose*, 49 F.3d 1363, 1371 (9th Cir. 1994) (under §11, "defendants will be liable for innocent or negligent material misstatements"); *In re Westinghouse Sec. Litig.*, No. 91-354, 1998 WL 119554, at *7 (W.D. Pa. Mar. 12, 1998) (scienter not required for §11 claim, mere negligence or innocent misrepresentations are actionable).  Accordingly, to properly allege liability on the part of the Underwriters, all Plaintiffs must plead - which they have - is that the Underwriters participated in the Constar IPO, and that the Company's the Registration Statement was materially false and misleading.

**H.     The Complaint Pleads Securities Violations and Not Corporate Mismanagement**

The Underwriters also seek to avoid liability for the materially false and misleading statements in the Registration Statement by re-casting Plaintiffs' claims as nothing more than "mere mismanagement or internal disagreement regarding strategy." Underwriter Mem. at 6-7.  This is a red herring.

Although Defendants' conduct in allowing the Company to lose its competitive advantage and its customers may also amount to mismanagement, and although the truth about Constar's business condition and financial problems may have been disclosed after the IPO, nowhere do Plaintiffs allege that Defendants are liable for that "corporate mismanagement."  *See In re Home Health Corp. of Am. Sec. Litig.,* No. Civ. A. 98-834, 1999 WL 79057, at *13 (E.D. Pa. Jan. 29, 1999) ("claims that defendants misrepresented or omitted information pertaining to existing, material events" will not be dismissed because they are not allegations of corporate mismanagement.).  Instead, it is the falsity of the statements in the Registration Statement that forms the basis of Plaintiffs' claims. What was disclosed after the IPO simply put the lie to those false statements. Accordingly, the Underwriters' "corporate mismanagement" argument should be given short shrift.

**I.     The Defendants are Liable Under Section 15(a) of the Securities Act**

The Constar Defendants seek dismissal of Plaintiffs' control person claim against the Individual Defendants and Crown on the sole ground that Plaintiffs' claims based on Section 11 "fail as a matter of law."  Defs. Mem. at 46.  As demonstrated throughout this brief, however, Plaintiffs adequately pled violations of Section 11 against all Defendants. Moreover, the Individual Defendants and Crown had the power and influence over

Constar to be considered control persons under Section 15(a).  *See Ravisent*, 2004 WL 1563024, at *15 ("To establish a defendant is a control person, a plaintiff must demonstrate that 'the defendant had actual power or influence over the allegedly controlled person.'") (*quoting Mobile Media*, 28 F. Supp. 2d at 940).

Plaintiffs have met their burden of establishing control at this stage of the litigation. The Individual Defendants were the most senior officers and/or directors of Constar and each signed the Registration Statement. ¶¶ 34-41, 231.  At the time of the IPO, Defendant Casey served as Chairman of the Board of Constar, Defendant Hoffman was Constar's President and Chief Executive Officer, and Defendant Cook, was among other positions, Constar's Chief Financial Officer.  ¶¶ 34, 36-37. Each of the Individual Defendants had the ability to control the contents of the Registration Statement and could have prevented the issuance of false and misleading statements. The fact that the Individual Defendants were directors, and the most senior officers of Constar, is sufficient to demonstrate "actual power" or "influence" over Constar.  *See Ravisent*, 2004 WL 1563024, at *15 (allegations that defendants were CEO and CFO sufficient to demonstrate actual power or influence).

Crown was a controlling person of Constar within the meaning of Section 15 by virtue of its ownership of 100% of Constar's stock until the IPO.  ¶ 232.  Crown controlled Constar's corporate actions and the IPO.  *Id.*  Crown also had the power to control the contents of the Registration Statement.  Therefore, Crown is liable as a control person under Section 15 of the Securities Act.  *See In re Enron Sec., Derivative & "ERISA" Litig.*, 235 F. Supp. 2d 549, 598 (S.D. Tex. 2002) ("Control can be established by demonstrating that the defendant possessed the power to direct or cause direction of

management and policies of a person through ownership of voting securities, by contract, business relationships, interlocking directors, family relationships and the power to influence and control the activities of another.") (*citing Ellison v. Am. Image Motor Co.*, *Inc.* 36 F. Supp.2d 628, 638 (S.D.N.Y. 1999).    Thus, Crown's ownership of 100% of Constar's stock and its control over the management and operations of Constar up to the time of the IPO, is sufficient to establish, at this stage, that Crown had influence and power over Constar.

Moreover, Plaintiffs need not prove the extent of Defendants' control over Constar at this stage of the litigation.  *See Ravisent*, 2004 WL 1563024, at *15 ("[t]he issue before us is whether plaintiffs have satisfied their burden in light of the 12(b)(6) motion, not whether Wilde and Liu were actually liable under this doctrine."); *see also In re Cabletron Sys. Inc.*, 311 F.3d 11, 41 (1st Cir. 2002) ("control is a question of fact that 'will not ordinarily be resolved summarily at the pleading stage.'") (internal citations omitted). Thus, Plaintiffs' have adequately stated a claim against Defendants under Section 15(a) to survive this motion.

### J.    If Necessary, Leave to Amend Should Be Granted

In the event that the Court finds that Complaint fails to plead any viable claims, Plaintiffs respectfully request that they be granted leave to amend.[26]

---

[26]    Leave to amend should be "freely given when justice so requires."  Fed. R. Civ. P. 15(a).  *See also Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962) (Rule 15(a)'s mandate that leave to amend "'shall be freely given when justice so requires'" "is to be heeded.").  As the Third Circuit stated in *Burlington Coat Factory*, Courts should be "hesitant to preclude the prosecution of a possibly meritorious claim because of defects in the pleadings." 114 F.3d at 1435.

### III.    CONCLUSION

For all the foregoing reasons, the motions of the Constar Defendants and the Underwriters to dismiss the Complaint should be denied.

Dated: October 25, 2004

**LAW OFFICES BERNARD M. GROSS, P.C.**

_____
Deborah R. Gross, I.D. No. 44542
1515 Locust Street, Second Floor
Philadelphia, PA 19102
Telephone: (215) 561-3600

**Liaison Counsel for Lead Plaintiffs**
  **and the Class**

**BERNSTEIN LIEBHARD & LIFSHITZ, LLP**
Jeffrey M. Haber
Timothy J. MacFall
Stephanie M. Beige
10 East 40th Street, 22nd Floor
New York, NY 10016
Telephone: (212) 779-1414

-and-

**LERACH COUGHLIN STOIA**
  **& ROBBINS LLP**
Steven W. Pepich
Andrew J. Brown
Brian O. O'Mara
401 B Street, Suite 1700
San Diego, CA 92101
Telephone:  (619) 231-1058

**Counsel for Lead Plaintiffs**
  **and the Class**