# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE CONSTAR INT'L INC. SECURITIES LITIGATION, | ) ) ) | Master File No. 03cv05020 |
| This Document Relates To: | ) ) | **CLASS ACTION** |
| ALL ACTIONS. | ) ) ) ) | |

# REPLY MEMORANDUM IN SUPPORT OF
# MOTION OF THE DEFENDANTS TO DISMISS
# THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Steven B. Feirson
Michael L. Kichline
Michael E. Baughman
Scott A. Thompson
Dechert LLP
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103
(215) 994-2489

Attorneys for Defendants
Constar International, Inc.,
Crown Cork & Seal
Company, Inc. and the
Individual Defendants

Dated: November 9, 2004

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

ARGUMENT ........................................................................................................ 5

I.    THE PLAINTIFFS ATTEMPT TO SIDE-STEP THE MOTION TO DISMISS BY INACCURATELY CLAIMING THAT THE DEFENDANTS ARE "RAISING FACTUAL ISSUES" ................................................................... 5

II.   THE PLAINTIFFS' CLAIMS ARE BARRED BY THE EXTENSIVE AND DETAILED RISK FACTOR ANALYSIS IN THE REGISTRATION STATEMENT ....................................................................................... 7

III.  THE SPECIFIC PURPORTEDLY MISLEADING STATEMENTS IN THE REGISTRATION STATEMENT ARE NOT ACTIONABLE AS A MATTER OF LAW ........................................................................................... 9

    A.  Capital Expenditures and Capacity Expansion ............................... 10

        1.  Constar Accurately Presented Hard Data on Capital Expenditures and Capacity Expansion ................................... 11

        2.  The Statements about Constar's Future Capital Expenditures and Capacity Expansion do not Suggest Anything about Past Capital Expenditures or Capacity Expansion ................................. 13

    B.  Constar's Machinery and Technology ........................................... 14

    C.  Oxbar Technology ...................................................................... 19

        1.  Constar's Opinion that its Oxbar Technology is "The Best" is Immaterial as a Matter of Law ........................................... 20

        2.  The Plaintiffs have not Pleaded that Constar's Assertion that Oxbar was "the Best" Available Oxygen Scavenging Technology Lacked any Basis ............................................................... 22

    D.  Constar's Relationship with Crown ............................................. 23

    E.  Resin ........................................................................................ 24

    F.  Goodwill .................................................................................. 25

IV.   SECTION 15 LIABILITY ...................................................................... 27

V.    THIS CASE SHOULD BE DISMISSED WITH PREJUDICE ........................... 27

CONCLUSION ...................................................................................................................... 28

## <u>EXHIBIT</u>

Except from Registration Statement showing "Risk Factors" ..............................................Tab A

## INTRODUCTION

The Consolidated Amended Class Action Complaint ("Amended Complaint") does not allege that the actual hard facts disclosed in the Registration Statement are inaccurate. In other words, this is not a case where the plaintiffs primarily claim that the financial statements of a company were misrepresented, or that any other objective fact laid out in the Registration Statement is false and misleading. Rather, as the defendants noted in their opening memorandum, this is a complaint that is based on the plaintiffs' disagreement with the defendants' view of what those disclosed facts might mean. In this endeavor, the plaintiffs are trying to convince this Court to break new ground, and to take the unprecedented step of attaching potential liability to the expression of opinions based on facts that are accurately **_disclosed_** in the Registration Statement.

In their opening memorandum, the defendants carefully dissected the 60-page Amended Complaint in order to demonstrate that each and every attack on the Registration Statement is, in fact, not actionable as a matter of law. In response, the plaintiffs appear to argue that they should skate by a 12(b)(6) motion solely on the basis of the sheer volume of their Amended Complaint. True to their tactic of trying to mask the facial defects in their purported claims behind reams of verbiage, the plaintiffs spend page-after-page regurgitating their allegations, and taking offense that "[i]n the face of these detailed allegations, defendants argue that the courthouse doors are, nonetheless, closed to plaintiffs." Pl.s' Mem. at 2. But, while the courthouse doors are always open to those who can state a viable claim, they are closed to those plaintiffs who cannot even facially articulate the necessary elements of their claim. And, the evaluation of whether a claim has been properly set forth is an exercise in evaluating quality, not

quantity. Here, the plaintiffs, despite the mass of their Amended Complaint, simply fail to do what the law requires of them.

Even with their confidential witnesses in hand, and accepting what those witnesses say as true, the opinion statements in the Registration Statement identified by the plaintiffs are not materially misleading. First of all, it is important to note that the Registration Statement contains page-after-page of unchallenged *hard* data about Constar, detailing its sales and profit results, past capital expenditures, the amount of money spent on equipment maintenance, particular equipment purchases over the last several years, data about Constar's debt, and hard facts and data about Constar's relationship with Crown. Not surprisingly, the plaintiffs steer clear of these admittedly accurate hard facts.

Instead, the plaintiffs entire Amended Complaint is an effort to cobble together a claim by recasting this hard data into unfavorable characterizations or to quibble over the adjectives used in Constar's opinions regarding the hard data. Given the vague information provided by their confidential witnesses, the plaintiffs have sought out correspondingly vague statements in the Registration Statement – such as Constar's opinion that its equipment was "generally comparable" to that of its competitors, Constar's view that Oxbar was "the best" performing technology, and the disclosed risk factors concerning Constar's future capital expenditures and capacity expansion. But the securities laws are not intended to hold issuers liable based upon their views about what accurately disclosed hard data might mean for the future. There is nothing improper about an issuer stating its views, even if optimistic, about the *disclosed* facts in a Registration Statement, and investors understand that such descriptions are

nothing more than the *issuer's opinion*. Where, as here, hard data is disclosed in the Registration Statement, potential purchasers of a company's stock are in a position to reach their *own* conclusions, draw their *own* opinions, and put whatever "spin" on the information they deem appropriate.

In sum, the issuer cannot be held liable on the basis that a group of plaintiffs wishes to argue that its after-the-fact take on the disclosed information is not as optimistic as the issuer's. Indeed, the statements identified by the plaintiffs as supposedly "misleading" are nothing more than the kind of subjective opinions and statements about disclosed facts which courts routinely have held are not actionable.

Moreover, the plaintiffs *still* cannot explain why their confidential witnesses' stories, even if true, render the opinions in the Registration Statement inaccurate. As pointed out in the defendants' opening memorandum, there is a fundamental disconnect between the hodge-podge of stories provided by the confidential witnesses and any of the alleged inaccuracies in the expressed views of the Company in the Registration Statement. The incidents described by the confidential witnesses are isolated as to location, time and the nature of the problems allegedly witnessed by these sources. In fact, this smorgasbord of isolated manufacturing incidents stretches over several locations throughout the country and a 10-year period prior the IPO. They simply cannot be used to challenge the accuracy of opinions in the Registration Statement that go to Constar's *overall, worldwide* operations.

Instead, the plaintiffs ask this Court to *ignore* the defendants' discussion of the plaintiffs' confidential witnesses, claiming that the defendants are improperly raising "factual

issues" outside of the pleadings on a motion to dismiss.  But, the defendants' arguments do not go to the *veracity* of the confidential witnesses' stories.  Instead, the defendants simply point out that the "facts" these witnesses provide are wholly irrelevant to the actual claims in the Amended Complaint at the motion to dismiss stage because, even if what they say is true, there is a complete and utter disconnect between the fragmented and isolated statements by the witnesses and the alleged misstatements in the Registration Statement.

Thus, the Amended Complaint should be dismissed with prejudice for at least two independently sufficient reasons.  First, the plaintiffs target opinions and not facts in their Amended Complaint.  The law has been clear for some time that opinions used to describe disclosed facts are not actionable under the securities laws.  Second, even if such statements of opinion were legally cognizable, the facts as pleaded do not make out a case of falsity.  The plaintiffs' reliance on the stories of their confidential witnesses is misplaced.  A few anecdotes about events over a 10-year period, in varying locations, concerning disparate problems simply cannot, as a matter of law, establish anything about a global company's practices at the time of the IPO.  For these reasons, as well as those set forth in detail in defendants' initial memorandum of law, the Amended Complaint should be dismissed with prejudice.

## ARGUMENT

### I. THE PLAINTIFFS ATTEMPT TO SIDE-STEP THE MOTION TO DISMISS BY INACCURATELY CLAIMING THAT THE DEFENDANTS ARE "RAISING FACTUAL ISSUES"

The plaintiffs accuse the defendants, among other things, of "improperly rais[ing] disputed issues of fact [and] improperly challeng[ing] the sources of Plaintiffs' allegations . . . ." Pl.s' Mem. at 3.  Thus, say the plaintiffs, the Court is precluded from granting relief under Rule 12(b)(6).  They are wrong.

First of all, the defendants are not injecting factual issues into the case; they are, instead, suggesting that even if the Court were to take all of the allegations in the Amended Complaint as true (as the Court is required to do on a motion to dismiss), the plaintiffs have not stated a claim.  None of the defendants' arguments for dismissal require this Court to decide any issues of fact.  For example, with respect to the confidential witnesses, the point is that, *even if the Court were to credit all of the allegations made by these furtive sources*, what they have to say does not make the Registration Statement materially misleading.  Significantly, nowhere in the plaintiffs' response do they address the single most fatal defect in their Amended Complaint – the confidential witnesses provide only isolated stories of a lost customer here, a broken down machine there.  Such shortcomings are *commonplace* in *any* manufacturing operation, i.e., there has never been a business entity known to man that does not have at least some isolated problems at some locations at some points in time.  These isolated incidents cannot transform statements about Constar's *overall, worldwide* operations in the Registration Statement into

material misrepresentations.  The plaintiffs simply refuse to address this point, let alone refute it.[1]

Even taking as true the isolated stories told by the confidential witnesses, the plaintiffs cannot identify any material misstatements in the Registration Statement.  Instead, they focus on vague, and supposedly optimistic opinions about the hard data that was disclosed.  As is explained below, the statements they identify are simply not material as a matter of law.[2]

---

[1] Of course, it was the *plaintiffs*, not the defendants, who chose to plead in their Amended Complaint the "evidentiary support," which, they say, is what shows that the statements in the Registration Statement are false and misleading.  Pl.s' Mem. at 38.  Thus, it was hardly improper for defendants to point out that, under the facts as pleaded by the plaintiffs themselves, many of the confidential witnesses – such as those who left the company years before the IPO – were in no position to know what they were talking about and in any event, the "evidence" provided does not align itself with the alleged misstatements.  To the extent that the facts pleaded in the Amended Complaint are simply inferences or conclusory assertions unsupported by the facts set out in their own pleading, or are simply illogical conclusions based upon the plaintiffs own pleadings, the Court need not credit them.  Schuylkill Energy Res., Inc. v. Pa. Power & Light Co., 113 F.3d 405, 417 (3d Cir. 1997) (holding that courts do not need to accept as true "unsupported conclusions and unwarranted inferences" for purposes of a motion to dismiss); First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 772 (2nd Cir. 1994) (refusing to credit, on a motion to dismiss, allegations that "def[ied] logic"); Corporate Aviation Concepts, Inc. v. Multi-Service Aviation Corp., Civ. A. No. 03-3020, 2004 U.S. Dist. LEXIS 17154, at *10 (E.D. Pa. Aug. 24, 2004) ("Although the court must construe the complaint in the light most favorable to the complainant, it need not accept as true legal conclusions or unwarranted factual inferences."); Wallace v. Sys. & Computer Tech. Corp., No. 95-CV-6303, 1996 U.S. Dist. LEXIS 5328, at *18 (E.D. Pa. Apr. 19, 1996) ("[U]pon a Rule 12(b)(6) motion, the court need not accept inferences drawn by plaintiff if they are unsupported by facts set out in complaint.") (citation omitted).  The allegations offered by plaintiffs through the testimony of the confidential witnesses, who were never in the position to know the information about which they testify, are exactly the type of "unwarranted factual inferences" and "legal conclusions" the Court should discount in assessing the sufficiency of the plaintiffs' Amended Complaint.

[2] The plaintiffs' blanket assertion that the Court may not decide the question of whether a statement is "material" on a motion to dismiss is bunk.  The very cases relied upon by plaintiffs recognize that it is appropriate for the district court to make materiality decisions at the motion to dismiss stage in the securities context.  See Shapiro v. UJB Fin. Corp., 964 F.2d 272, 283 n.12

## II.   THE PLAINTIFFS' CLAIMS ARE BARRED BY THE EXTENSIVE AND DETAILED RISK FACTOR ANALYSIS IN THE REGISTRATION STATEMENT

From reading the plaintiffs' memorandum, one would be lead to think that the Registration Statement portrays Constar as a sure thing – an investment that could not lose. The plaintiffs assert, among other things, that the Registration Statement "portrayed Constar as a highly competitive, growing company . . . ." Pl.s' Mem. at 2.  While there were, no doubt, positive things to say about Constar, the Registration Statement also clearly discloses that it was not all roses at Constar.  In fact, the plaintiffs simply ignore the fact that the Registration Statement began with eleven pages of 38 specific risk factor disclosures.  The defendants will not repeat here the risk factors in the Registration Statement to show just how detailed they were – instead, the defendants invite the Court to view them for itself, as they are attached hereto as Exhibit A.  Given these extensive disclosures, "no reasonable investor could believe anything but that [Constar] represented a rather risky, speculative investment . . . ." In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 369 (3d Cir. 1993).

---

(3d Cir. 1992) (finding certain statements were immaterial puffery at the motion to dismiss stage).  Indeed, courts routinely dismiss Section 11 claims at the motion to dismiss stage based on a finding that the alleged misstatements or omissions were not material.  See, e.g. Klein v. General Nutrition Cos., 186 F.3d 338 (3d Cir. 1999) (affirming dismissal of Section 11 claims with prejudice because alleged misstatements were immaterial as a matter of law); In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357 (3d Cir. 1993) (same); In re Craftmatic Sec. Litig., 890 F.2d 628 (3d Cir. 1989) (affirming dismissal of Section 11 claims with prejudice because alleged omissions were immaterial as a matter of law); In re U.S. Interactive, Inc. Sec. Litig., No. 01-CV-522, 2002 U.S. Dist. LEXIS 16009 (E.D. Pa. Aug. 23, 2002) (dismissing Section 11 claims with prejudice in part because alleged misstatements were immaterial as a matter of law); Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc., 114 F. Supp. 2d 316 (D.N.J. 2000) (dismissing Section 11 claims with prejudice because alleged misstatements were immaterial as a matter of law).  Thus, to the extent that the language claimed to be misleading is immaterial on its face, there is no question that the Court can and should dismiss the Amended Complaint with prejudice.

The plaintiffs say that "the Registration Statement merely contains generic warnings concerning the possible adverse effects of various then-existing events." Pl.s' Mem. at 41. The extensive disclosures in the Registration Statement were not "generic," but, as shown from even a cursory review of Exhibit A, instead provided investors with fair warning that investing in Constar did, indeed, involve many specific risks. And, perhaps even more importantly, these risks included the very areas the plaintiffs take the defendants to task for inadequately disclosing, including risks that the Company's goodwill might have to be written down, risks that the Company might be unable to make capital expenditures, and risks that the Company's equipment might be rendered obsolete. "We can say that the prospectus here truly bespeaks caution because, not only does the prospectus generally convey the riskiness of the investment, but its warnings and cautionary language directly address the substance of the statement the plaintiffs challenge." Trump, 7 F.3d at 372.

Given that these risk factors were designed to *warn* investors about the risks of investing in Constar and, therefore, would likely have *discouraged* investment in the Company, it is odd that the plaintiffs have seized upon the risk factors in the Registration Statement to argue that reasonable investors would have been *encouraged* to invest in the Company by these warnings. In fact, this argument is so flawed that courts have repeatedly and decidedly rejected it. See In re Foundry Networks Inc. Sec. Litig., No. 00-4823, 2003 U.S. Dist. LEXIS 18244, at *34-35 (N.D. Cal. Feb. 14, 2003) (noting that risk factors cannot be actionable as a matter of law); Zeid v. Kimberley, 930 F. Supp. 431, 437 (N.D. Cal. 1996) ("[W]arnings regarding potential adverse factors are not actionable as a matter of law."); see also Williams v. WMX Techs., 112 F.3d 175, 179 (5th Cir. 1997) (noting "the 'risk factors' section of a prospectus is not

intended to make promises or claims regarding the future, but is meant to warn investors of factors that can affect a company's future performance"); Steinberg v. PRT Group, Inc., 88 F. Supp. 2d 294 (S.D.N.Y. 2000) (dismissing claims that risk factors are misleading because even the alleged 'facts' were either disclosed or not inconsistent with statement).

## III.   THE SPECIFIC PURPORTEDLY MISLEADING STATEMENTS IN THE REGISTRATION STATEMENT ARE NOT ACTIONABLE AS A MATTER OF LAW

Given the extensive warnings contained in the Registration Statement, and the numerous *hard* facts about the Company that are not alleged to be misleading, the plaintiffs are left to complain about Constar's view of this data and its opinions about Constar's future prospects. Essentially, the plaintiffs' case is premised on their claim that the defendants should have been more pessimistic about what the future held for Constar.

But, the securities laws do not require the defendants to disparage their own business. As the Third Circuit clearly held in Trump, where accurate, hard information is disclosed in a prospectus, an issuer cannot be held liable simply because it has not described the data "with pejorative nouns or adjectives." Trump, 7 F.3d at 375 (quoting Goldberg v. Meridor, 567 F.2d 209, 218 n.8 (2d Cir. 1977)). Nor do the securities laws require Constar to disparage itself in comparison to its competitors. Id. ("The federal securities laws do not ordain that the issuer of a security compare itself in myriad ways to its competitors, whether favorably or unfavorably . . . .").

Instead, as Judge Becker held in the <u>Trump</u> case, "*it is uniquely the function of the prudent investor, not the issuer of securities, to make such comparisons among investments.*" <u>Id.</u> at 375-76 (emphasis added).

In light of the extensive risk factors discussed in the prospectus, and the accurate, hard data about Constar and its operations, the plaintiffs' attempt to challenge Constar's opinions and choice of words cannot possibly pass the materiality test imposed by the securities laws. Accordingly, the Amended Complaint should be dismissed with prejudice.

## A.     <u>Capital Expenditures and Capacity Expansion</u>

The plaintiffs' attack on the disclosures concerning capital expenditures and capacity expansion suffers from two fatal defects. Either one is sufficient to serve as the basis to dismiss this claim.

First, and foremost, there was an overwhelming amount of hard data disclosed in the Registration Statement about *past* activities in these areas. Registration Statement at 46. This information was more than sufficient for investors to make judgments about Constar's activity in these areas. And, notably, the plaintiffs do not claim that any of the information disclosed was inaccurate. Such failure even to allege falsity dooms any claim about the *past*.

Second, the statements concerning *future* conduct were contained in the Risk Factor section of the Registration Statement, *warning* investors about the potential pitfalls which could befall the company if it could not make such investments in the future. Registration Statement at 9, 13. Even putting to one side the fact that predictions about the future are almost

always non-actionable, here these statements raised a red flag about whether the past activity

would continue unchanged into the future. This kind of warning precludes any claim based upon

predictions about the future. See Zeid, 930 F. Supp. at 437.

Knowing they could not attack the accuracy of the hard data provided in the

Registration Statement about present and past expenditures and expansion, and despite the fact

that the "risk factors" about future expenditures have nothing to do with that information, the

plaintiffs link the two in an effort to create misstatements where none exist. This effort fails as a

matter of law.

1.     **Constar Accurately Presented Hard Data on Capital Expenditures and Capacity Expansion**

First of all, the plaintiffs do not identify any *statements of fact* in the Registration

Statement that were false regarding Constar's existing or past capital expenditures and capacity

expansion. Nor could they, because Constar provided detailed information concerning past

capital expenditures, which is not challenged in the Amended Complaint:

> Capital expenditures increased $1.1 million, or 7.5%, to $15.7 million in the nine months ended September 30, 2002 from $14.6 million in the nine months ended September 30, 2001.

> Capital expenditures were $23.5 million in 2001 compared to $34.9 million in 2000 and $32.2 million in 1999.

> . . .

> Due to reductions in the amount of capital expenditures required to satisfy our customer's requirements and the use of an operating lease for the acquisition of one hot-fill production line, our capital spending was lower in 2001 than in 2000.

Registration Statement at 46. The plaintiffs accept the truth of these representations.

Because accurate hard data was presented in the Registration Statement, there was no duty to characterize these numbers as somehow "low" or "inadequate" based on the isolated, anecdotal incidents cited in the Amended Complaint. See Trump, 7 F.3d at 375-76 (where issuer accurately disclosed debt to equity ratio, the defendants could not be liable because they did not describe the ratio as "unwarranted" or "excessive"). Constar "has provided accurate hard data from which analysts and investors can draw their own conclusions about the company's conditions and the value of its stock." In re Ultrafem Inc. Sec. Litig., 91 F. Supp. 2d 678, 699 (S.D.N.Y. 2000) (quoting In re Syntex Corp. Sec. Litig., Civ. No. 92-20548, 1993 U.S. Dist. LEXIS 20420, at *22 (N.D. Cal. Sept. 1, 1993)); accord In re Bell Atlantic Sec. Litig., No. 91-0514, 1997 U.S. Dist. LEXIS 4938, at *127 (E.D. Pa. Apr. 16, 1997) (holding that statements commenting on company's results were not material because "[t]he historical figures were accurately disclosed from which a reasonable investor could deduce" the information for himself), aff'd without opinion, 142 F.3d 427 (3d Cir. 1998). Hence, the plaintiffs' claims in this regard are not actionable.[3]

---

[3] Plaintiffs argue that these disclosures were not sufficient because there was not an appropriate "context" provided, yet offer no examples as to what "context" could have possibly been more helpful than the actual hard data that was provided. The only case cited by plaintiffs to support their argument is a case arising under Rule 10b-5 prior to the passage of the PSLRA, out of the Fifth Circuit. But that case actually supports defendants' argument that the selective dissection of the statements of the Registration Statement inappropriately masks their true intended meaning. In Isquith v. Middle South Utils., Inc., 847 F.2d 186, 201 (5th Cir. 1988), the Fifth Circuit stated, "it is wrong to treat each individual piece of information separately, as if it had no relation to the other pieces which surround it."

2.    **The Statements about Constar's Future Capital Expenditures and
      Capacity Expansion do not Suggest Anything about Past Capital
      Expenditures or Capacity Expansion**

Second, the plaintiffs' attempt to transform the *risk* factors about Constar's *future*

spending into representations about Constar's *past* spending is non-sensical.  There is no

question that the past capital expenditures were accurately disclosed, and the risk factors were

simply discussing *future* capital expenditures and the possibility that inadequate funds would

exist to make such expenditures.  The plaintiffs' argument relies on twenty-year old language

from the Fifth Circuit's decision in <u>Huddleston v. Herman & MacLean</u>, 640 F.2d 534, 544 (5th

Cir. 1981), which stated, "To warn that the untoward may occur when the event is contingent is

prudent; to caution that it is only possible for the unfavorable events to happen when they have

already occurred is deceit."  In <u>Huddleston</u>, the "event" involved was a specific, one time project

– the construction of an automobile racetrack – which was the explicitly stated reason for the

offering.  The plaintiffs alleged that the defendants' statements that "warned" of the risk that "the

construction costs might be underestimated," were misleading because, in fact, the defendants

"already knew that the cost of construction was understated."  <u>Id.</u>  The court determined that the

future "risk" had already materialized, was no longer contingent, and thus the statement was

actionable.

Here, the "risk factors" undoubtedly speak only in terms of future events – events

that could not possibly have already occurred – *future capital expenditures*.  As noted above,

the hard data about past events was, in fact, disclosed and the plaintiffs do not claim that those

disclosures were inaccurate.  Unlike construction costs for an ongoing project which were

already being incurred, it defies all logic to claim that Constar's *future* capital expenditure levels

were anything but ***contingent*** at the time of the IPO.  In fact, as stated in its opening

memorandum, when this future, contingent event ultimately occurred, in the year following the

IPO, capital expenditures actually ***increased*** by $17.1 million.  <u>See</u> Constar's Annual Report

Form 10-K for year end 2003 (available at <u>www.sec.gov</u>); <u>see also</u> <u>Oran v. Stafford</u>, 226 F.3d

275, 289 (3d Cir. 2000) (taking judicial notice of public disclosure documents filed with SEC).

Thus, the plaintiffs' accusations about the warning with respect to future expenditures fail both

because no reasonable investor would read a statement regarding risks to ***future*** capital

expenditures and glean anything about ***past*** capital expenditures or capacity expansion and also

because now, with the benefit of hindsight, capital expenditures actually increased.  The

plaintiffs' capital expenditure and capacity expansion claims should be dismissed.

**B.**     <u>**Constar's Machinery and Technology**</u>

The same problems pervade the plaintiffs' claims with respect to Constar's

equipment and technology.  As the defendants previously argued, the plaintiffs' claims fail as a

matter of law because the plaintiffs plainly mischaracterize the statements in the Registration

Statement, ignore the hard facts that are disclosed about past machinery purchases, and ignore

the explicit risk factor disclosures about the limited circumstances in which it would acquire new

machinery in the future.  <u>See</u> Def.s' Mem. of Law at 33-38.

As explained in Constar's opening memorandum, extensive ***hard information***

about Constar's machinery and maintenance program was disclosed in the Registration

Statement.  The Registration Statement expressly disclosed Constar's investments in specific

machinery in the past two years:

- Acquisition of equipment from a U.K. self-manufacturer during 2000 in conjunction with our entry into a long-term supply arrangement with this customer;

- Installation of a high-speed manufacturing line in 2000 and 2001 to serve the hot fill beverage market in the U.S.;

- Acquisition of new multi-layer injection machines in 2000 and 2001 to support our growth into the market for oxygen-sensitive beer, juices and teas; and

- Purchase of new molds for new business in each year.

Registration Statement at 46.  Immediately thereafter, the Registration Statement explained the

extent of Constar's maintenance program:

> Our average spending for maintenance capital is approximately $9 million per year, the majority of which applies to mold refurbishment and major renovation activities for infrastructure and buildings. A formal program of preventative maintenance, which includes weekly, monthly and annual parts replacement and overhaul, is managed centrally and is accounted for as an expense in our cost of sales. The average annual expense for annual preventative maintenance activity is approximately $8 million, in addition to the approximately $12 million spent annually on weekly and monthly maintenance and on running repairs. We believe our preventative maintenance program limits downtime and increases the efficiency of our operations.

Id.

In their memorandum and Amended Complaint, the plaintiffs do not plead that

this information is inaccurate.[4]  Instead, they focus their attack on the defendants' **_opinion_** that

---

[4]      Plaintiffs' confidential witnesses offer vague accounts as to whether Constar operated particular brands of new equipment (like the Sidel 02 instead of the Sidel 01), whether Constar made particular capital expenditures to maintain business with particular customers, or whether Constar spent sufficient money to maintain its equipment and prevent equipment breakdowns. These sources do not and cannot dispute that the Registration Statement accurately describes the Company's machinery upgrading and maintenance program in the years leading up to the IPO, the amount spent on equipment, and the precise amount of money spent on machinery

the speed and capacity of its equipment are "generally comparable" to that of its competitors.

While the plaintiffs may disagree with Constar's choice of adjectives, the actual data supporting

those opinions was disclosed in the Registration Statement, and investors were entitled to draw

their own conclusions.  Also, as explained above, where an issuer has accurately disclosed hard

facts about its business, it cannot be liable for its subjective descriptions of those facts, even if

the plaintiffs disagree with them.  See Trump, 7 F.3d at 375-76.  "A company has no duty to

disparage its own competitive positions in the market where it has provided accurate hard data

from which analysts and investors can draw their own conclusions about the company's

conditions and the value of its stock."  In re Ultrafem, 91 F. Supp. 2d at 699.

    That is particularly so where, as here, all Constar has done is compare its

equipment to that of its competitors in the vaguest of terms.  Contrary to the plaintiffs' assertion

in their memorandum, the Registration Statement does not say that Constar utilized "cutting-

edge" manufacturing equipment or that all of its equipment was "state-of-the-art" when

---

maintenance.  It is these corporate wide disclosures which investors would consider material, not
anecdotal evidence about particular business decisions and particular instances of lost customers.
Furthermore, unless a defendant makes a specific representation concerning the sales they expect
from a particular customer listed in the Registration Statement, it is not, as a matter of law,
required to disclose the level of sales to these customers or the fact that the company lost these
customers altogether.  See Shoenhaut v. Amer. Sensors, Inc., 986 F. Supp. 785, 793 (S.D.N.Y.
1997) (holding that the failure to disclose that sales to customer were decreasing is not material
as a matter of law because prospectus did not list current volume of sales to the customer, predict
sales levels or suggest that the customer would remain a customer); In re Verifone Sec. Litig.,
784 F. Supp. 1471, 1484 (N.D. Cal. 1992) (finding no duty to disclose the fact that customers
listed in prospectus were not currently ordering from the company because the prospectus did not
contain any representations about current or future orders from those customers); In re
Convergent Tech. Sec. Litig., 721 F. Supp. 1133, 1135-36 (N.D. Cal. 1988) (finding no duty to
disclose the "trend" of declining orders from the defendants' major customers when the company
did not disclose its internal estimate of expected orders).

compared to that of its competitors.[5]  What Constar actually said about the present state of its

equipment was that:  "Because the speed and capacity of our equipment *are generally*

*comparable to the equipment of our competitors*, we *believe* that our manufacturing platform is

*cost competitive*."  Registration Statement at 34 (emphasis added).

       Whether Constar had stated that its equipment was "generally comparable" to that

of its competitors, or even "state-of-the-art," that subjective label is nothing more than Constar's

view of the actual facts disclosed in the financial statements.  Constar did not even have a duty to

disclose this view as "it is precisely and uniquely the function of the prudent investor, not the

issuer of securities, to make such comparisons." Trump, 7 F.3d at 375-76; accord In re Advanta

Corp. Sec. Litig., 180 F.3d 525, 538-39 (3d Cir. 1999).

       Moreover, Constar's statement that it "believes" that its manufacturing platform

was "cost competitive," is obviously an opinion which, in any event, is manifestly true.

Obviously, there was a reasonable basis to make the unremarkable statement that Constar's

manufacturing platform was "cost competitive," given that Constar continued to generate

---

[5]     In their memorandum, plaintiffs claim that "the Registration Statement states that Constar 'was able to maintain [its] competitive cost position as [it] grew by purchasing state-of-the-art manufacturing equipment for [its] high-volume product lines . . ." Pls.' Mem. at 14 (alterations in original).  What the Registration Statement actually says is "We are able to maintain our competitive cost position as we grow by purchasing state-of-the art manufacturing equipment for our high-volume product lines and redeploying existing machines to lower volume and specialty product lines." Registration Statement at 33 (emphasis added); see also id. at 46 (Constar stated that it would only purchase "the highest speed state of the art equipment *on each occasion that we increase capacity*." (emphasis added)).  Thus, contrary to plaintiffs' suggestion in their memorandum, the Registration Statement does not suggest that all of Constar's equipment was state-of-the-art or cutting edge; it says only that as it grows, Constar purchases state-of-the-art machinery.  The Complaint offers nothing to suggest that Constar did not, in fact, purchase "the highest speed state of the art equipment on each occasion that we increase capacity."

hundreds of millions of dollars in sales, sales numbers which the plaintiffs do not dispute were accurately disclosed in the Registration Statement.  In other words, logic dictates that if Constar's equipment was not "generally comparable to the equipment of [its] competitors" or if Constar's "manufacturing platform [was not] cost competitive," it would have been quickly driven out of business.  Certainly, it could not have continued in a fiercely competitive marketplace to rack up hundreds of millions of dollars in sales each year.  Thus, not surprisingly, the Courts have accepted this kind of logic to preclude claims like those made by the plaintiffs in this case.  See First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 772 (2nd Cir. 1994) (refusing to credit, on a motion to dismiss, allegations that "def[ied] logic"); Schoenhaut v. American Sensors, Inc., 986 F. Supp. 785, 794 (S.D.N.Y. 1997) (recognizing that the plaintiffs' claim that prospectus was misleading because it failed to disclose that issuer's products were "obsolete" failed "as a matter of law" when sales figures showed that company was still selling product) (citing In re Seagate Technology II Sec. Litig., No. 88-20489, 1989 U.S. Dist. LEXIS 10466, at *14 (N.D. Cal. May 3, 1989) (finding product was not "obsolete" because it made up a substantial portion of company's sales)).

　　　　The plaintiffs' citation to Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1093-94 (1991), does not change this result.  First, the Third Circuit has held that where, as here, the challenged statements are, at best for the plaintiffs, no more than immaterial "puffing," Virginia Bankshares does not apply.  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1428 n.14 (3d Cir. 1997).  Second, all Virginia Bankshares held was that otherwise material statements of opinion may be actionable where they "expressly or impliedly assert something false or misleading about their subject matter."  Trump, 7 F.3d at 371.  Where, as here, the

disclosed facts in the Registration Statement, taken as a whole, could not possibly render the opinion materially misleading, <u>Virginia Bankshares</u> is of no help to the plaintiffs. <u>Id.</u> at 371-72 (accurate information and sufficient warning statements may make opinions inactionable under <u>Virginia Bankshares</u>).

As a matter of law, no reasonable investor could have been duped into purchasing Constar stock by such assertions. The statements regarding Constar's equipment and maintenance are immaterial as a matter of law and should be dismissed.

### C.   <u>Oxbar Technology</u>

The plaintiffs again take issue with adjectives in attacking Constar's description of its Oxbar technology – this time claiming the statement that Constar "***believes*** that our Oxbar oxygen-scavenging technology . . . is ***the best*** performing technology for the preservation of oxygen sensitive products and is cost competitive with other available technologies" and the statement that Constar "***believes*** that Oxbar . . . is recognized as ***the best*** available technology for the protection of oxygen sensitive products" are materially false and misleading. Pl.s' Mem. at 22 (quoting Registration Statement at 1) (emphasis added). The plaintiffs' only pleaded support for this claim is the supposed testimony of one unidentified source who concluded Oxbar was not "the best" technology available because, he believed, one customer did not think the product worked. This argument, again, is nonsense.

1.     **Constar's Opinion that its Oxbar Technology is "The Best" is Immaterial as a Matter of Law**

First and fundamentally, it is crystal clear that assertions about which product a company *"believes"* to be the *"best"* should be considered, as a matter of law, nothing more than a optimistic opinion about an issuer's product, Courts routinely have found no reasonable investor could consider such assertions material.  The Registration Statement expressly warns investors that statements beginning with the term we "believe" are forward looking statements that are subject to risk.  Registration Statement at 22.  Moreover, claims that a product is "the best" are routinely held immaterial.  See Mobile Media, 28 F. Supp. 2d at 938 ("The statement MobileMedia will continue to provide the *best* in customer service is the type of puffery that has been found to be immaterial as a matter of law.") (emphasis added); In re U.S. Interactive, Inc. Sec. Litig., No. 01-CV-522, 2002 U.S. Dist. LEXIS 16009, at *34 (E.D. Pa. Aug. 23, 2002) (commenting that a "reasonable investor would *expect* a professional services firm to say that it was the *best* at integrating [certain] skills" and that "[s]uch 'puffing' would not significantly alter the 'total mix' of information available to a reasonable investor") (emphasis added); see also City of Monroe Emples. Ret. Sys. v. Bridgestone Corp., Civ. A. No. 03-5505, 2004 U.S. App. LEXIS 22125, at *54 (6th Cir. Oct. 22, 2004) ("[S]tatements describing a product in terms of 'quality' or *'best'* . . . are too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision.") (emphasis added); Longman v. Food Lion, Inc., 197 F.3d 675, 684 n.2 (4th Cir. 1999) (determining that statements that Food Lion is one of the *"best-managed"* companies and provides *"some of the best benefits"* were immaterial) (emphasis added); accord In re Splash Tech. Holdings Inc. Sec. Litig., 160 F. Supp. 2d 1059, 1077 (N.D. Cal. 2001) (finding statements

using the words "healthy," "strong," "increased awareness," "robust," "well positioned," "solid," "improved," "better than expected," and "unfolding as planned" were puffery and not actionable).  Cf. Marvin Lumber & Cedar Co. v. PPG Indus., 223 F.3d 873, 880 (8th Cir. 2000) (finding representation that product was "better" than its competitors was inactionable puffery and could not support express warranty claim for product defect case); Ruffin v. Shaw Indus., 149 F.3d 294, 302 (4th Cir. 1998) (determining claim that a product was "higher quality" than another is mere puffing and thus cannot create an express warranty for product defect case); Glen Holly Entm't, Inc. v. Tektronix, Inc., 100 F. Supp. 2d 1086, 1093 (C.D. Cal. 1999) (finding assertion that a product is the "best" is non-actionable puffery and cannot support a fraud claim).

For example, the Sixth Circuit recently was asked to find that Ford Motor Company's statements that "Ford has its *best* quality ever" and "Ford is a worldwide leader in customer safety" were misleading in light of the highly publicized problems Ford had with Firestone tires on the Ford Explorer.  The Sixth Circuit declined to do so saying: "Such statements are either mere corporate puffery or hyperbole that a reasonable investor would not view as significantly changing the general gist of available information, and thus, are not material, even if they were misleading."  In re Ford Motor Co. Sec. Litig., 381 F.3d 563, 570 (6th Cir. 2004).[6]  Thus, these superlatives are immaterial as a matter of law.

---

[6]      Plaintiffs again rely on Virginia Bankshares but, as explained above, the requirement announced in Virginia Bankshares that a statement have a "reasonable basis" only applies to statements that are material on their face, and thus does not apply to the alleged misstatements here, nor did it apply in the Ford case.  Burlington Coat Factory, 114 F.3d at 1428 n.14; Ford, 381 F.3d. at 570.

2.     **The Plaintiffs have not Pleaded that Constar's Assertion that Oxbar was "the Best" Available Oxygen Scavenging Technology Lacked any Basis**

And, even if the statements are not, on their face, merely puffery, the loss of the Anheusur-Busch contract does not suggest that Oxbar was ineffective, as the plaintiffs and their confidential witnesses say.  This is particularly so because, as shown in the defendants' opening memorandum, the contract constituted less than 1% of Constar's overall sales.  The plaintiffs' reliance on In re Unisys Corp. Sec. Litig., Civ. A. No. 99-5333, 2000 U.S. Dist. LEXIS 13500, *15-16 (E.D. Pa. Sept. 21, 2000), for the proposition that even small amounts of lost business can be material, is misplaced.  In Unisys, the plaintiff alleged facts showing that the defendant itself had touted the importance of the contracts at issue through its own disclosures.  See id.  In that case, defendant had described one of the contracts as "a major award from the U.S. General Services Administration" and put out a press release describing the two contracts as one of the "reasons for Unisys's economic strength."  Id.  Here, by contrast, the loss of the Anheusur-Busch contract could not possibly show that Constar's claim about Oxbar was material, as the plaintiffs' claim, because Constar never represented it was a critical basis for its current "economic strength."

Moreover, the plaintiffs fail to allege sufficient facts to permit the conclusion that Oxbar was not the "best."  The mere fact that one customer chose to switch from Oxbar to some other technology does not mean that Oxbar is not, in fact, "the best" available technology.  Even where a certain technology is indisputably the "best," there are many reasons why someone may decide not to utilize that technology, including the technology's cost, prior relationships with other manufactures, or friction in an ongoing business relationship.  Again, it is simply illogical

to conclude that, based upon one customer choosing a product other than Oxbar, Oxbar is not "the best" available technology. First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 772 (2nd Cir. 1994) (refusing to credit, on a motion to dismiss, allegations in the Compliant that "def[ied] logic").

### D.    Constar's Relationship with Crown

The defendants explain in detail in their opening memorandum that a substantial amount of information about the relationship between Crown and Constar was set forth explicitly in the Registration Statement. Def.s' Mem. of Law at 25. Yet, the plaintiffs ignore the Registration Statement and still argue that the "Registration Statement omits material information about the financial relationship between Crown and Constar." Pl.s' Mem. at 30. But, the only information they point to is that Constar did not disclose that the $350 million note to Crown was, according to the plaintiffs, "in effect a 'dividend,'" because Constar supposedly did not receive any benefit from the $350 million note.

However, the Registration Statement, in fact, discloses the very information the plaintiffs claim is absent. The Registration Statement provided detailed information about the relationship between Crown and Constar and about the financing arrangements that were part of the IPO. It was crystal clear in establishing that "[Constar] will not receive any of the proceeds from the sale of shares of our common stock in this offering," and that "[t]he net proceeds from the sale of our common stock will be paid to Crown." Registration Statement at 1, 22. And, specifically with respect to the $350 million note, the Registration Statement explained in detail that:

> The proceeds from the concurrent $175 million note offering . . . the proceeds of our $150 million term loan and $27.6 of our initial borrowing under our revolving loan facility will be used to pay off our $350 million note to Crown.

Id. at 22.  In other words, Constar was not to receive any benefit from the Note.

The plaintiffs do not say that the disclosures regarding the note to Crown were inaccurate.  They do not say that Constar somehow represented that it was receiving $350 million in cash, or any other benefit, from Crown for the note.  Everything was disclosed.

The plaintiffs offer no explanation for their chosen characterization of this amount as "a dividend," point to no facts which would justify such a characterization other than those disclosed in the Registration Statement or publicly known, and fail to explain why this characterization is material (or relevant in any way).[7]  The plaintiffs simply looked at the financial statements and coined the term "dividend" to describe the note.  The fact that Constar did not adopt the plaintiffs' "dividend" description does not mean that the Registration Statement did not accurately disclose the hard underlying facts.  Trump, 7 F.3d at 372-73.  Accordingly, all claims based on the alleged misstatements relating to the relationship between Crown and Constar should be dismissed.

### E.   Resin

As explained in the defendants' opening memorandum, there was no obligation to explain to investors the basic economics lesson that, if the price for resin were to rise, Constar's customers may seek out cheaper alternatives such as aluminum or glass.  See Def.s' Mem. of

---

[7]      In fact, the Complaint alleges that information about Crown's financial condition was publicly "reported by the news media."  Complaint at ¶ 69.

Law at 41.  And, the plaintiffs have no answer to the defendants' argument that, even though

there was no duty to disclose this simple economic principle, it was in fact disclosed.  Id. at 42.

The Registration Statement said:  "A sustained increase in the price of resin may slow the rate of

conversion of alternative packaging materials, such as glass and metal, to PET, or may make

these alternative packaging materials more attractive than PET."  Registration Statement at 42.[8]

Finally, although the plaintiffs assert that the defendants couched this as a "risk factor" while

PepsiCo had actually switched to cheaper alternatives in the past, elementary economics about

the past are no more material than elementary economics about the future.  Accordingly, the

claims based on the disclosure of resin price are spurious and should be dismissed.

### F.      Goodwill

The *only* hard fact that the plaintiffs challenge in the entire Registration Statement

relates to the amount of "goodwill" set forth in Constar's financial statements.  But, while this is

a claim relating to an actual *fact*, the plaintiffs offer nothing to show that the representation was

false.

The plaintiffs attempt to avoid their defective goodwill claim by disingenuously

asserting that "defendants do not . . . deny the Company's goodwill was overstated."  Pl.s' Mem.

---

[8]      Plaintiffs' claim that Constar was obligated to purchase what it characterizes as "inferior" resin based on its contract with Pepsi is similarly unpersuasive.  First, Constar did disclose that its Pepsi contract allowed Pepsi to require Constar to purchase its resin.  See Registration Statement at 14.  Second, and more importantly, Constar's opinion of the quality of that resin is the type of opinion not actionable under the securities laws.  Ford, 381 F.3d at 570-71 (finding statements boasting about Ford's "quality" were inactionable puffery).  Moreover, surely the securities laws do not require a company to disclose negative opinions about the quality of its customers' products.

at 34.  This is, of course, totally false.  In fact, the whole point of the defendants' argument was

that the plaintiffs' confidential witnesses did not point to anything that was not **_public knowledge_**

or **_expressly disclosed_** in the Registration Statement to support their claim that goodwill was

overstated in the Registration Statement.[9]  Instead, they simply point to the fact that goodwill

was eventually written down as a consequence of a substantial decline in Constar's stock – a risk

that was expressly disclosed in the financial statements.  Registration Statement at 16 ("One

circumstance that may indicate the need for an immediate impairment review would be if our

book value was in excess of our market capitalization.").  This is a classic example of "fraud by

hindsight," which has been "soundly rejected by several courts."  Castlerock Mgmt., 68 F. Supp.

2d at 488; see also In re IKON Office Solutions, Inc., 277 F.3d 658, 673 (3d Cir. 2002); In re

Rockefeller Ctr. Props. Sec. Litig., 311 F.3d 198, 225 (3d Cir. 2002).  The goodwill claims

should be dismissed.

*   *   *   *   *

In sum, the alleged misstatements plucked from the Registration Statement are

immaterial and inactionable on their face in light of the unchallenged financial data disclosed in

the prospectus and the specific risk factors which warned about the specific challenges facing the

Company after the IPO.  And while the plaintiffs use their confidential witnesses to add some

razzle-dazzle to the Amended Complaint, even taking what they say as true, they do not establish

that there were any materially misleading statements in the Registration Statement.  Since that is

---

[9]     As explained in defendants' opening memorandum, while the plaintiffs suggest that some
companies were unwilling to buy Constar when it was put up for sale prior to the IPO, even if the
public did not know this information, it is irrelevant – the market price was subsequently set in
the context of the IPO, so whatever prices were discussed prior to the IPO does not reflect on
Constar's market value or, consequently, the value of its goodwill carried on the books.

26

what the plaintiffs must plead to establish a Section 11 claim, the Amended Complaint must be dismissed.

## IV.    SECTION 15 LIABILITY

As demonstrated above, the plaintiffs fail to allege a cognizable claim under Section 11.  For this reason, the plaintiffs' claims against Constar directors and/or board members Charles F. Casey, Michael J. Hoffman, James C. Cook, William G. Little, Alan Rutherford, John W. Conway, Angus F. Smith and Frank J. Mechur (collectively, the "Individual Defendants") and Crown pursuant to Section 15 must necessary fail as well.  The law is clear: liability under Section 15 is derivative and therefore predicated on the presence of liability pursuant to Section 11.  See In re Advanta Corp., 180 F.3d at 541; Castlerock Mgmt., 114 F. Supp. 2d at 325.  As the plaintiffs have failed to prove Section 11 liability, they cannot, as a matter of law, maintain a claim pursuant to Section 15.

## V.    THIS CASE SHOULD BE DISMISSED WITH PREJUDICE

This Court should dismiss this case with prejudice.  As shown above, Courts routinely recognize that where the fatal flaws in the complaint lie not in the art of pleading, but in the fact that the statements in the Registration Statement are not, on their face, materially misleading, there is no need to allow a plaintiff to replead.  See, e.g., In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357 (3d Cir. 1993); In re Craftmatic Sec. Litig., 890 F.2d 628 (3d Cir. 1989).  The plaintiffs have not even attempted to suggest what other facts or allegations they would make to rescue their Amended Complaint.  Given that there are no other facts or

27

allegations which could salvage the plaintiffs' claims, the Amended Complaint should be dismissed with prejudice.

## CONCLUSION

Constar's Registration Statement contained accurate hard data about every aspect of its business.  It also had 38 specific warnings to investors of the potential pitfalls Constar might well face in the future.  The plaintiffs' Amended Complaint, though larded up with anecdotal stories from former Constar employees and competitors, does not and cannot challenge the accuracy of the hard information which was disclosed in the robust and definitive risk factor disclosures.  Instead, they attempt to manufacture a claim by disputing the expressed views and opinions of Constar about disclosed facts.  But, this is not the stuff of a Section 11 claim.  Indeed, if plaintiffs could simply seek out persons unhappy with a company in order to extract anecdotes to undermine opinions contained in a Registration Statement, courts would be inundated with Section 11 Claims.

The bottom line is that the plaintiffs here have not and cannot identify any material misstatements in the Registration Statement.  The Court should dismiss the Amended Complaint with prejudice.

Steven B. Feirson
Michael L. Kichline
Michael E. Baughman
Scott A. Thompson
Dechert LLP
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103
(215) 994-2489

Attorneys for Defendants Constar
International, Inc., Crown Cork &
Seal Company, Inc. and the
Individual Defendants

Dated: November 9, 2004

# EXHIBIT A

# RISK FACTORS

*Our business involves a number of risks, some of which are beyond our control. You should carefully consider each of the risks and uncertainties we describe below, which we believe are the material risks involved in investing in our securities, and all of the other information in this prospectus before deciding to invest in our shares. Additional risks and uncertainties not currently known to us or that we currently deem immaterial may also become important factors that may harm our business.*

## Risks Related To Our Business And Industry

### *We Had Net Losses In Recent Years And We May Not Generate Profits In The Future*

For the fiscal years ended December 31, 2001 and 2000 we had net losses of approximately $13.6 million and $14.8 million, respectively. During the nine months ended September 30, 2002 we had a net loss of approximately $33.0 million, including a charge of $50.1 million for the cumulative effect of a change in accounting for goodwill. Continuing operating losses may limit our ability to service our debt and fund our operations and we may not generate net income from operations in the future.

### *We Must Generate Sufficient Cash Flow To Service Our Debt And Provide For Ongoing Operations*

If we are unable to generate sufficient cash from operations to service our debt and fund our operations, or if we are unable to refinance our debt, we may have to defer capital expenditures or sell assets to generate cash, which could weaken our competitive position. When we complete this offering, we will have approximately $365 million in principal amount of debt consisting of senior subordinated notes and borrowings under our senior secured credit facility. We will need to generate enough cash to service our debt. Although interest rates and the amount outstanding under our senior secured credit facility may vary, based on the interest rates assumed in our unaudited pro forma combined financial statements and assuming that our debt levels do not change from the date of completion of this offering, servicing our outstanding indebtedness under the senior secured credit facility and our senior subordinated notes would require annual payments of approximately $31.6 million of interest (excluding $1.8 million of annual amortization of financing fees and debt discount). Our ability to generate cash depends to some extent on general economic, competitive, legislative and other factors beyond our control. Our senior secured credit facility may alleviate our short-term cash needs, but any borrowings from this facility may further increase our debt. In addition, we may need to refinance all or a portion of our debt and we may be unable to do so on commercially reasonable terms or at all.

### *Our Debt May Negatively Impact Our Liquidity And Harm Our Competitive Position*

Our debt may have important negative consequences for us, such as:

- significantly increasing our interest expense and related debt service costs;

- limiting our ability to obtain additional financing;

- increasing our vulnerability to economic downturns and changing market and industry conditions;

- limiting our ability to compete with companies that are not as highly leveraged and that may be better positioned to withstand economic downturns; and

- restricting our ability to pay dividends or make distributions to our stockholders.

We and our subsidiaries may be able to incur substantial additional debt in the future. If new debt is added to our current debt levels or the current debt levels of our subsidiaries, the related risks that we and they now face could intensify.

9

I.Table of Contents

***Indebtedness Under Our Senior Secured Credit Facility Is Subject To Floating Interest Rates, Which May Cause Our Interest Expense To Increase***

Changes in economic conditions could result in higher interest rates, thereby increasing our interest expense and reducing our funds available for operations and other purposes. When we complete this offering, we will have approximately $193 million in borrowings under our senior secured credit facility. We may incur up to an aggregate of $250 million of indebtedness under our senior secured credit facility, which is subject to floating interest rates. A 1% increase in market interest rates on our $193 million in borrowings under our senior secured credit facility would result in an annual increase in our interest expense and a decrease in our income before taxes of approximately $1.9 million.

***We Are Subject To Certain Covenant Restrictions In Our Senior Secured Credit Facility And The Indenture Relating To Our Senior Subordinated Notes Which May Limit Our Flexibility In Operating Our Business And Our Ability To Repay Our Indebtedness***

Our senior secured credit facility and the indenture relating to our senior subordinated notes contain a number of restrictive covenants that impose significant restrictions on us. Compliance with these restrictive covenants may limit our flexibility in operating our business. Failure to comply with these covenants could give rise to an event of default. These covenants restrict, among other things, our ability to:

- incur additional indebtedness and guarantee obligations;

- create liens;

- engage in mergers, consolidations, liquidations or the creation of subsidiaries;

- change the nature of our business;

- make equity investments or loans;

- sell, lease or otherwise dispose of assets;

- engage in sale and leaseback transactions;

- sell or discount notes or receivables;

- pay dividends, make distributions, or redeem any equity securities;

- engage in transactions with affiliates;

- modify our organizational documents or certain debt documents;

- enter into agreements restricting our ability or the ability of a subsidiary to incur liens, or restricting the ability of a subsidiary to pay dividends to, make or repay loans to, transfer property to, or guarantee indebtedness of, us or any of our other subsidiaries;

- prepay certain indebtedness; and

- allow debt to be designated as senior debt.

Our senior secured credit facility also includes financial covenants.

If we default on any of these covenants, the lenders could cause all amounts outstanding under our senior secured credit facility and our senior subordinated notes to be due and payable immediately and the lenders under our senior secured credit facility could proceed against any collateral securing that indebtedness. Our assets or cash

flow may not be sufficient to fully repay the borrowing under the senior secured credit facility or the senior subordinated notes, either upon maturity or if accelerated upon an event of default. In addition, any event of default or declaration of acceleration under one debt instrument could also result in an event of default under one or more of our other debt instruments.

10

---

**II.Table of Contents**

Under our senior secured credit facility, we will pledge as collateral all of the capital stock of our domestic subsidiaries, 65% of the capital stock of our foreign subsidiaries and all of the assets of our domestic subsidiaries. As of September 30, 2002, the book value of the assets of our domestic subsidiaries that will be pledged as collateral was $313.2 million.

*The Market For Custom PET Packaging May Not Grow As Large Or As Quickly As We Anticipate*

To the extent that the custom PET market does not grow as large or as quickly as we anticipate, our growth and profitability may be lower than we currently expect. We believe that one of the keys to our future success will be our ability to sell more custom PET products. Partly because of the more complex technologies required for custom PET, our margins are higher for custom PET products than for conventional PET products. We believe that an increasing number of products will convert from glass, metal and other packaging to custom PET packaging. A slow rate of conversion would limit our growth.

*If We Lose PepsiCo As A Customer Or If PepsiCo Reduces The Number Of Containers That It Purchases From Us, Our Net Sales And Profitability May Decline*

PepsiCo may in its discretion terminate its new five-year Supply Agreement with us if we materially breach any of our obligations under the agreement or if a third party acquires more than 20% of our outstanding capital stock or United States-based PET assets. The loss of PepsiCo as a customer would cause our net sales and profitability to decline significantly. Our sales to PepsiCo accounted for approximately 35% of our 2001 revenue and in 2002 PepsiCo acquired another of our customers that accounted for approximately 2.5% of our 2001 revenue. In addition, notwithstanding PepsiCo's commitment to purchase containers from us in certain geographic regions, PepsiCo may purchase containers from a third party for such regions under several circumstances, including our failure to meet our supply obligations and our failure to meet the quality standards required by the Supply Agreement.

*We Enjoy Limited Protection For Our Intellectual Property And The Loss Of Our Intellectual Property Rights Would Negatively Impact Our Ability To Compete In The PET Industry*

If we are unable to maintain the proprietary nature of our technologies, we may lose the ability to generate royalties in the future by licensing our technologies and our competitors may use our technologies to compete with us. We have a number of patents covering various aspects of our design and construction of our products, including our Oxbar technology. Our patents may not withstand challenge in litigation, and patents do not ensure that competitors will not develop competing products, design around our patents or infringe upon our patents. The costs of litigation to defend our patents could be substantial and may outweigh the benefits of enforcing our rights under our patents. We market our products internationally, and the patent laws of foreign countries may offer less protection than the patent laws of the United States. Not all of our domestic patents have been registered in other countries. We also rely on trade secrets, know-how and other unpatented proprietary technology, and others may independently develop the same or similar technology or otherwise obtain access to our unpatented technology. To protect our trade secrets, know-how and other proprietary information, we require employees, consultants, advisors and collaborators to enter into confidentiality agreements with us. These agreements may not provide meaningful protection for our trade secrets, know-how or other proprietary information in the event of any unauthorized use, misappropriation or disclosure of this information. In addition, we have from time to time received letters from third

parties suggesting that we may be infringing their intellectual property rights and third parties may bring infringement suits against us. If the claims of these third parties are successful, we may be required to seek licenses from these third parties. In addition, other parties use oxygen barrier technologies, and we have not determined whether these technologies may infringe upon our patents.

### If We Lose An Existing Lawsuit Regarding Oxbar, Our Ability To Use And License Oxbar For Certain Applications Would Be Impaired

An existing lawsuit challenges our ability to use and sublicense certain applications of Oxbar. Crown Cork & Seal Technologies Corporation, or CCK Technologies, holds the patents related to Oxbar and will contribute these

11

---

### III.Table of Contents

patents to us upon the completion of this offering. CCK Technologies is the plaintiff in a patent infringement suit regarding Oxbar for use in certain plastic containers. Oxbar may be combined with various plastic materials, including PET, for use in various forms of packaging. An intervenor in the suit is asserting that it has the exclusive right under a license from CCK Technologies to use and sublicense certain combinations of Oxbar as used in, among other things, PET packaging. CCK Technologies is contesting the intervenor's claim to the extent it relates to PET packaging. Although we have not earned any revenue from licensing Oxbar, we believe that licensing Oxbar represents a potential source of revenue. If we lose the Oxbar action, the amount of revenue that we may earn by licensing Oxbar will likely be reduced because the intervenor will have the exclusive right to license certain applications of Oxbar. In addition, the patent infringement claim could not proceed against the alleged infringer as the intervenor purports to have granted the alleged infringer a sublicense. If successful, the intervenor may also assert claims against our right to use Oxbar in certain PET applications.

### A Third Party Has The Right To Sublicense Our Oxbar-Related Patents, Which May Weaken The Competitive Advantages Of Our Oxbar Technology

Our Oxbar technology is subject to a worldwide royalty-free cross-license with Rexam AB, which owns several patents relating to oxygen-scavenging technology. The cross-license agreement gives both parties the right to use and sublicense each other's oxygen scavenging technology patents, but not each other's know-how. The competitive advantages that we believe can be achieved through Oxbar may not be fully realized to the extent that Rexam uses Oxbar to compete with us or sublicenses Oxbar to any of our existing or potential competitors. We are in the process of negotiating a new agreement with Rexam to modify our respective rights to Oxbar, but this agreement may not be concluded.

### Rapid Changes In Available Technologies Could Render Our Products And Services Obsolete

Significant technological changes could render our existing technology or our products and services obsolete. The markets in which we operate are characterized by rapid technological change, frequent new product and service introductions and evolving industry standards. We attribute much of our recent competitive success to our existing technology, and our ability to compete may dissipate if our existing technology is rendered obsolete. If we are unable to successfully respond to these developments or do not respond in a cost-effective way, our net sales and profitability may decline. To be successful, we must adapt to rapidly changing markets by continually improving our products and services and by developing new products and services to meet the needs of our customers. Our ability to develop these products and services will depend, in part, on our ability to license leading technologies useful in our business and develop new offerings and technology that address the needs of our customers. Similarly, the equipment that we use may be rendered obsolete by new technologies. A significant investment in new equipment may reduce our profitability.

### We May Have Difficulty Replacing Key Personnel

We believe that our success will depend on continued employment by us of senior management and key technical personnel. If one or more of these persons are unable or unwilling to continue in their present positions, and if we are unable to attract and retain other comparable personnel, our business and operations could be disrupted. Certain members of our senior management have years of industry experience, and it would be difficult to find new personnel with comparable experience. Because our business is highly specialized, we believe that it would also be difficult to replace our key technical personnel. There is no guarantee that our key senior management and technical personnel will be able or willing to continue working with us after this offering. In addition, we do not currently maintain key man insurance for any of our senior managers or technical personnel.

***Demand For Our Products May Fluctuate As Our Customers Change Their Product Lines And Marketing Strategies***

A reduction in demand for PET packaging may reduce our net sales and negatively impact our prospects for future growth. From time to time our customers change product lines, eliminate product lines and reduce the

12

---

**IV.** <u>Table of Contents</u>

amount that they spend on marketing product lines. As a result, our customers' demand for PET packaging may fluctuate or decrease permanently.

***Consolidation Of Our Customers May Increase Our Customers' Negotiating Leverage And Harm Our Business***

The consolidation of our customers may reduce our net sales and profitability. If one of our larger customers acquires one of our smaller customers, or if two of our customers merge, the combined customer's negotiating leverage with us may increase and our business with the combined customer may become less profitable. In addition, if one of our customers is acquired by a company that has a relationship with one of our competitors, we may lose that customer's business.

***We Operate In A Very Competitive Business Environment And We May Lose Business To Other Forms Of Packaging Or To Our Competitors In The PET Industry***

Competition from producers of other forms of packaging and our competitors within the PET industry may cause our customers to purchase other types of packaging or to purchase PET containers from our competitors, which may reduce our net sales and profitability. PET containers compete in the packaging market with glass bottles, metal cans, paperboard cartons and other materials. Changes in the relative cost and quality of other packaging materials may reduce the market for PET containers. In addition, competition within the PET industry is intense and increases in productivity and other factors have increased pricing pressure. Some of our competitors have greater financial, technical and marketing resources than we do. Our current or potential competitors may offer products at a lower cost or products that are superior to ours. In addition, our competitors may be more effective and efficient in integrating new technologies. Although we typically sell to our customers pursuant to long-term contracts, our contracts typically provide that our customers may purchase from an alternative source if we cannot provide products that are of similar quality at an equivalent price. If we lose a significant amount of business from one or more customers, our net sales and profitability may decline.

In addition to competition with other independent suppliers of PET packaging, some of our potential customers produce their own PET containers. Coca-Cola, one of the largest end-users of conventional PET containers in the United States, self-manufactures its own PET preforms and blows its own bottles. Our customers, including PepsiCo, could develop or expand in-house preform production and bottle blowing capacity in the future, which may reduce our sales to those customers and our profitability.

***If We Do Not Have Adequate Funds To Make All Capital Expenditures That Are Necessary To Grow With Our Markets And Maintain Our Facilities, Our Business May Be Impaired And Our Profitability Reduced***

If we do not have adequate funds to make our capital expenditures or if the expected benefits of capital expenditures are not achieved, our business may be impaired and our profitability reduced. Our business is capital intensive, and our equipment is currently operating at near full capacity. We expect to have substantial capital needs in the near future for capacity expansion. If we do not have funds available to satisfy our capital expenditure requirements, we may not be able to pursue our strategy for profitable growth. We cannot be certain that our capital needs will not be larger than expected. We also can not be certain that the expected benefits of any capital expenditures will be achieved.

### *Increases In The Price Of Resin May Impact Our Financial Results And May Deter The Growth Of The PET Market*

We use large quantities of plastic resin in manufacturing our products and increases in the price of resin may increase our cost of products sold, reduce our profitability and reduce our prospects for growth. Resin is the principal raw material used in the manufacture of our products. Resin is subject to substantial price fluctuations. Resin is a petroleum product and resin prices may fluctuate with prices in the worldwide oil market. Political or economic events in oil producing countries such as those in the Middle East may impact the price of resin. We

13

---

## V. Table of Contents

generally do not have long-term supply contracts with our resin suppliers and are therefore subject to the risk of fluctuations in the price of resin. Although most of our contracts permit us to pass the price of resin through to our customers, market conditions may not permit us to fully pass through any future resin price increases. Significant increases in resin prices, coupled with an inability to promptly pass such increases on to customers, may increase our cost of products sold and reduce our profitability. A sustained increase in the price of resin may slow the rate of conversion of alternative packaging materials, such as glass and metal, to PET, or may make these alternative packaging materials more attractive than PET. If this reduces the demand for PET packaging, it may significantly reduce our prospects for growth.

### *PepsiCo May Choose To Supply Us With Resin, Which May Reduce Our Ability To Negotiate Favorable Resin Purchase Contracts*

PepsiCo may choose to supply us with an increasing amount of resin, which may reduce our profitability. Because we are a large purchaser of resin, we enjoy significant leverage in negotiating resin purchase agreements. To the extent that PepsiCo exercises this right with respect to an increasing amount of resin, the amount of resin that we purchase will decline and we may lose some of our leverage in negotiating resin purchase agreements. If we have to pay higher prices for resin, our costs will increase and we may not be able to offer our customers pricing terms as favorable as those we offer now or as favorable as those offered by our competitors.

### *Interruptions In The Supply Of Resin Could Disrupt Our Operations*

If our suppliers are unable to meet our requirements for resin, it may prevent us from manufacturing our products. Our suppliers may not continue to provide resin to us at attractive prices, or at all, and we may not be able to obtain resin in the future from these or other suppliers on the scale and within the time frames we require. Any failure to obtain resin on a timely basis at an affordable cost, or any significant delays or interruptions of supply, could prevent us from supplying our customers on a timely basis.

Expansion of our operations might place a significant strain on our suppliers, some of whom have limited resources and production capacity. Certain of our suppliers, in turn, rely on sole or limited sources of supply for components included in the resin that they sell to us. Failure of our suppliers to adjust to meet such increasing demand may prevent them from continuing to supply resin in the quantities and at the quality and the times required by us, or at all.

***We Depend On A Small Number Of Suppliers For Some Of Our Manufacturing Equipment And An Interruption In Our Supply Of Manufacturing Equipment Would Harm Our Ability To Expand***

Our business relies on specialized manufacturing equipment that is produced by a small number of suppliers. If any of these suppliers increases its prices significantly, goes out of business or is otherwise unable to meet our requirements for necessary equipment, we may be unable to expand our operations. This may significantly reduce our prospects for growth.

***Our Business Is Seasonal And Cool Summer Weather May Result In Lower Sales***

Unseasonably cool weather during a summer could reduce our net sales and profitability. A significant portion of our revenue is attributable to the sale of beverage containers. Demand for beverages tends to peak during the summer months. In the past, significant changes in summer weather conditions have affected the demand for beverages, which in turn affects the demand for beverage containers manufactured by us.

***Our International Operations Subject Us To Foreign Currency Risk And Other Instabilities***

In 2001, we derived approximately 22% of our revenue from sales in foreign currencies. In our financial statements, we translate local currency financial results into United States dollars based on average exchange

14

---

**VI.Table of Contents**

rates prevailing during a reporting period. Our most significant foreign currency exposures are to the British pound and the euro. During times of a strengthening United States dollar, our reported international revenue and earnings will be reduced because the local currency will translate into fewer United States dollars. In addition, we may face restrictions on our ability to repatriate funds from our international operations.

As a result of our international operations, we are also subject to risks associated with operating in foreign countries, including changes in governmental policies and regulations, war, acts of terrorism, and other sources of instability. We are also at risk for acts of terrorism in the United States. These risks may negatively impact our financial condition and results of operations.

***Higher Energy Costs And Interrupted Power Supplies May Increase Our Operating Costs And Limit Our Ability To Supply Our Customers***

Electrical power is vital to our operations, and we rely on a continuous power supply to conduct our business. If energy costs substantially increase in the future, we could experience a significant increase in operating costs. In addition, frequent power interruptions may limit our ability to supply our customers and negatively impact our business.

***We Are Subject To Costs And Liabilities Related To Environmental And Health And Safety Standards***

Our facilities and operations are subject to federal, state, local and foreign environmental and employee safety laws and regulations, including those regarding the use, storage, handling, generation, transportation, treatment, emission and disposal of certain substances. The nature of our operations exposes us to the risk of liabilities or claims with respect to environmental and worker health and safety matters.

Currently, we are involved in a small number of compliance and remediation efforts primarily concerning wastewater discharge and possible soil and groundwater contamination, including investigations and certain other activities at our Didam, Netherlands facility for which we have recorded an accrual of $200,000. Based on information presently available, we do not believe that the cost of these efforts will be material. However,

environmental and health and safety matters cannot be predicted with certainty, and actual costs may increase materially.

### We Face Product Liability Risks And The Risk Of Negative Publicity If Our Products Fail

Our business is exposed to products liability risk and the risk of negative publicity if our products fail. Although we maintain insurance for products liability claims, the amount and scope of our insurance may not be adequate to cover a products liability claim that is successfully asserted against us. In addition, products liability insurance could become more expensive and difficult to maintain and, in the future, may not be available on commercially reasonable terms or at all.

In addition, we are exposed to the products liability risk and negative publicity affecting our customers and suppliers. Because many of our customers are food, beverage and other consumer products companies, with their own products liability risks, our sales may decline if any of our customers are sued on a products liability claim. We may also suffer a decline in sales from the negative publicity associated with such a lawsuit or with adverse public perceptions in general regarding our products or our customers' products that use our containers.

### Our Operations and Profitability Could Suffer If We Experience Labor Relations Problems

A prolonged work stoppage or strike could prevent us from operating our manufacturing facilities. The contract with our union employees in our Didam, Netherlands facility expires on September 30, 2003 and the contract with our union employees in our Sherburn, England facility expires on December 31, 2003. We believe that our employee relations are good and that we will be able to reach new agreements on satisfactory terms.

15

---

## VII.Table of Contents

However, we may not be able to reach new agreements without a work stoppage or strike and any new agreements that are reached may not be reached on terms satisfactory to us.

### We Have A Significant Amount Of Goodwill And A Writedown Of Goodwill Could Result In Lower Reported Net Income And A Reduction Of Our Net Worth

We have a significant amount of goodwill and a writedown of our goodwill would reduce our net worth. At September 30, 2002, we had $331.8 million of goodwill. In July 2001, the Financial Accounting Standards Board issued Statements of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets." We adopted this standard on January 1, 2002 and recorded a charge for the cumulative effect of a change in accounting for $50.1 million. Under the new standard we will no longer amortize goodwill reflected on our balance sheet. We are, however, required to evaluate goodwill reflected on our balance sheet to determine whether the goodwill is impaired under the guidelines of the standard. Accordingly, we will need to test the value of our goodwill for impairment at least annually and, under certain circumstances, recognize an impairment charge.

One circumstance that may indicate the need for an immediate impairment review would be if our book value was in excess of our market capitalization. This could occur at any time after the completion of this offering. If we recognize an impairment charge, our net worth will be reduced.

### Risks Related To Our Relationship With Crown

### If Crown Owns A Significant Portion Of Our Common Stock Upon Completion Of This Offering, Crown Would Be Able To Influence Us

Because Crown's interests may differ from ours, actions Crown takes with respect to us as a stockholder may not be favorable to us. After the completion of this offering, if the underwriters do not exercise their over-allotment option in full, Crown could own up to 12.5% of our common stock. With such an ownership interest, Crown would

be able to influence the outcome of corporate actions requiring stockholder approval. As a result, Crown would be in a position to influence most of our significant corporate actions.

***Transitional Arrangements And Agreements With Crown Are Not The Result Of Arm's Length Negotiations And May Not Be Sustained On The Same Terms***

The transitional arrangements and other contractual agreements that we will have with Crown after the completion of this offering will have been made in the context of a parent-subsidiary relationship and negotiated in the overall context of this offering. As a result, these agreements are not on arm's length terms, and are not representative of the terms that we might have reached with unaffiliated third parties or of the terms of future agreements that we may enter into with unaffiliated third parties. As a result of a material breach relating to us or Crown, Crown may cease to provide these services.

***Our Business May Be Disrupted As We Develop Internal Information Technology And Other Services***

We are a wholly owned subsidiary of Crown and have received information technology and other corporate services from Crown. Following the completion of this offering we will no longer be wholly owned by Crown, but Crown will continue to provide services to us for a period of time pursuant to contracts between Crown and us. We plan to develop our own corporate service capabilities over time. The development and implementation of these capabilities may divert management's attention and involve significant costs. We expect the development of our own information technology systems to be particularly demanding. Our business may be disrupted as we begin the transition to internal corporate services.

16

---

**VIII.** <u>Table of Contents</u>

***We Could Be Liable For Crown's Pension Obligations***

Under certain circumstances we may be liable for Crown's pension obligations. The Crown pension plans are subject to the Employee Retirement Income Security Act of 1974, or ERISA, and if all Crown pension plans terminated as of December 31, 2001, would have been underfunded by approximately $670 million. Under ERISA, the Pension Benefit Guaranty Corporation, or PBGC, has the authority to terminate an underfunded plan under certain circumstances. If the Crown pension plans were terminated prior to the completion of this offering, we could be held liable for the underfunding. We have discussed this situation with the PBGC, and as a result of these discussions, prior to the completion of this offering we will assume the Crown pension plan that covers all of our current and former hourly employees and certain of our former salaried employees. Provided we assume such plan, the PBGC has indicated that it does not intend to take any action now with respect to the Crown pension plans as a result of this offering. However, if the remaining Crown pension plans are terminated within five years of the completion of this offering, the PBGC may bring a claim under ERISA to hold us liable for the Crown plans' underfunding if it is determined that a principal purpose of this offering was to evade pension liability. We do not believe that is the case. Because Crown will use its proceeds from this offering to pay a portion of its debt, we believe it is unlikely that we would be liable for any such claim, but we may not prevail. Excluding the Crown pension plan that Constar will assume, if all the Crown pension plans terminated as of December 31, 2001, these plans would have been underfunded by approximately $645 million. The actual amount for which Constar may become liable in the future depends on the future funding status of Crown's pension plans. In any case, if any of these claims are brought against us in the future, they may be costly to defend and they may reduce our liquidity and the price of our stock.

***We Could Be Liable For Income Taxes Owed By Crown***

In previous years, our tax results were consolidated with those of Crown and its United States subsidiaries, and we could be liable for income taxes owed by Crown for those years. Following this offering, we will no longer

be part of the federal consolidated group or any state combined or consolidated group including Crown and its United States subsidiaries. However, with respect to the years during which we were part of this consolidated group, we are severally liable for the federal income tax liability of each other member of the consolidated group. We could also be jointly and severally liable for state tax liabilities of each other member of a combined or consolidated group for state tax purposes for the years that included us or any of our subsidiaries and Crown or any of its subsidiaries. Certain of our non-United States subsidiaries were also part of a combined tax group including subsidiaries of Crown. We could similarly be liable for foreign taxes of each other member of such a combined tax group for years that our non-United States subsidiaries were included in a combined tax group. Consequently, the Internal Revenue Service or other taxing authority may seek payment of any of the foregoing taxes from us. Disputes or assessments could arise during future audits by the Internal Revenue Service or other taxing authorities in amounts that we cannot quantify.

***If Crown Is Unable To Meet Its Financial Obligations, Including Obligations To Its Lenders, Pension Plan Obligations And Payments To Settle Asbestos-Related Claims, Its Own Creditors May Pursue Claims Against Us***

If Crown is unable to meet its own financial obligations, including obligations to its lenders, pension plan obligations and payments to settle asbestos-related claims, Crown's creditors may try to bring their claims for payment against us. If these claims are successful, they may exceed the value of our stockholders' equity. Crown is highly leveraged and, as of September 30, 2002, the aggregate amount of its outstanding indebtedness due prior to December 31, 2003 was approximately $2.82 billion. A significant portion of Crown's operating cash flow is used for the payment of principal and interest, funding pension plan obligations and for payments to settle asbestos-related claims brought against Crown. As a result of downgrades in Crown's credit ratings during 2000 and 2001 and the uncertainties regarding its asbestos-related liabilities, Crown may not be able to access the capital markets in the future, or successfully repay, refinance or restructure its debt. No claims have been asserted against us by Crown's own creditors, and asbestos-related claims against Crown have not involved our business. While we believe it is unlikely that our historical relationship with Crown would result in liability for claims by Crown's

17

---

IX.**Table of Contents**

creditors, we may not prevail in such a claim. In any case, if any of these claims are brought against us in the future, they may be costly to defend and they may reduce the price of our stock. We may also have joint liability with Crown for certain taxes, pension obligations and other similar statutory obligations, as discussed in the two immediately preceding risk factors.

***Our Directors May Have Conflicts Of Interest Because Of Their Ownership Of Crown Stock And Because Some Of Them Are Also Directors Or Executive Officers Of Crown***

Some of our directors own Crown common stock and participate in incentive compensation programs of Crown. This could create, or appear to create, potential conflicts of interest when our directors are faced with decisions that could have different implications for Crown than they do for us. In addition, three of our eight directors are also directors or executive officers of Crown. These directors will owe fiduciary duties to the stockholders of each company and may have conflicts of interest in matters involving or affecting us and Crown. Under our certificate of incorporation and the corporate agreement between us and Crown we renounced any interests or expectation in being offered any business opportunity presented to Crown or any of its affiliates. In the event that one of our directors who is also a director, officer or employee of Crown or any of its affiliates acquires knowledge of a potential transaction or matter which may be a corporate opportunity for us, that director will have no duty to communicate or present the corporate opportunity to us. In addition, that director may communicate or present the corporate opportunity to Crown or any of its affiliates and will not be liable to us or our stockholders for breach of any fiduciary duty as one of our directors by reason of the fact that Crown or any of its affiliates pursues or acquires the corporate opportunity for itself, directs the corporate opportunity to another person or does not communicate information regarding such corporate opportunity to us.

***If Any Transfers Of Assets To Us By Crown Are Deemed To Be Fraudulent Conveyances, We May Be Required To Return The Assets To Crown***

If any transfers of assets to us by Crown in connection with this offering are found to be fraudulent conveyances, we may be required to return the assets to Crown or may be held liable to Crown or its creditors for damages alleged to have resulted from the conveyances. In connection with this offering Crown will transfer to us various assets, including intellectual property, as described in "Relationship with Crown Cork & Seal Company, Inc.—License Agreements," and equity interests in certain Crown affiliates, as described in "—Transfers of Certain Interests." A court could hold a transfer to be a fraudulent conveyance if Crown received less than reasonably equivalent value and Crown was insolvent at the time of the transfer, was rendered insolvent by the transfer or was left with unreasonably small capital to engage in its business. A transfer may also be held to be a fraudulent conveyance if it was made to hinder, delay or defraud creditors. We believe that Crown is receiving reasonably equivalent value and that Crown is not acting to hinder, delay or defraud creditors, and we therefore do not believe that any of the transfers to us by Crown in connection with this offering would constitute a fraudulent conveyance even if Crown were later determined to have been rendered insolvent or left with unreasonably small capital. However, a court applying the relevant legal standards may not reach the same conclusion. In a recent evidentiary ruling in *In re W.R. Grace & Co.*, the federal bankruptcy court for the District of Delaware held that under the Uniform Fraudulent Transfer Act, whether a transferor is rendered insolvent by a transfer depends on the actual liabilities of the transferor, and not what the transferor knows about such liabilities at the time of the transfer. Therefore, under that court's analysis, liabilities that are unknown, or that are known to exist but whose magnitude is not fully appreciated at the time of the transfer, may be taken into account in the context of a future determination of insolvency. If the principle articulated by that court is upheld, it would make it very difficult to know whether a transferor is solvent at the time of transfer, and would increase the risk that a transfer may in the future be found to be a fraudulent conveyance.

**Risk Factors Relating To Our Common Stock**

***Future Sales Of Our Shares By Crown Could Cause Our Common Stock Price To Decline***

Sales of a substantial number of shares of our common stock by Crown in the public market or the perception that sales by Crown could occur following this offering could reduce the market price of our common

18

X.Table of Contents

stock. In particular, Crown is highly leveraged, has other financial obligations and has been the subject of litigation regarding asbestos-related liabilities. Our stock price may decline if the shares of our common stock held by Crown are sold to satisfy these obligations, or if investors become concerned that such sales may take place. The shares of our common stock held by Crown are pledged to Crown's creditors, who have the right to sell the shares under some circumstances. Crown is not subject to any contractual obligation to maintain its ownership position in our shares, except that it has agreed not to sell or otherwise dispose of any shares of our common stock for a period of 180 days after the completion of this offering, subject to certain exceptions, including exceptions relating to Crown's pledge to its creditors of our common stock owned by Crown. We have entered into an agreement with Crown under which Crown may require us to register for resale its shares of our common stock.

***Provisions Of Our Certificate Of Incorporation And Bylaws Or Delaware Law May Discourage, Delay Or Prevent A Change Of Control Of Our Company Or Changes In Our Management And Therefore Depress The Price Of Our Common Stock***

Delaware corporate law and our certificate of incorporation and bylaws contain provisions that could discourage, delay or prevent a change in control of our company or changes in our management that the stockholders of our company may deem advantageous. These provisions, among other things:

- establish a classified board of directors so that not all members of our board may be elected at one time;

- authorize the issuance of "blank check" preferred stock that our board could issue to increase the number of outstanding shares and to discourage a takeover attempt;

- eliminate the ability of our stockholders to act by written consent or to call special meetings of stockholders;

- eliminate cumulative voting in the election of directors, which would allow less than a majority of our stockholders to elect director candidates; and

- establish advance notice requirements for nominations for election to our board or for proposing matters that can be acted upon by stockholders at stockholder meetings.

We will also be afforded the protections of Section 203 of the Delaware General Corporation Law, which would prevent us from engaging in a business combination with a 15% or greater stockholder for a period of three years from the date it acquired such status unless certain board or stockholder approvals are obtained. Section 203 may discourage takeover attempts that might result in a premium over the market price for the shares of our common stock.

***The Initial Public Offering Price Of Our Common Stock May Not Be Indicative Of The Market Price After This Offering And Our Stock Price May Be Volatile***

Prior to this offering, there has been no public market for our common stock and an active market for our common stock may not develop or be sustained after this offering. The initial public offering price of our common stock will be determined by negotiations between us and representatives of the underwriters and may not be indicative of the market price of the common stock after this offering. Among the factors that could affect our stock price are:

- actual or anticipated variations in our quarterly operating results;

- new sales formats or new products or services offered by us and our competitors;

- changes in financial estimates prepared by securities analysts;

- conditions or trends in the packaging industry in general and the PET container and preform industry in particular;

19

## XI. Table of Contents

- announcements by us and our competitors of technological innovations;

- announcements by us or our competitors of significant acquisitions, strategic partnerships or joint ventures;

- our capital commitments;

- additions or departures of our key personnel; and

- sales of our common stock.

Many of these factors are beyond our control. These factors may decrease the market price of our common stock, regardless of our operating performance.

## CERTIFICATE OF SERVICE

        I, Scott A. Thompson, do hereby certify that on November 9, 2004, I caused a true and correct copy of the Reply Memorandum in Support of Motion of the Defendants to Dismiss the Consolidated Amended Class Action Complaint to be served upon the following by Federal Express or hand delivery as designated below:

**(Hand Delivery)**
Marc J. Sonnenfeld
Karen Pieslak Pohlmann
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-5000

*Attorneys for Underwriter Defendants*

Deborah R. Gross
Law Offices of Bernard M. Gross, P.C.
1515 Locust Street, Second Floor
Philadelphia, PA 19102
Telephone: (215) 561-3600

*Liaison Counsel for Lead Plaintiffs and the Class*

**(Federal Express)**
Sandy A. Liebhard
Jeffrey M. Haber
Bernstein Liebhard & Lifshitz, LLP
10 East 40th Street, 22nd Floor
New York, NY 10016
Telephone: (212) 779-1414

Steven W. Pepich
Brian O. O'Mara
Lerach Coughlin Stoia & Robinson LLP
401 B Street, Suite 1700
San Diego, CA 92101
Telephone: (619) 231-1058

*Attorneys for Plaintiffs*

Scott A. Thompson, Esquire