## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE CONSTAR INT'L INC. SECURITIES LITIGATION, | ) ) ) | **Master File No. 03cv05020** |
| **This Document Relates To:** | ) ) | <u>**CLASS ACTION**</u> |
| **ALL ACTIONS.** | ) ) ) | |

<u>**ORDER**</u>

AND NOW, this _____ day of _____, 2005, upon consideration of the

Motion of Defendants for Judgment on the Pleadings (the "Motion"), it is hereby ORDERED

and DECREED as follows:

1.  The Motion is GRANTED.

2.  Judgment is hereby entered in favor of all defendants and against plaintiffs.

3.  The Clerk of the Court shall mark this matter as CLOSED.


_____
Judge Ludwig

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE CONSTAR INT'L INC. SECURITIES LITIGATION, | ) ) ) | Master File No. 03cv05020 |
| This Document Relates To: | ) ) | <u>CLASS ACTION</u> |
| ALL ACTIONS. | ) ) ) | |

## <u>MOTION OF DEFENDANTS FOR JUDGMENT ON THE PLEADINGS</u>

Defendants Constar International, Inc., Crown Holdings, Inc., Charles F. Casey, William G. Little, Michael J. Hoffman, James C. Cook, Alan W. Rutherford, John W. Conway, Angus F. Smith and Frank J. Mechura, hereby move this Honorable Court for the entry of an Order granting judgment to the defendants based on the pleadings. Grounds supporting this Motion are set forth in the accompanying Memorandum.

Respectfully,

*Steven B. Feirson/sm*

Steven B. Feirson
Michael L. Kichline
Michael E. Baughman
Scott A. Thompson
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19103
(215) 994-2489

Attorneys for Defendants Constar International, Inc., Crown Holdings, Inc. and the Individual Defendants

Dated: November 14, 2005

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE CONSTAR INT'L INC. SECURITIES LITIGATION, | ) ) ) ) ) ) ) ) |

Master File No. 03cv05020

**<u>CLASS ACTION</u>**

This Document Relates To:

ALL ACTIONS.

## MEMORANDUM IN SUPPORT OF MOTION
## <u>OF DEFENDANTS FOR JUDGMENT ON THE PLEADINGS</u>

Steven B. Feirson
Michael L. Kichline
Michael E. Baughman
Scott A. Thompson
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19103
(215) 994-2489

Attorneys for Defendants Constar
International, Inc., Crown Cork &
Seal Company, Inc. and the
Individual Defendants

Dated: November 14, 2005

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................1

FACTUAL BACKGROUND ......................................................................................4

I.      CONSTAR ANNOUNCES 2003 SECOND QUARTER RESULTS...............4

    A.      July 29 Press Release.........................................................................4

    B.      Market Reaction to July 29, 2003 Disclosure.....................................5

II.     CONSTAR RECOGNIZES GOODWILL IMPAIRMENT............................5

    A.      The August 14 and 18, 2003 Disclosures ...........................................5

    B.      The Stock Price Rises ........................................................................6

ARGUMENT................................................................................................................7

I.      APPLICABLE LEGAL PRINCIPLES .........................................................7

    A.      The Securities Laws Allow Recovery Of Only Those  Losses Covered By
        A Securities Violation – Not Investment Losses...................................7

    B.      There Can Be No Loss Causation Without A Disclosure Of The "True"
        Facts – The Market Cannot React To Facts It Does Not Know ...........8

    C.      The Definition Of "Loss Causation" Does Not Vary by Cause Of Action ..........10

    D.      The Disclosure Must Directly Relate To The Untrue Statement Or The
        Untrue Statement Could Not Have Caused The Loss ..........................12

    E.      District Courts Appropriately Dismiss Section 11 Claims At The Pleading
        Stage Where It Is Clear On The Face Of The Complaint That There Is No
        Loss Causation....................................................................................15

II.     DEFENDANTS ARE ENTITLED TO JUDGMENT ON THE PLEADINGS ON
        ALL OF THE ALLEGED CLAIMS ............................................................18

    A.      There Is No Direct Causal Link Between The Targeted Misrepresentations
        And The  Facts Disclosed In The July 29 Announcement ...................18

    B.      There Is No Loss Relating To The Goodwill Claim ...........................20

III.    INDIVIDUAL DEFENDANTS AND CROWN ARE ENTITLED TO
        JUDGMENT ON THE SECTION 15 CLAIMS ...........................................22

CONCLUSION ...........................................................................................................23

## TABLE OF AUTHORITIES

### FEDERAL CASES

AUSA Life Ins. Co. v. Ernst & Young,
    206 F.3d 202 (2d Cir. 2000) .................................................................................. 8

Ackah v. Hershey Foods Corp.,
    236 F. Supp. 2d 440 (M.D. Pa. 2002).................................................................. 7

Akerman v. Oryx Commc'ns, Inc.,
    810 F.2d 336 (2d Cir. 1987) ................................................................ 9, 11, 16, 18

In re Adams Golf, Inc. Sec. Litig.,
    381 F.3d 267 (3d Cir. 2004) ............................................................................... 11

In re Advanta Corp. Sec. Litig.,
    180 F.3d 525 (3d Cir. 1999) ............................................................................... 22

In re Alamosa Holdings, Inc. Sec. Litig.,
    382 F. Supp. 2d 832 (N.D. Tex. 2005) .......................................... 12, 13, 16, 17

Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.,
    315 F. Supp. 2d 666 (E.D. Pa. 2000).................................................................. 9

Bastian v. Petren Res. Corp.,
    892 F.2d 680 (7th Cir. 1990) ................................................................. 8, 10, 11

In re Burlington Coat Factory Sec. Litig.,
    114 F.3d 1410 (3d Cir. 1997) ....................................................................... 20, 21

D.E. & J. Ltd. P'ship v. Conaway,
    133 Fed. App'x 994 (6th Cir. 2005) ............................................................. 14, 15

In re DNAP Sec. Litig.,
    No. C 99-00048 WHA, 2000 U.S. Dist. LEXIS 13482 (N.D. Cal. Sept. 14, 2000).......... 18

Dura Pharms., Inc. v. Broudo,
    125 S. Ct. 1627 ......................................................................................... *passim*

In re EquiMed, Inc. Sec. Litig.,
    No. 98-cv-5374, 2000 U.S. Dist. LEXIS 6209 (E.D. Pa. May 9, 2000) .......................... 22

In re Fortune Sys. Sec. Litig.,
    680 F. Supp. 1360 (N.D. Cal. 1987)...................................................... 13, 17, 18

Gannon v. Continental Ins. Co.,
    920 F. Supp. 566 (D.N.J. 1996)......................................................................22

Hayes v. Arthur Young & Co.,
    Nos. 91-15531, 91-15546 & 91-15593, 1994 U.S. App. LEXIS 23608 (9th Cir.
    Aug. 26, 1994).....................................................................................................7

In re Initial Pub. Offering Sec. Litig.,
    MDL 1554, Nos. 21 MC 92 & 04 Civ. 3757, 2005 U.S. Dist. LEXIS 12845
    (S.D.N.Y. June 28, 2005) ..................................................................................13

Lentell v. Merrill Lynch & Co.,
    396 F.3d 161 (2d Cir. 2005) .....................................................................8, 13, 15

In re McKesson HBOC, Inc. Sec. Litig.,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000)..........................................................9, 17

McKowan Lowe & Co. v. Jasmine, Ltd.,
    Nos. Civ. 94-5522 RBK & Civ. 96-2318 RBK, 2005 WL 151062 (D.N.J. June 30,
    2005).................................................................................................................11

In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003) ...........................................9, 12, 16, 17

Merrill Lynch & Co. v. Allegheny Energy, Inc.,
    02 Civ. 7689, 2005 U.S. Dist. LEXIS 14216 (S.D.N.Y. July 18, 2005).........10, 13, 17, 18

Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
    259 F.3d 154 (3d Cir. 2001) ..........................................................................10, 12

United States v. Olis,
    No. 04-20322, 2005 U.S. App. LEXIS 23545 (5th Cir. Oct. 31, 2005) ..............9

Oran v. Stafford,
    226 F.3d 275 (3d Cir. 2000) ....................................................................7, 20, 21

Rebenstock v. Deloitte & Touche, 907 F. Supp. 1059 (E.D. Mich. 1995).....................11

Robbins v. Koger Props.,
    116 F.3d 1441 (11th Cir. 1997) .........................................................................9

Semerenko v. Cendant Corp.,
    223 F.3d 165 (3d Cir. 2000) ...............................................................9, 10, 13, 14

Shapiro v. UJB Fin. Corp.,
    964 F.2d 272 (3d Cir. 1992) .............................................................................23

Suez Equity Investors, L.P. v. Toronto-Dominion Bank,
250 F.3d 87 (2d Cir. 2001) ........................................................................8, 13

Sutton v. Royal Chevrolet-Oldsmobile-Pontiac-Buick, Inc.,
Civil Action No. 03-CV-1825, 2004 U.S. Dist. LEXIS 708 (E.D. Pa. Jan. 16,
2004)..............................................................................................................7

In re U.S. Interactive, Inc. Class Action Sec. Litig.,
No. 01-cv-522, 2002 U.S. Dist. LEXIS 16009 (E.D. Pa. Aug. 23, 2002).........................22

In re Wash. Pub. Power Supply Sys. Sec.,
650 F. Supp. 1346 (W.D. Wash. 1986) ...........................................................13

In re Worldcom, Inc. Sec. Litig.,
No. 02 Civ. 3288, 2005 WL 375314 (S.D.N.Y. Feb. 17, 2005)........................................11

In re Worlds of Wonder Sec. Litig.,
35 F.3d 1407 (9th Cir. 1994) ........................................................................14

In re WRT Energy Sec. Litig.,
No. 96 Civ. 3610(JFK), 2005 WL 323729 (S.D.N.Y. Feb. 9, 2005) ..................................9

**FEDERAL STATUTE**

15 U.S.C. § 77k(e) ...................................................................................7, 13

## INTRODUCTION

On April 19, 2005, while the motions to dismiss in this action were pending, the United States Supreme Court handed-down its decision in <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 125 S. Ct. 1627 (2005). In a unanimous decision, written by Justice Breyer, the Court held that a private securities plaintiff can only recover if there is "loss causation" — i.e., that there are direct causal links between: (1) the targeted misrepresentation or omission and the disclosure of the "truth" that renders that representation or omission misleading; and (2) an additional direct link between this revelation and a subsequent stock price decline, which represents the economic loss attributable to the alleged securities law violation:



If either direct link is missing, there is no loss causation and the claim must be dismissed.

The application of these principles in the securities context is relatively simple and straightforward. For example, assume that (i) a company issued stock at $10 pursuant to a registration statement, representing that its sole product is protected by two valid patents and (ii) investors file suit alleging that the patent representation was false:

- Following the offering, the company announces that it had not actually filed applications for the two patents prior to the date of the registration statement and its stock price declines. Both direct links are established. There is a direct causal link between the alleged untrue statement (patent protection) and the disclosure of the lack of patent protection. The second required link – an immediate stock price decline upon the disclosure of the "truth" – is also established. Hence, loss causation is established.

- Following the offering, the company announces that its raw material costs for the coming year are expected to rise 100%. The stock price thereafter declines. There is no direct causal link between the alleged untrue statement (patent protection) and the disclosure matter (raw material costs). Hence, there is no loss causation, even though there is a stock price decline.

- Following the offering, the company announces that one of the two patents had been declared invalid prior to the offering, but the stock price does not change or actually rises following this announcement. While the first direct link is established – the link between the targeted representation and the disclosure of the "truth" – the second requirement – that there has to be a loss as a result of the disclosure of the truth – does not exist. Accordingly, no loss causation exists.

Thus, courts must examine the specific targeted representations or omissions and determine whether they are linked to a particular disclosure, and whether, in turn, that disclosure is linked to the stock price decline for which the plaintiff seeks recovery. If either link in this chain is missing, the plaintiff cannot recover.

Here, the plaintiffs allege that the November 2002 Registration Statement for Constar International Inc. ("Constar") contained several untrue statements about (i) Constar's operations (e.g., machinery, technology, capital expenditures and expansion, financial condition, resin pricing, and the financial condition of its former parent) and (ii) Constar's accounting for its goodwill. As a matter of law, the plaintiffs cannot recover for any decline in the value of Constar's stock price based on these theories:

- ***Constar's operations*** – the plaintiffs affirmatively allege that the "truth" about Constar's operations emerged on July 29, 2003. See Amend. Compl. ¶ 25 (alleging "the price of Constar stock dropped almost 30% when the Company announced a 2003 second quarter loss of $4 million"). But, the disclosure that plaintiffs point to as the cause of the loss has nothing whatsoever to do with any of the facts plaintiffs contend were omitted or misrepresented in the November 2002 Registration Statement. Therefore, the face of their own Amended Complaint makes clear that there is no link, let alone a direct

one, between the loss at issue in this case and the alleged misrepresentations or omissions.

- ***Constar's goodwill*** – the plaintiffs allege that the "truth" about goodwill emerged on August 14, 2003, when Constar "announced that it would write off $183 million to reflect the impairment of goodwill." Amend. Compl. ¶ 25. In contrast to the July announcement, plaintiffs do not plead any stock price decline following the goodwill announcement. Plaintiffs do not do so because they cannot. The indisputable fact is that Constar's price did not decline on the goodwill announcement – it actually rose.

In short, plaintiffs' own Amended Complaint fails to establish the necessary direct link between the alleged untrue statements and the cause of the 30% stock decline. And, as to goodwill, there is no loss at all. Because these defects appear on the face of the Amended Complaint, the defendants are entitled to judgment on the pleadings as a matter of law.

*   *   *   *   *

Allowing this case to proceed will have serious consequences for Constar. This litigation will impose extraordinary burdens on Constar (and the Court). This litigation will require substantial discovery – yet none of this discovery could ever supply the missing causal link obvious on the face of the Amended Complaint or create a loss where none was incurred. To force Constar through this protracted and expensive journey only to have the case fail in the end because there is no loss or loss causation would be a grave injustice. This is especially true given that, as is made clear in the Amended Complaint, Constar operates in a fiercely competitive industry with slim profit margins. The company can ill afford the enormous distraction and cost of having to defend against these baseless claims. This case should be dismissed now.

## FACTUAL BACKGROUND

In November 2002, Constar International Inc. ("Constar" or the "Company"), a manufacturer of conventional and custom PET (polyethylene terephthalate) plastic containers for the food and beverage industries, was sold by Crown Cork & Seal Company, Inc. ("Crown") in an initial public offering ("IPO").  In connection with the IPO, Constar issued a Registration Statement providing investors with extensive and detailed information about the Company, its business and finances, its relationship with Crown, and the terms of the offering.  Constar directed investors to "carefully consider" twelve pages of "Risk Factors" and other cautionary language.  Some of these "material risks" included the warnings that, "Our business is seasonal and cool summer weather may result in lower sales," "Demand for our products may fluctuate as our customers change their product lines and marketing strategies," "The market for custom PET packaging may not grow as large or as quickly as we anticipate," and "We have a significant amount of goodwill and a writedown of goodwill could result in lower reported net income and a reduction of our net worth."  Presented with all this and substantial other information, the IPO was priced at $12 when trading began.

## I.    CONSTAR ANNOUNCES 2003 SECOND QUARTER RESULTS

### A.    July 29 Press Release

Eight months after the IPO, on July 29, 2003, Constar issued a press release announcing Constar's financial results for the second quarter 2003.  For the three-month period of April-May-June 2003, Constar reported a loss of $4.0 million, although it also reported some encouraging news.  Constar announced that ***net sales actually increased*** 5.3% compared to the prior year's second quarter. July 29 Press Release at 1, Exh. 1.  Constar announced that the "growth in net sales reflects increased shipments of custom products, the pass-through of

increased resin prices, and benefits resulting from strengthening foreign currencies against the U.S. dollar." Id. However, this increased demand for custom products and other net sales "was partially offset by reduced domestic shipments in conventional products and implementation of price reductions associated with contract extensions." Id. Michael Hoffman, President and Chief Executive Office of Constar, further explained that the reduced conventional domestic shipments were caused by both a "lack of demand for our customers' products . . . exacerbated by poor weather conditions," and "slower than expected ramp-up of new customers and product conversions in the United States and Europe." Id. Quite simply, with the poor weather conditions, sales of water bottles and soft drinks were down and Constar's customers needed fewer bottles. Constar explained that the reduction in domestic volume "produced higher than anticipated inventory levels, leading to increased warehousing and shuttle costs." Id. Gross profits were also adversely impacted by "an unfavorable shift in product mix" and "an increase in the company's group, property and casualty insurance costs."

### B.    Market Reaction to July 29, 2003 Disclosure

After the announcement of the 29th, Constar's stock price declined to close at $6.29 on July 30, 2003. In fact, the Amended Complaint alleges that, "On July 30, 2003, the price of Constar stock dropped almost 30% when the Company announced a 2003 second quarter loss of $4 million." Amend. Compl. ¶ 25. Thus, the cause of the stock price decline – the announcement of a loss for the second quarter of 2003 – is not in dispute.


## II.    CONSTAR RECOGNIZES GOODWILL IMPAIRMENT

### A.    The August 14 and 18, 2003 Disclosures

Weeks later, on August 14, 2003, with Constar's stock price at $5.19, Constar issued an after-market press release announcing "that it expects to record a non-cash charge to

earnings for the second quarter of 2003 to reflect the impairment of goodwill under FAS 142."
August 14 Press Release at 1, Exh. 2.  Constar attributed the need to write down goodwill "to the
trading price of the Company's common stock and other factors."  Id.  Constar then disclosed the
precise amount of the writedown ($183 million) when it filed its second quarter 10-Q dated
August 15, 2003, made public before the markets opened early in the morning of Monday,
August 18, 2003.

**B.**      **The Stock Price Rises**

The day after Constar's August 14 announcement that it would recognize a
goodwill impairment, Constar's stock rose slightly to close at $5.20.  The market became aware
of the magnitude of the impairment before the market opened on Monday, August 18th, in
conjunction with Constar's filing of its 10-Q.  Nevertheless, the stock opened dramatically
higher at $5.89.  The stock closed at $5.37 on the 18th (still an increase over the previous close),
and by the 22nd had rebounded to close at $5.45 – which was $.26 higher than before Constar
announced it had a goodwill impairment.

## ARGUMENT[1]

## I.   APPLICABLE LEGAL PRINCIPLES

### A.   The Securities Laws Allow Recovery Of Only Those Losses Covered By A Securities Violation – Not Investment Losses

The securities laws allow recovery for only those losses that are ***caused by*** the issuers' alleged misstatements or omissions. Dura, 125 S. Ct. 1627 (2005); Hayes v. Arthur Young & Co., Nos. 91-15531, 91-15546 & 91-15593, 1994 U.S. App. LEXIS 23608, at *29 (9th Cir. Aug. 26, 1994) ("Under § 11 [of the Securities Act of 1933, 15 U.S.C.S. § 77k], defendants are liable only for the losses caused by material misrepresentations or omissions in the registration statement."). The attempt to have every loss lead to recovery – not just those that flow from a violation of the securities laws – is at the heart of the widespread judicial criticism of the plaintiffs' tactic of trying to transform an ordinary investment loss into a securities claim by post-hoc attempts to manufacture some misstatement:

> No social purpose would be served by encouraging everyone who
> suffers an investment loss because of an unanticipated change in
> market conditions to pick through offering memoranda with a fine-
> tooth comb in the hope of uncovering a misrepresentation.
> Bastian v. Petren Res. Corp., 892 F.2d 680, 685 (7th Cir. 1990) (Posner, J.).

Indeed, the securities statutes exist, "not to provide investors with broad insurance against

---

[1]   Although this is a motion for judgment on the pleadings, the Court may also "take judicial notice of properly-authenticated public disclosure documents filed with the SEC." Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000). In addition, the Court may consider the Press Release (attached hereto as exhibit 1) without converting the motion into one for summary judgment as it is central to plaintiffs' claims and defendants' affirmative defenses – and indeed is explicitly relied upon in the Amended Complaint and attached to defendants' Answer. Ackah v. Hershey Foods Corp., 236 F. Supp. 2d 440, 443 (M.D. Pa. 2002); see also Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); Sutton v. Royal Chevrolet-Oldsmobile-Pontiac-Buick, Inc., Civil Action No. 03-CV-1825, 2004 U.S. Dist. LEXIS 708, at *9 (E.D. Pa. Jan. 16, 2004) (holding that exhibits to an Answer are "properly a part of the Answer" and under Rule 10, a motion based on these documents "need not be converted to one for summary judgment").

7

market losses, but to protect [investors] against those economic losses that misrepresentations actually cause." Dura, 125 S. Ct. at 1633; AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202, 234 (2d Cir. 2000) ("The securities laws are . . . not an insurance policy against all losses by investors . . . .").[2]

### B. There Can Be No Loss Causation Without A Disclosure Of The "True" Facts – The Market Cannot React To Facts It Does Not Know

The first prong of loss causation can only be established if and when the "truth" is revealed to the market and the misrepresentations come to light.  In Dura, the Supreme Court explained that "as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value." Dura, 125 S. Ct. at 1631 (emphasis in original).  Therefore, it held that if "the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." Id.  *Thus, prior to the alleged "true facts" being revealed to the market, any decline in stock value must be caused by something other than the alleged misrepresentations and thus there can be no loss causation.*  Quite simply, the market cannot react to facts it does not know and, therefore, cannot "correct" any improper stock price inflation until such time as the "true facts" become known and the misrepresentation is revealed.

This logic did not originate in Dura, nor is it dependent on Dura.  Indeed, as the Fifth Circuit recently noted, "[i]n civil cases, the principle of loss causation is well established." United States v. Olis, No. 04-20322, 2005 U.S. App. LEXIS 23545, *17 (5th Cir. Oct. 31, 2005).

---

[2]      Indeed, courts have made clear that plaintiffs may only recover if "the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered." Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005) (quoting Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001) (emphasis added)).

Under Third Circuit precedent, established in <u>Semerenko v. Cendant Corp.</u>, 223 F.3d 165, 185

(3d Cir. 2000), "[i]n the absence of a correction in the market price, the cost of the alleged

misrepresentation is still incorporated into the value of the security and may be recovered at any

time simply by reselling the security at the inflated price." Not surprisingly, other courts have

long recognized that a decline in stock price cannot, as a matter of law, have been "caused by

misstatements which ha[ve] not yet been revealed" to the market.  <u>In re Merrill Lynch & Co.,</u>

<u>Inc. Research Reports Sec. Litig.</u>, 272 F. Supp. 2d 243, 253-55 (S.D.N.Y. 2003) (dismissing

clams under Section 11 based on stock price declines that occurred "before public disclosure of

the allegedly concealed information" finding that "[s]uch price declines may not be charged to

Defendants under Section 11").[3]

---

[3]    <u>See also</u> <u>Olis</u>, 2005 U.S. App. LEXIS 23545 at *17 (noting that "there is no loss attributable to a misrepresentation unless and until the truth is subsequently revealed and the price of the stock accordingly declines. Where the value of a security declines for other reasons, however, such decline, or component of the decline, is not a 'loss' attributable to the misrepresentation"); <u>Robbins v. Koger Props.</u>, 116 F.3d 1441, 1448-49 (11th Cir. 1997) (affirming dismissal of case because no reasonable jury could find loss causation where the stock price decline occurred prior to any corrective disclosure of alleged misrepresentations); <u>Akerman v. Oryx Commc'ns, Inc.</u>, 810 F.2d 336 (2d Cir. 1987) ("The price decline before disclosure may not be charged to defendants."); <u>In re WRT Energy Sec. Litig.</u>, No. 96 Civ. 3610(JFK) & 96 Civ. 3611(JFK), 2005 WL 323729, at *13 (S.D.N.Y. Feb. 9, 2005) (finding that "the 1933 Act and the precedent in this Circuit are clear: damages predating the *disclosure* of the misstatements or omissions are not chargeable to the Defendants") (emphasis in original); <u>In re McKesson HBOC, Inc. Sec. Litig.</u>, 126 F. Supp. 2d 1248, 1262 (N.D. Cal. 2000) (finding that defendants had an "absolute 'negative causation' defense pursuant to Section 11(e)" for shareholders who disposed of their shares prior to the corrective disclosures); <u>Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.</u>, 315 F. Supp. 2d 666, 681 (E.D. Pa. 2000) (finding there can be no "loss causation if [plaintiff] sold the security before public disclosure of the misrepresentation caused the price to decline") (citing <u>Semerenko</u>, 223 F.3d at 185).

C.    **The Definition Of "Loss Causation" Does Not Vary By Cause Of Action**

Dura, and the cases before it, have made clear that loss causation exists only where the "artificial inflation" of the stock price caused by the alleged misrepresentations or omissions is removed through a disclosure to the market of the "truth."  It further made clear that this alleged "revelation" must establish (1) a direct link between the alleged misrepresentation and the alleged event that caused the loss, i.e., the disclosure of the "truth" to the market; and (2) a resulting decline in stock price signifying a loss, i.e. the removal of the "artificial inflation."  The basic tenants of "loss causation" are the same across securities actions and, indeed, the common law.  Therefore, although the claim in Dura was brought under 10b-5, its holdings on the contours of loss causation are equally applicable to Section 11.

As noted above, loss causation derives from the common law.  Dura, 125 S. Ct. at 1632-33.  Indeed, the Third Circuit has recognized that the concept of "[l]oss causation derives its function from the 'standard rule of tort law that the plaintiff must allege and prove that, but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complains.'"  Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 177 (3d Cir. 2001) (quoting Bastian, 892 F.2d at 685).  For these reasons, Dura's explanation of loss causation has already been applied to even non-securities cases.  Merrill Lynch & Co. v. Allegheny Energy, Inc., 02 Civ. 7689, 2005 U.S. Dist. LEXIS, at *21 (S.D.N.Y. July 18, 2005) (noting that "[t]he Dura Court made it clear that there is no analytic difference between loss causation under Rule 10b-5 and the common law" and therefore applying Dura's definition of loss causation to breach of contract case).

The only difference in how loss causation is applied in actions based on 10b-5 and Section 11 is in which party has the burden.  For actions brought pursuant to Section 10(b) of the Securities Exchange Act of 1934, "loss causation" is an element of the plaintiffs' prima facie

case. Dura, 125 S. Ct. at 1631.  However, in cases brought pursuant to Section 11 of the

Securities Act of 1933, as the action is here, "[i]t is the defendants who may assert, as an

affirmative defense, that a lower share value did not result from any nondisclosure or false

statement." In re Adams Golf, Inc. Sec. Litig., 381 F.3d 267, 277 (3d Cir. 2004); 15 U.S.C. §

77k(e); see also Bastian, 892 F.2d at 685 (noting that "in actions under section 11 of the 1933

Act, absence of loss causation is an explicit defense" (citation omitted)).  The affirmative defense

available to defendants under Section 11(e) is sometimes referred to as "negative causation."

Akerman, 810 F.2d at 340 (noting that defendants' burden under Section 11 has been

characterized as "negative causation").

This "distinction between causation for §11 and Rule 10b-5 is technical."

Rebenstock v. Deloitte & Touche, 907 F. Supp. 1059, 1065 n.4 (E.D. Mich. 1995) (finding that

other than the burden shifting, the loss causation analysis under 10b-5 and Section 11 is

"essentially the same"); see also McKowan Lowe & Co. v. Jasmine, Ltd., Nos. Civ. 94-5522

RBK & Civ. 96-2318 RBK, 2005 WL 1541062, at *11-12 (D.N.J. June 30, 2005) (demonstrating

that loss causation is analyzed identically under 10b-5 and Section 11, other than the difference

in burden); In re Worldcom, Inc. Sec. Litig., No. 02 Civ. 3288, 2005 WL 375314, at *6-7

(S.D.N.Y. Feb. 17, 2005) (using 10b-5 cases to analyze loss causation in Section 11 matter).

As is explained above, and as recognized in Dura, loss causation is the same no

matter what the cause of action.  In this case, if defendants establish that the face of the Amended

Complaint makes clear that the alleged misrepresentations or omissions could not have caused

the alleged harms, then the affirmative defense available under Section 11(e) is established, and

the defendants are entitled to judgment as a matter of law.

11

**D.    The Disclosure Must Directly Relate To The Untrue
Statement Or The Untrue Statement Could Not Have Caused The Loss**

**1.    There Must Be A Specific Disclosure Revealing The "Truth" About
The Targeted Misrepresentation**

Simply pointing to a "disclosure" is not enough – even if that disclosure is of "bad news." If the disclosure does not directly link up with – disclose the "truth" about – the alleged misrepresentation, then as a matter of law *something other than that misrepresentation* must have caused the loss at issue and the case should be dismissed. See, e.g., In re Alamosa Holdings, Inc. Sec. Litig., 382 F. Supp. 2d 832, 865 (N.D. Tex. 2005) ("If the negative causation defense is apparent on the face of a complaint, dismissal under Rule 12(b)(6) of the Section 11 claim is proper").[4]

Moreover, courts have made clear that the link between the alleged misstatements and the alleged disclosure of the "truth" must be *direct*. In Newton, the Third Circuit held that "[l]oss causation demonstrates that the fraudulent misrepresentation actually caused the loss suffered." 259 F.3d at 173. In doing so, it rejected the notion advanced by some courts that loss causation should be judged by a foreseeability test – i.e., if the ultimate harm was a foreseeable consequence of the misrepresentation, that would establish loss causation. See id. at 181 n.24. Indeed, Newton held that "[w]hether or not the loss is foreseeable becomes a factor *only if direct*

---

[4]    Section 11(e) states in relevant part:

> [I]f the defendant proves that any portion or all of such damages
> represents other than the depreciation in value of such security
> resulting from such part of the registration statement, with respect
> to which his liability is asserted, not being true or omitting to state
> a material fact required to be stated therein or necessary to make
> the statements therein not misleading, such portion of or all such
> damages shall not be recoverable.

15 U.S.C. § 77k(e).

*causation has been demonstrated.*" Id. (emphasis added).  Similarly, in Semerenko, 223 F.3d

at 184, the Third Circuit held that loss causation requires a "causal nexus between the loss and

the alleged misrepresentation."  It further held:

> Where the value of the security does not actually decline as a result
> of an alleged misrepresentation, it cannot be said that there is in
> fact an economic loss attributable to that misrepresentation. In the
> absence of a correction in the market price, the cost of the alleged
> misrepresentation is still incorporated into the value of the security
> and may be recovered at any time simply by reselling the security
> at the inflated price.

Id. at 185.

Other courts agree that there must be a direct link between the misrepresentations

and the alleged cause of the price decline.  See, e.g., Lentell, 396 F.3d at 173 (holding that loss

causation requires that "the *subject* of the fraudulent statement or omission was the cause of the

actual loss suffered.") (quoting Suez Equity Investors, L.P., 250 F.3d at 95); In re Fortune

Systems Sec. Litig., 680 F. Supp. 1360 (N.D. Cal. 1987) (holding that "loss causation requires

that the 'damages [of the plaintiff] must be the direct result of the misrepresentations or

omissions'") (quoting In re Wash. Pub. Power Supply Sys. Sec., 650 F. Supp. 1346, 1353 (W.D.

Wash. 1986)); Merrill Lynch, 2005 U.S. Dist. LEXIS 14216, at *20 (noting that where an

"'alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's

loss, it is the materialization of the undisclosed condition or event that causes the loss'") (quoting

In re Initial Pub. Offering Sec. Litig., MDL 1554, Nos. 21 MC 92 & 04 Civ. 3757, 2005 U.S.

Dist. LEXIS 12845, at *27 (S.D.N.Y. June 28, 2005)); In re Alamosa Holdings, Inc., 382 F.

Supp. 2d at 861 ("Loss causation refers to a direct link between the misstatement and a plaintiff's

loss.").

To the extent there had been any debate about the need for the causal link to be

direct, Dura ended that debate.  In Dura, the Supreme Court made clear that the link must be

direct.  It shattered the minority view of some courts that had suggested that even an attenuated

relationship between the alleged misstatements or omissions and the plaintiffs' claimed damages

was sufficient to establish loss causation.  Based on the fundamentals of proximate causation and

the "important securities law objective" of "maintain[ing] public confidence in the marketplace,"

the Court rejected the definition of loss causation adopted by the Ninth Circuit and other courts,

see, e.g., In re Worlds of Wonder Sec. Litig., 35 F.3d 1407 (9th Cir. 1994), which had held that

loss causation was present if the alleged misrepresentation had merely "touched upon" a later

economic loss.  Dura, 125 S. Ct. at 1632-33. The Court instead held, "To 'touch upon' a loss is

not to *cause* a loss, and it is the latter that the law requires." Id. (emphasis in original).


### 2.    General Disclosures Of Negative Results Are Insufficient

It follows from the requirement of a direct link between allegations and the

alleged causes of a loss that when plaintiffs claim specific misrepresentations about the inner

workings of a company, the loss must be occasioned by a specific disclosure of the "truth" about

the specifically identified alleged misrepresentation.  The mere reporting of general, negative

financial results does not itself establish causation.  As circuit courts both before and after Dura

have held, if the subject of the later disclosures does not make clear that the prior statements

were themselves false, there is no loss causation.  Thus, announcing general adverse information

about the company is insufficient.

Recently, in D.E. & J. Limited Partnership v. Conaway, 133 Fed. App'x 994 (6th

Cir. 2005), plaintiffs brought a securities claim alleging that several of Kmart's executives and

its auditor had concealed widespread accounting fraud centering on accounting for rebates and

inventory.  Id. at 996.  Plaintiffs alleged that the class period ended on January 22, 2002 – the

date Kmart issued a press release announcing that it had filed Chapter 11 and its stock price fell.

14

In the press release, Kmart attributed its filing to a combination of factors, including a decline in liquidity resulting from below forecast sales and earnings performance.   But none of these factors were related to inventory or rebates – the subjects of the alleged misrepresentations.   The Sixth Circuit held that there was no evidence of loss causation because

> [a]s to the bankruptcy filing, D.E. & J. never alleged that Kmart's bankruptcy announcement disclosed any prior misrepresentations to the market. . . . ***D.E. & J. has done nothing more than note that a stock price dropped after a bankruptcy announcement, never alleging that the market's acknowledgement of prior misrepresentations caused that drop.***   But the observation that a stock price dropped on a particular day, whether as a result of bankruptcy or not, is not the same as an allegation that a defendant's fraud caused the loss.

Id. at 1000-01 (emphasis added).

Similarly, in Lentell, 396 F.3d at 175 n.4, the Second Circuit held that downgrades of stock recommendations did "not amount to a corrective disclosure . . . because they do not reveal to the market the falsity of the prior recommendations." The alleged misrepresentations must directly link up to the corrective disclosures or the market loss was necessarily caused by something other than the market learning the "truth."

**E.       District Courts Appropriately Dismiss Section 11
          Claims At The Pleading Stage Where It Is Clear On
          The Face Of The Complaint That There Is No Loss Causation**

District courts have relied on the above concepts and reasoning to grant judgment for defendants on a Section 11(e) defense when the facts pled in the complaint make clear that something other than the alleged misrepresentations or omissions was the cause of the claimed loss.   The courts even grant motions to dismiss when the plaintiffs' own allegations of when the "disclosure" occurred do not match the alleged misrepresentations.

For example, in In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 272 F. Supp. 2d 243, mutual fund shareholders sued the issuing firm (Merrill Lynch) under Section 11 alleging it had fraudulently failed to disclose certain transactions with companies whose securities were owned by the mutual funds, and that Merrill Lynch had issued false and misleading analyst reports about those companies in order to artificially boost stock prices and the value of the mutual funds. The court dismissed the Section 11 claims finding that it was "apparent from the face of the complaint" that the alleged stock decline had occurred prior to any disclosure of the allegedly omitted information. Id. at 254 (holding that "[n]o portion of that decline can be attributed to the alleged non-disclosure"). Therefore, the Court concluded that price declines prior to the alleged disclosure of corrective information "may not be charged to Defendants under Section 11." Id. at 255.[5]

Similarly, in the recent case In re Alamosa Holdings, Inc., 382 F. Supp. 2d 832, the district court dismissed a Section 11 claim based on the affirmative defense under Section

---

[5]     The In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation case relied upon an earlier ruling by the Second Circuit, Akerman, 810 F.2d 336. In Akerman, defendant Oryx Communications, Inc. was accused of issuing a registration statement that falsely overstated earnings for the eight-month period before the IPO. The case proceeded to trial because there was a factual debate about when "disclosure" of the alleged misrepresentations to the market had occurred. Plaintiffs claimed that when the misstatement in the registration statement was disclosed to the SEC (months before public disclosure), insiders had traded on this information, and thus the market learned of the misstatements even before the public announcement. However, after extensive discovery, plaintiffs had no facts to support this theory and thus summary judgment was granted to defendants. The Second Circuit affirmed because it was clear that plaintiffs could not establish loss causation because the entire claimed loss occurred prior to the disclosure of the alleged misrepresented facts. It held that "[t]he price decline before disclosure may not be charged to defendants" under Section 11(e). Id. at 342. In relying on Akerman, the district court in In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation made clear that "Although Akerman was decided on summary judgment, its legal principal is not limited to that procedural context." 272 F. Supp. 2d at 255 n.10.

11(e) at the pleading stage.  In that case, plaintiffs claimed that defendant Alamosa, a provider of

wireless cell phone service, had misstated its subscriber numbers and the effect of those

subscriber numbers on uncollectible accounts receivable and revenues.  However, the court

dismissed the case because the complaint alleged the stock plummeted in response to a June 13,

2002 press release "admission" – an admission that did not even mention the challenged numbers

from the registration statement, instead discussing only subscription figures from the post-

registration period.  Id. at 865-66.  The court found that because Alamosa did not even discuss

the figures from the registration statement in that press release, it clearly did not disclose the

"truth" about these statements – and, therefore, it was necessarily something other than the

alleged misrepresentations that caused the stock decline following June 13, 2002.  Id.  The court

concluded that "[i]f the negative causation defense is apparent on the face of a complaint,

dismissal under Rule 12(b)(6) of the Section 11 claim is proper," and dismissed the case.  Id.

In re McKesson HBOC, Inc. Sec. Litig., 126 F. Supp. 2d 1248 (N.D. Cal. 2000),

also dismissed a case based on this reasoning.  In McKesson, four months after the IPO, in April

of 1999, the defendant company announced that it had discovered more than $42 million in

improperly recognized revenue.  Id. at 1253.  Not surprisingly, the stock price quickly and

dramatically declined.  Id.  The court ruled that prior to the corrective disclosure, "the complaint

reveals that the Section 11 defendants have an absolute 'negative causation' defense pursuant to

Section 11(e) for any [] shareholders who disposed of their shares prior to the corrective

disclosure."  Id. at 1262.  Quite simply, prior to the corrective disclosure, there were no damages.

In re Fortune Systems Sec. Litig., 680 F. Supp. 1360 (N.D. Cal. 1987), is also on

point.  There plaintiffs sued under Section 11, claiming various misrepresentations and omissions

in Fortune's Registration Statement regarding problems with its new computer product that had

been causing the losses of orders and customers. Id. at 1363. Defendants moved for partial

summary judgment, alleging that the misrepresentations and omissions could not have caused, as

a matter of law, any of the losses suffered prior to the alleged disclosure of the "truth." Id. The

court agreed with defendants that "the market *could not* react to the omissions until they were

actually learned of," id. at 1365, and thus, granted summary judgment for defendants for those

losses that occurred prior to public disclosure. See In re DNAP Sec. Litig., No. C 99-00048

WHA, 2000 U.S. Dist. LEXIS 13482 (N.D. Cal. Sept. 14, 2000) (dismissing case under Section

11(e) where the affirmative defense was "evident on the face of the complaint").[6]

## II.   DEFENDANTS ARE ENTITLED TO JUDGMENT ON THE PLEADINGS ON ALL OF THE ALLEGED CLAIMS

### A.   There Is No Direct Causal Link Between The Targeted Misrepresentations And The Facts Disclosed In The July 29 Announcement

The allegations in the Amended Complaint focus on several specific alleged

misstatements or omissions regarding Constar's operations at the time of the IPO – statements

about the quality of Constar's machinery, technology, capital expenditures, ability to pass along

resin price increases, and goodwill. Plaintiffs base their entire case on the claim that the truth

---

[6]     Like Akerman, the Second Circuit case relied upon by In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation, Fortune was decided on summary judgment, as opposed to on a motion to dismiss or motion for judgment on the pleadings, because there was disagreement as to when the alleged "disclosure" of the truth to the market had occurred. Here, there is no such issue. Plaintiffs assert that disclosure of the true facts occurred on July 29, 2003 in the press release. No discovery is necessary to evaluate whether those statements in fact did disclose the alleged misrepresentations or omissions of the Registration Statement. If, as defendants contend, the July 29, 2003 announcement of second quarter losses establishes that something other than the alleged misrepresentations and omissions in the Registration Statement necessarily caused the stock decline that followed, defendants are entitled to judgment on their affirmative defense on the face of the pleadings.

behind these alleged misstatements "came to light" on July 29, 2003 with Constar's announcement of its results for the second quarter of 2003.  Amend. Compl. at ¶ 208.  But, it is clear from the press release, Constar said nothing about the operations at Constar at the time of the IPO – more than seven months earlier.  Indeed, none of specific alleged misstatements or omissions, or even the general subjects of those statements, were topics of the press release.  Therefore, even assuming plaintiffs' allegations are true and Constar had made material misrepresentations in the Registration Statement, the market did not learn of any of these misrepresentations or omissions on July 29, 2003.  Therefore, as a matter of law, the misrepresentations could not have affected the market price in the manner identified by the plaintiffs in the Amended Complaint.  No amount of discovery could change this basic fact – it is clear on the face of the Amended Complaint.

Plaintiffs' own Amended Complaint makes clear that they themselves are aware of no *publicly* disclosed facts that suggest any of the statements in the Registration Statement are false.  The initial complaint contained none of the allegations of misstatements found in the Amended Complaint.  Only when plaintiffs found sixteen "confidential witnesses" – former employees with inside, non-public information, did plaintiffs then begin to allege problems with Constar's operations, e.g., its machinery, technology, capital expenditures, etc.  All the facts in the Amended Complaint that plaintiffs offer to prove the falsity of the Registration Statement come from only these *non-public* sources.  Quite simply, there has never been a public "disclosure" of any facts that would cause the market to believe the statements in the Registration Statement were false or misleading.

The market cannot react to facts it does not know.  Based on plaintiffs' own allegations, it is clear that the market did not learn the "truth" about these alleged

misrepresentations in the July 29, 2003 press release identified by plaintiffs and hence, these alleged misrepresentations could not have caused the complained of losses that followed that announcement.  It is clear on the face of the Amended Complaint that there is no direct link between the alleged misrepresentations and omissions and the alleged cause of the stock decline. Therefore, something other than the alleged misrepresentations or omissions necessarily caused plaintiffs' losses.  Accordingly, the defendants are entitled to judgment on the pleadings based on their affirmative loss causation defense under Section 11(e).

**B.**     **There Is No Loss Relating To The Goodwill Claim**

Plaintiffs also allege that, at the time of the Registration Statement, "the $331.8 million of goodwill on [Constar's] books was grossly overstated" and "should have been written down prior to the IPO in accordance with GAAP."  Amend. Compl. at ¶¶ 195, 205.  Plaintiffs allege "the Company finally admitted that its goodwill was impaired" when it announced, in August 2003, that it would incur a writedown of goodwill.  Amend. Compl. at ¶ 203.

Because, as is discussed above, stock price declines prior to the disclosure of a misrepresentation or omission could not have been caused by those misrepresentations or omissions, it follows that once an alleged misrepresentation or omission is disclosed, its effect is measured by the subsequent movement of the stock price.  Therefore, if the alleged disclosure has no negative effect on the stock price, the alleged misrepresentation or omission clearly caused no loss and was immaterial.  Not surprisingly, the Third Circuit has adopted this rationale in a series of cases.  See, e.g., Oran, 226 F.3d at 283; In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410 (3d Cir. 1997).

In Oran, the Third Circuit held:

> [W]hen a stock is traded in an efficient market, the materiality of
> disclosed information may be measured post hoc by looking to the

> movement, in the period immediately following disclosure, of the
> price of the firm's stock.  Because in an efficient market "the
> concept of materiality translates into information that alters the
> price of the firm's stock," if a company's disclosure of information
> has no effect on stock prices, "it follows that the information
> disclosed . . . was immaterial as a matter of law."

226 F.3d at 282 (quoting In re Burlington Coat Factory, 114 F.3d at 1425).  This decision was

based upon the earlier holding in In re Burlington Coat Factory, 114 F.3d at 1425, in which

Judge Alito explained that in an efficient market, "information important to reasonable investors

. . . is immediately incorporated into stock prices" and, thus, "to the extent that information is not

important to reasonable investors, it follows that its release will have a negligible effect on the

stock price."

In looking to the stock price movement, the question is not whether there is *any*

decrease, but whether there is an "appreciable negative effect on the company's stock price."

Oran, 226 F.3d. at 283.  To determine if there was an "appreciable negative effect on the

company's stock price," the district court in Oran examined the closing prices for the four-day

period after the disclosure of the information.  Id.[7]

Applying this same standard to Constar's trading history, it is clear that even if it

is assumed that the August announcement disclosed that Constar's goodwill was impaired at the

time of the IPO nearly eleven months earlier, which defendants dispute, that alleged

misrepresentation was insignificant to the market and caused no loss.  As plaintiffs allege in their

Amended Complaint, Constar first announced it would "record a non-cash charge to earnings for

the second quarter 2003 to reflect the impairment of goodwill under FAS 142."  Amend Comp.

---

[7]    The briefs filed in Oran make it clear that both the trial and appellate courts were
presented only closing prices in determining that the price rose by $3.00 over four days.
The court did not factor in the changes in the stock price throughout the day – ignoring
the open, high and the low of the day.

at ¶ 211 (quoting August 14, 2003 press release). Constar also announced that "the Company expects that the impairment charge will be material." Id. (emphasis omitted). Prior to the announcement, the stock closed at $5.19. The day following the announcement (Friday, August 15) the stock price had *increased* to close at $5.20. Monday morning, the stock opened more than 13% higher, at $5.89. The market was quite obviously not concerned with Constar's need to writedown goodwill.[8]

Because the market deemed this information immaterial as a matter of law, any improper accounting of goodwill at the time of the IPO could not have caused any alleged loss. Thus, once again plaintiffs have failed to establish a critical loss causation link. The defendants are entitled to judgment on the pleadings.

## III.   INDIVIDUAL DEFENDANTS AND CROWN ARE ENTITLED TO JUDGMENT ON THE SECTION 15 CLAIMS

As plaintiffs concede, liability under Section 15 is derivative and must be predicated upon an independent violation of Sections 11 or 12 of the Act. See In re Advanta Corp. Sec. Litig., 180 F.3d 525, 541 (3d Cir. 1999); In re U.S. Interactive, Inc. Class Action Sec. Litig., No. 01-cv-522, 2002 U.S. Dist. LEXIS 16009, at *19 n.7 (E.D. Pa. Aug. 23, 2002); In re EquiMed, Inc. Sec. Litig., No. 98-cv-5374, 2000 U.S. Dist. LEXIS 6209, at *29 (E.D. Pa. May 9, 2000); Gannon v. Continental Ins. Co., 920 F. Supp. 566, 575-76 (D.N.J. 1996). Because the claims under Section 11 fail as a matter of law, the individual defendants and Crown are entitled

---

[8]      The stock did lose this weekend gain as Constar made public its less-than-stellar third quarter results on Monday morning, which contained the value of the impairment, but within four days the stock was again trading above $5.19. There was no appreciable loss caused by the goodwill impairment announcement.

to Judgment on the Section 15 claims asserted against them.  Shapiro v. UJB Fin. Corp., 964

F.2d 272, 279 (3d Cir. 1992).

## CONCLUSION

For the foregoing reasons, the defendants request that the Court enter an Order

granting their motion for judgment on the pleadings.

Respectfully,

Steven B. Feirson
Michael L. Kichline
Michael E. Baughman
Scott A. Thompson
Dechert LLP
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103
(215) 994-2489

Attorneys for Defendants Constar
International, Inc., Crown Cork &
Seal Company, Inc. and the
Individual Defendants

Dated: November 14, 2005

## CERTIFICATE OF SERVICE

I, Scott A. Thompson, do hereby certify that on November 14, 2005, I caused a

true and correct copy of Motion of Defendants for Judgment on the Pleadings, Memorandum of

Law in Support of Motion of Defendants for Judgment on the Pleadings, and a proposed Order,

to be served upon the following by Federal Express or hand delivery as designated below:

**(Hand Delivery)**

Marc J. Sonnenfeld
Karen Pieslak Pohlmann
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-5000

*Attorneys for Defendants Salomon Smith Barney, Inc.,*
*d/b/a Citigroup Global Markets, Inc., Citigroup,*
*Deutsche Bank Securities, Inc., J.P. Morgan Securities, Inc.,*
*and Lazard Freres & Col., LLC*

Deborah R. Gross
Law Offices of Bernard M. Gross, P.C.

Suite 450, John Wanamaker Bldg.
Juniper and Market Streets
100 Penn Square East
Philadelphia, PA 19107
Telephone: (215) 561-3600

*Liaison Counsel for Lead Plaintiffs and the Class*

**(Federal Express)**

Sandy A. Liebhard
Jeffrey M. Haber
Bernstein Liebhard & Lifshitz, LLP
10 East 40th Street, 22nd Floor
New York, NY 10016
Telephone: (212) 779-1414

Steven W. Pepich
Brian O. O'Mara
Lerach Coughlin Stoia & Robinson LLP
401 B Street, Suite 1700
San Diego, CA 92101
Telephone: (619) 231-1058

*Attorneys for Plaintiffs*

Scott A. Thompson, Esquire